**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**FORT MYERS DIVISION**

TERRY LYNN DUNN-FISCHER,

    Plaintiff,

v.    Case No.: _2:26-cv-2121-SPC-KRH_

FIRST CHARLOTTE A.C. & REFRIGERATION, INC., a Florida corporation;

TAYLOR CELLAMARE, individually; DARLENE CELLAMARE, individually;

JOSEPH CELLAMARE, individually; CARMEN C. THOMPSON, individually;

CHARLOTTE COUNTY, FLORIDA, a political subdivision; JACK D. McSTRAVIC,

individually; BEN BAILEY, individually; SHAWN McNULTY, individually; ROGER

H. MILLER III, ESQ., individually; and FARR LAW FIRM, P.A., a Florida professional

association,

    Defendants.

_____/

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, RICO, CONSUMER**

**PROTECTION, AND RELATED CLAIMS**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

"Plaintiff Terry Lynn Dunn-Fischer is a pro se litigant with a court-recognized language-based learning disability, formally acknowledged by the Charlotte County Court on September 25, 2025 (DIN 159). This disability affects the processing and perception of spoken and written language. Rather than being accommodated, Plaintiff's disability was weaponized against her by both opposing counsel and the lower court — opposing counsel repeatedly exploited Plaintiff's language-based processing challenges in the drafting and presentation of orders and proceedings, while the lower court denied equal access to proceedings, failed to provide proper notice of hearing topics, and conducted ambush hearings that exploited the precise cognitive processing challenges Plaintiff's disability creates, foreclosing meaningful participation. This pattern served a consistent purpose: to protect the contractor and county defendants whose misconduct was squarely before the court."

WHY THIS ACTION IS FILED IN FEDERAL COURT:  This is not a rehearing of a state court HVAC dispute. Plaintiff Terry Lynn Dunn-Fischer has no open claims in the Charlotte County state court venue. Her counterclaims were voluntarily withdrawn without prejudice in December 2025 — before any adverse ruling on their merits — after four years of documented judicial conduct demonstrated that the state venue would not fairly adjudicate claims exposing Charlotte County's role in enabling a fraudulent installation. No state court has adjudicated the merits of any claim presented in this

federal complaint. This Court is asked to adjudicate independent federal civil rights claims for the first time.  No consumer agrees to purchase an HVAC system that cannot condition their home. Terry Lynn Dunn-Fischer did not agree to that. She requested and agreed to have a functional HVAC system installed in her investment property. What First Charlotte A.C. & Refrigeration, Inc. installed — designed around pre-selected inventory rather than her home's actual needs, installed by unlicensed workers without the qualifying agent present, passed by a county inspector who arrived without testing equipment and performed no mandatory tests — was not what she or any consumer would agree to, and not what any court should compel her to pay for. A licensed contractor does not have the right to design a system that cannot meet a consumer's home's needs, install it without the proper permit with and by unlicensed workers, and then bill the consumer for it. That proposition is not a legal argument. It is a fundamental principle of consumer protection that this case has spent four years trying to make a court acknowledge.  The consequences of this four-year coordinated fraud and judicial process abuse are not abstract. Plaintiff is a registered nurse who works as a travel nurse — a career that requires mobility and financial stability. Her investment property at 820 Conreid Drive NE, Port Charlotte, Florida was paid off at the time of the fraudulent HVAC installation in August 2022. It represented her financial foundation — her equity, her stability, her ability to make choices about where to live and work.  The fraudulent mechanics lien recorded on August 4, 2022 — filed within 79 minutes of Plaintiff's statutory defect notice, by a contractor whose qualifying agent was not present during the installation, whose unlicensed workers performed every aspect of the work, and whose

3

mandatory inspection documentation does not exist in the county permit file — clouded the title to that property. The subsequent state court judgment enforcing payment for a system three independent contractors confirmed cannot condition the home compounded that cloud.  For four years Plaintiff has been unable to sell her property, unable to refinance, unable to leverage her equity, and unable to make the life decisions that a free and unencumbered property owner has the right to make. Her daughter and grandson have been deprived of opportunities — educational, professional, and personal — that financial mobility would have provided. Plaintiff travels for work not freely but under financial constraint created entirely by the fraudulent acts of the Defendants and the failure of every governmental and judicial protection designed to prevent exactly this result.  This is what four years of coordinated fraud, governmental misconduct, and judicial process abuse costs' a real person. This federal complaint seeks to end it. Much of the extensive procedural history in this litigation is the direct consequence of responding to Defendant Miller's own pattern of procedural noncompliance — late filings, after-the-fact motions seeking to excuse those late filings, self-drafted orders granting his own retroactive relief, and a disproportionate private mediation fee demand made against an indigent pro se litigant — rather than evidence of excessive litigation conduct by Plaintiff. This action is brought in federal court because the state court proceedings that are the subject of this complaint have themselves become the instrument of constitutional violation. This is not an HVAC dispute that has been elevated to federal court because a state litigant is dissatisfied with the outcome. This is a federal civil rights action because the State of Florida — through its court officials, its building

officials, and its licensed contractor regulatory framework — has used state court machinery to deny Plaintiff her constitutional rights while insulating that denial from review. The lower court granted Plaintiff's ADA accommodation and then refused to memorialize it in writing — using that deliberate refusal as the mechanism to her equal access by denying the accommodations' at every subsequent hearing. The lower court imposed a filing bar without findings, without notice, and without a hearing — blocking Plaintiff from raising the court's own procedural failures through the very mechanisms the rules provide for that purpose. The lower court entered void post-jurisdictional orders striking the specific evidence most damaging to a named county defendant. The lower court conducted hearings while audibly inaccessible to an ADA-accommodated pro se litigant who had been denied her recording device — with opposing counsel acknowledging on the official transcript that the judge was difficult to hear, and Plaintiff stating on the record that she could hardly hear the presiding judge. These are not errors. They are a pattern. A pattern in which the state court system used its procedural authority to protect the conduct of state actors and the county permitting officials who validated a fraudulent permit, concealed that validation for four years, and sat silent while active litigation proceeded based on a permit they knew was fraudulent. The State of Florida is bound by federal law. The Americans with Disabilities Act, the United States Constitution, and 42 U.S.C. § 1983 do not yield to state court procedure. When state actors use state court machinery to deny federal constitutional rights — and when that denial is self-protective, designed to insulate the state actors' own conduct from scrutiny before a jury — the federal court is not merely an available forum. It is the

constitutionally mandated forum. There is no other court that can provide the remedy Plaintiff seeks because the court that should have provided it is part of the constitutional violation this complaint documents. Plaintiff respectfully invokes the jurisdiction of this Court and asks that it do what the state court system systematically refused to do: apply the law fairly, without restriction based on pro se status or economic circumstance and provide the due process that the Constitution guarantees to every person — not merely to those with attorneys and resources, but to every person.

1.    Before the first piece of equipment entered Plaintiff's property on August 2, 2022, First Charlotte A.C. & Refrigeration, Inc. had already committed three independent legal violations that made the entire installation impermissible. First, the permit filed was a Level 1 Replacement permit — a permit for swapping existing equipment — in a house that had never had central air conditioning. The work performed was a new installation, not a replacement. The permit did not authorize the work that was done. Second, no pre-installation Manual J, S or D load calculations was performed to determine what size system the property actually required — the state mandatory professional obligation when installing central air in a property that never had it, particularly one with sixty-year-old jalousie windows that are the dominant thermal factor in the property's heat gain and loss profile. Third, every contracting function was performed by unlicensed persons — Taylor and Darlene Cellamare — rendering the contract void and unenforceable under Florida Statutes §489.128. The job should never have been done. Not because of what happened during installation or after. Because before the first tool was picked up, First

6

Charlotte lacked the permit, the load calculation, and the licensed personnel required by Florida law to perform the work. Every damage Plaintiff suffered flows from that foundational fact.

2.    This is a civil rights, consumer protection, and RICO action arising from a four-year pattern of coordinated institutional misconduct involving a contractor operating under a licensed qualifying agent while every contracting function was performed by unlicensed persons, a Charlotte County permitting system/policy that enabled and then concealed permit fraud, and a state court system that systematically denied Plaintiff due process, equal access, and ADA-mandated accommodations in proceedings designed to enforce a void contract supported by fabricated documentation.

3.    Plaintiff is a registered nurse and travel nurse who purchased an investment property at 820 Conreid Drive NE, Port Charlotte, Florida 33952, for cash in January 2021 with intent to renovate and resell. In July 2022, she engaged what she was told was a licensed HVAC contractor to install a central air conditioning system. That representation was false. Every contracting function was performed by unlicensed persons. The licensed qualifying agent signed nothing, supervised nothing, and inspected nothing.

4.    In June 2022, the licensed qualifying agent, Joseph Cellamare, personally visited the property and observed that it had never had central air conditioning — creating mandatory professional obligations to produce Manual J, Manual S, and Manual D calculations before any estimate or permit could be properly generated. He produced

none. Instead, Taylor Cellamare — unlicensed — generated a two-page inventory-based estimate on July 5, 2022, and the permit was filed as a Level 1 Replacement to avoid the load calculation requirement triggered by a proper new installation classification. This created a fatal and documented inconsistency: the two-page estimate describes a brand new complete HVAC system installation — new equipment, new ductwork, new everything — in a house that had never had central air. The permit says replacement. A replacement permit covers swapping existing equipment. It does not authorize installing a complete new system in a property with no prior central air infrastructure. The estimate and the permit describe two different scopes of

work and cannot both be accurate. Roger Miller, attorney for Plaintiff, an employee of Farr and Farr Law firm, has repeatedly argued to the court that the estimate proves Plaintiff agreed to "a total new system." Every time Miller makes that argument he simultaneously confirms that First Charlotte performed new installation work under a replacement permit — constituting permit fraud by misrepresenting the scope of work to the Charlotte County Building Department. Either the estimate controls — new installation work was performed under a replacement permit, constituting permit fraud — or the permit controls — only replacement work was authorized, and First Charlotte exceeded the permit scope. Either way the "passed" inspection is invalid: the county inspected the work under a replacement permit classification while the work actually performed was a new installation requiring different inspection standards, different code

8

compliance requirements, and a pre-installation Manual J load calculation that was never performed.

5. Every document generated by the contractor defendants — the permit submission, the Notice of Commencement, the Claim of Lien, the Housecall Pro platform profile, the Final Payment Affidavit — was prepared in the name 'Terry Dunn-Fischer' rather than Plaintiff's legal name 'Terry Lynn Dunn-Fischer,' without verified identity, authentic consent, or proper authorization. Charlotte County's own permit record correctly identifies the property owner as TERRY LYNN DUNN-FISCHER. Defendant Miller and Farr Law Firm filed and litigated for four years using the incorrect name with actual knowledge of the correct legal name from the deed of record and county tax records — constituting fraud on the court from the date of filing.

6. When the installation failed its first inspection, on August 5, 2022, Charlotte County Deputy Building Official Jack D. McStravic directed reclassification of the fraudulent permit and accepted a retroactive load calculation created and uploaded to the county system the same day — after a defective installation, after a failed inspection, and without any physical corrections to the work. The county's own permit system records the CoolCalc modification date as August 8, 2022, uploaded by contractor account 'firstcharlotte.' That retroactive fabrication became the evidentiary foundation for four years of litigation.

7. On August 3, 2022 — the day after the installation — Plaintiff called Charlotte County Code Enforcement and spoke with investigator Tom Atkinson, seeking

9

guidance on how to get the contractor to fix a system that did not work. Plaintiff did not yet know that the permit had been misclassified or that any documentation would later be fraudulently submitted. Atkinson advised Plaintiff to provide formal Chapter 558 notice to the contractor before filing any complaint against the contractor's license and advised Plaintiff not to pay until the job met code. Plaintiff followed that advice. On August 9, 2022, Plaintiff transmitted the governing R403.7 compliance statute directly to McStravic's county email, still focused on code compliance for the system rather than any known fraud. By 2023, having received no resolution and having determined that the system still did not function correctly despite having passed inspection, Plaintiff requested a formal roundtable meeting to ask Charlotte County directly how a malfunctioning system could pass code. The September 20, 2023, meeting, convened with multiple county officials, did not disclose to Plaintiff that the permit had been misclassified on August 8, 2022, that a retroactive load calculation had been accepted without physical verification, or that the mandatory duct leakage test had never been performed. Rather than answer Plaintiff's direct question honestly, county officials patronized and dismissed her, providing no substantive explanation despite possessing the answer in their own permit file. The County Attorney declared the matter closed on September 27, 2023, while acknowledging no due process mechanism existed for civil rights complaints. Plaintiff did not discover the specific permit fraud — the misclassification, the retroactive CoolCalc submission, and the five categories of falsified data underlying it — until 2025, through her own independent investigation of the permit file. On July 14, 2025, Building Official Shawn McNulty officially admitted in writing

10

that the work was 'a new system installed in previously unconditioned space' —
validating Plaintiff's August 2022 defect reports and confirming what the county had
concealed at the September 2023 roundtable. On March 18, 2026, Bailey issued Charlotte
County's final written refusal to act, explicitly invoking the four-year statute of
limitations.

8.      The deception that began at First Charlotte's door in July 2022 was carried
through four years of state court litigation and laundered into a Final Judgment through
Farr Law Firm and Roger Miller's knowing intentional misrepresentations to the court.
Plaintiff seeks compensatory damages, RICO treble damages, punitive damages, and
attorney fees. One fact anchors the entire case: the Homeowner never paid First Charlotte
a single dollar and withheld the cash payment until the problems were fixed. The Lien
was filed August 4, 2022 — before she paid, before the installation passed inspection,
and before any enforceable debt existed under any valid contract. It was not filed to
collect an unpaid obligation. It was filed to prevent refinancing, lock Plaintiff to the
property and to the dispute, defeat the regulatory mechanism that would otherwise have
applied, and create the legal instrument for a foreclosure sale through which the
contractor could acquire Plaintiff's property using the inflated judgment as currency. The
Florida Department of Business and Professional Regulation declined to investigate
Plaintiff's §489.129 complaint on the ground that no payment had been made —
confirming that the scheme was deliberately structured to defeat the regulatory
mechanism by filing the lien before payment, converting what should have been a

11

contractor licensing enforcement matter into a civil dispute in which the contractor controls the leverage through a recorded lien. The $8,863 invoice was the entry point. The property was always the destination.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims arising under 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. § 12132, 18 U.S.C. § 1962 (RICO), the Electronic Signatures in Global and National Commerce Act (E-SIGN Act), 15 U.S.C. § 7001 et seq., and 42 U.S.C. § 1988.

10.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, including claims under Florida Statutes §§ 117.105, 489.128, 489.119, 713.31, 668.50, and the Florida Deceptive and Unfair Trade Practices Act, § 501.201 et seq., as those claims form part of the same case or controversy as the federal claims.

11.     Venue is proper in the Fort Myers Division of the Middle District of Florida under 28 U.S.C. § 1391(b) because Charlotte County, Florida is a named defendant, the investment property at issue is located in Charlotte County, and a substantial part of the events giving rise to this action occurred in Charlotte County, Florida, which lies within the Fort Myers Division.

12.     The state court proceedings underlying this action were conducted in Charlotte County Court, Case No. 22-000945-CC, and are currently on appeal before the

Florida Sixth District Court of Appeal, Case No. 6D2026-0615. Plaintiff has exhausted available state remedies through four years of lower court proceedings, a pending DCA appeal, a Florida Bar complaint against opposing counsel, formal complaints to Charlotte County Code Enforcement, Contractor Licensing, and the DBPR, and formal notice to Commissioner Joseph Tiseo. Plaintiff's §489.129 complaint to DBPR was declined for investigation on the ground that Plaintiff made no payment to First Charlotte — a regulatory gap the scheme exploited by design. Florida's mechanic's Lien and contractor licensing enforcement framework assumes payment as the triggering condition for most consumer remedies. By filing the lien before payment was made, before the installation passed inspection, and before any enforceable obligation existed, First Charlotte structured the transaction to defeat DBPR jurisdiction while simultaneously creating the title encumbrance that prevented Plaintiff from selling or refinancing the property. A remedy that is structurally unavailable because of the defendant's own conduct is not an unexhausted remedy — it is a foreclosed remedy, and its foreclosure is itself part of the scheme. Plaintiff requests that this Court hold federal claims in abeyance, to the extent appropriate, pending resolution of Case No. 6D2026-0615 to allow full development of the state court record. The May 22, 2026 filing of Defendant's Supplemental Evidentiary Objection to Plaintiff's Motion for Attorney's Fees in the lower court, sworn and notarized, with five authenticated exhibits from official Secretary of State records documenting the contractor's post-litigation corporate title modifications, constitutes additional exhaustion of available state remedies demonstrating that no state-level mechanism exists to remedy the fraudulent lien execution or the institutional concealment

13

documented herein.  Plaintiff voluntarily withdrew her state court counterclaims without prejudice on November 29, 2025 — DIN 220, recorded in the Charlotte County Official Records as Instrument No. 3595418 — before any adverse ruling on their merits, formally stating that her damages exceeded the $30,000 county court jurisdictional limit, that Circuit Court was the proper forum, and that the withdrawal did not constitute an adjudication on the merits and did not bar refiling in the appropriate court. That withdrawal was made after four years of direct observation established that the Charlotte County Circuit Court — whose judicial officers are material witnesses to the constitutional violations alleged herein — was not a neutral forum for claims exposing Charlotte County's role in enabling the fraudulent installation. Plaintiff's determination was correct. Judge Powell's ADA accommodation grant without written order, his November 24, 2025, jury trial denial mischaracterizing a consumer protection case as pure equity, his hostile "how dare you work out of state" statement, and Rouse's verbatim adoption of Miller's proposed Final Judgment fourteen days after taking the bench on a four-year record — all documented in the official record — confirmed that the state venue would not provide what the Constitution guarantees. This Court is the correct and only available forum. The *Rooker-Feldman doctrine* does not bar this action because no state court has adjudicated the merits of any claim presented herein. The *Younger abstention doctrine* does not apply because the DCA appeal is appellate review of a completed proceeding and does not provide a forum for the federal civil rights claims presented here. This action presents independent federal claims, filed in federal court as

14

the constitutionally mandated remedy, after complete exhaustion of every available state remedy.

12a.    On May 26, 2026, the Sixth District Court of Appeal entered an order at DIN 304 directing Plaintiff to file within 20 days a copy of the lower tribunal's order resolving "Defendant's Motion to Stay Enforcement of Final Judgment Pending Appeal," served on April 30, 2026. On May 28, 2026, Plaintiff filed a Notice with the Sixth DCA explaining that the lower court had not ruled on the Motion to Stay despite it having been pending for twenty-eight days. On June 3, 2026, the Sixth DCA denied Plaintiff's Emergency Motion to Stay without prejudice, specifically directing Plaintiff to obtain a ruling from the lower court first under Florida Rule of Appellate Procedure 9.310(a). That order required Plaintiff to return to the lower court and file a Motion for Leave to Set Hearing — seeking permission to request a hearing on a motion the lower court had ignored for thirty-four days. On June 3, 2026, Plaintiff filed the Motion for Leave to Set Hearing in the lower court, attaching the June 3, 2026, DCA order as Exhibit A. The appellate court had to issue two orders — DIN 304 on May 26, 2026, and the June 3, 2026, stay denial — directing the lower court to perform a basic judicial function. The six-step sequence — Motion to Stay filed April 30, JA contacted May 1 with no response, DCA order May 26 directing lower court to act, Notice May 28 explaining no order exists, DCA stay denial June 3 without prejudice, Motion for Leave June 3 just to request a hearing — is documented exhaustion of state remedies demonstrating that no adequate state remedy exists for the access-to-court denial documented herein.

15

## PARTIES

Plaintiff

13.    Plaintiff **Terry Lynn Dunn-Fischer** is a registered nurse (RN, BSN) and licensed mental health professional, and travel nurse, and Florida domiciliary, with thirty-five years of nursing experience working predominantly in the mental health field. She owns the investment property at 820 Conreid Drive NE, Port Charlotte, Florida 33952, purchased for cash in January 2021. Plaintiff has appeared pro se in the underlying state court proceedings for approximately four years. In July 2025 Plaintiff accepted a nursing position with the State of Maine and relocated to Maine with her daughter and grandson — a legitimate state employment position documented in her sworn Affidavit in Support of Application for Indigent Status filed in the Sixth District Court of Appeal, not an act of disrespect toward any court proceeding. On September 25, 2025, Judge Powell granted Plaintiff's ADA accommodation from the bench, ruling that Plaintiff's language-based learning disability "Dyslexia" entitled her to use of AI assistive technology at all hearings and court proceedings, as reflected in the official hearing minutes, DIN 159 — the ADA Accommodation Ruling. No written signed order was ever produced, as Powell refused to sign Plaintiff's proposed order memorializing his own bench ruling. Powell then used his own deliberate refusal to sign the written order as the mechanism to deny the very accommodation he himself had verbally granted — as documented in Plaintiff's sworn indigency affidavit: "Judge Powell verbally granted my ADA accommodation on September 25, 2025, authorizing me to record all proceedings including ZOOM

16

appearances, using AI assisted technology as an accommodation for my documented dyslexia. He then refused to sign the written order memorializing that grant. At the February 6, 2026, hearing he denied me the right to record — using his own deliberate refusal to sign the written order as the mechanism to deny the very accommodation he himself had verbally granted." In January and February 2026, Plaintiff filed multiple motions requesting permission to appear via Zoom so that she would not be required to forfeit her Maine employment and return to Florida. Powell created a case management order in December 2025, making all hearing in person and never ruled on any of those motions — never granted them, never denied them, never acknowledged them — leaving his December 2, 2025, in-person order in full force and effect as a mechanism of economic coercion against a Maine-based travel

nurse with a court-recognized disability. At the February 6, 2026, hearing Powell confirmed on the record that he was aware his order required Plaintiff's physical presence and that he had deliberately refused to grant the pending Zoom motions. In compliance with Powell's case management order Plaintiff was required to forfeit her Maine nursing position, break her Maine lease, forfeit her security deposit, and return to Florida with her daughter and grandson, arriving February 14, 2026. These losses are documented in Plaintiff's sworn indigency affidavit and have nearly exhausted Plaintiff's available credit, with her credit card balance approaching its limit at approximately $8,000 as a direct result of Powell's deliberate refusal to rule on her Zoom motions. The Sixth District Court of Appeal had previously granted indigency in Case No. 6D2025-2863 by

17

order dated December 9, 2025. Despite Plaintiff filing that DCA indigency order in the lower court at DIN 230 on December 11, 2025, Powell refused to honor that determination in the lower court. Plaintiff's presence in Maine during portions of the underlying proceedings constituted legitimate state employment and did not constitute a change of Florida domicile. Powell's sua sponte statement on the certified November 24, 2025, transcript — "how dare you work out of state while you have an open case in court" — constitutes documented judicial hostility toward a travel nurse whose profession was known to the contractor defendants from the date of the installation. The exact language of Powell's accommodation grant is documented in the certified AI-assisted transcript of September 25, 2025 hearing. At timestamp 07:01–07:17, Powell stated: "That is granted. You are more than welcome, either on a Zoom hearing or you're more than welcome, if we have an in-person hearing in the court, to bring a device, laptop, whatever electronic assistance you want to bring using artificial intelligence, you're more than welcome to do that. The court has never had a problem with that, so that's fine." The grant was unconditional, unlimited as to device type, and explicitly covered both remote and in-person proceedings. Powell immediately added a single caution about verifying AI-generated case citations through Westlaw or Lexis — a caution applicable to any litigant, not a limitation on the accommodation itself. Miller was present and did not object, did not qualify the grant, and did not raise any concern. Miller's silence at the moment of the accommodation grant constitutes an admission that the accommodation was proper and uncontested. Following the oral grant, Powell assigned drafting responsibility for a written order to no one. He gave no direction to

18

Miller to prepare an order. He gave no direction to Plaintiff to submit a proposed order. He gave no direction to court staff to prepare a written order. He closed the accommodation topic and moved immediately to case management. The absence of a written order memorializing the accommodation is not attributable to any act or omission by Plaintiff. Powell granted the accommodation orally and assigned no one the responsibility to reduce it to writing. Plaintiff thereafter filed DIN 205 on November 7, 2025 — Defendant's Motion to Clarify and Produce a Clear Order for ADA Accessibility — specifically to obtain the written order Powell had not directed anyone to prepare. Powell never signed a written order in response to DIN 205.

## Defendants

14.    Defendant **First Charlotte A.C. & Refrigeration, Inc**. is a Florida corporation engaged in HVAC contracting, with its principal place of business in Charlotte County, Florida. At all times material, First Charlotte's standard operational practice was to conduct all contracting functions — including customer solicitation, estimate preparation, document execution, permit submission, installation, and lien enforcement — through unlicensed employees and agents, while holding out to the public that its operations were performed by or under the supervision of its licensed qualifying agent, Joseph Cellamare. This practice constitutes systematic unlicensed contracting within the meaning of Florida Statutes §§ 489.127 and 489.128. First Charlotte is vicariously liable for the acts of each individual defendant described herein, each of whom acted within the scope of their employment and in furtherance of First Charlotte's

19

standard business operations. Every document generated by First Charlotte employees in connection with this transaction — including the permit submission, the Notice of Commencement, the Claim of Lien, the Housecall Pro platform profile created without notice or consent, and the Final Payment Affidavit — was prepared in the name 'Terry Dunn-Fischer' rather than Plaintiff's legal name 'Terry Lynn Dunn-Fischer.' No First Charlotte employee at any stage of the transaction examined Plaintiff's government-issued identification or obtained verified consent to create records, establish platform profiles, or file instruments in Plaintiff's name. Charlotte County's own permit record for this property correctly reflects the owner as DUNN-FISCHER TERRY LYNN, as do the Charlotte County Property Appraiser and Tax Collector records — public records accessible to any attorney conducting basic pre-filing due diligence. Despite the absence of verified identity, authentic consent, or proper authorization, Defendants subsequently represented to the state court that these documents constituted a legally binding integrated contract enforceable against Plaintiff. The systematic creation of records in an incorrect legal name, without consent or authorization, and the subsequent attempt to enforce those records as binding obligations, constitutes a deceptive trade practice within the meaning of Florida Statutes § 501.204 and a predicate act of fraud within the meaning of 18 U.S.C. § 1961.

15.    Defendant **Taylor Cellamare** is an individual and, at all times material, an employee and agent of First Charlotte A.C. & Refrigeration, Inc. Taylor Cellamare, the daughter of Joseph Cellamare, was unlicensed to perform HVAC contracting in the State

20

of Florida at all times material to this action and held no license, registration, or certification authorizing her to perform or supervise any contracting function. In performing the contracting functions described herein, Taylor Cellamare acted within the scope of her employment with First Charlotte and in furtherance of First Charlotte's standard operational practice of conducting contracting work through unlicensed persons. Taylor Cellamare created the incomplete cost estimate that formed the basis of the contract, created the Housecall Pro contractor profile in Plaintiff's incorrect legal name without Plaintiff's knowledge, participation, or consent, served as the contact person on the Tropic Supply equipment invoice, and is identified as the document producer on the face of the recorded Claim of Lien, OR Book 5029, Page 1488. Taylor Cellamare transmitted the estimate via interstate text message on July 5, 2022, constituting a wire transmission in furtherance of the scheme to obtain payment for unlicensed contracting. Taylor Cellamare created and submitted the fraudulent retroactive CoolCalc Manual J to the county permit system on August 8, 2022, under contractor account 'firstcharlo,' with false inputs she was instructed to enter by Joseph Cellamare to justify a system already installed rather than to determine the actual thermal requirements of the property. Taylor Cellamare's production of the fraudulent Claim of Lien, which was recorded in the Charlotte County Official Records on August 4, 2022, directly caused the clouding of title on Plaintiff's property at 820 Conreid Drive NE, Port Charlotte, Florida 33952 — preventing sale, blocking refinancing, and eliminating Plaintiff's access to equity for four years. The Claim of Lien is invalid on its face because it was produced by an unlicensed person in furtherance of a void contract under Florida Statute §489.128, making the title

21

clouding damages Taylor Cellamare's individual responsibility. Taylor Cellamare is sued individually.

16.    Defendant **Darlene Cellamare** is an individual and, at all times material, an employee and agent of First Charlotte A.C. & Refrigeration, Inc. Darlene Cellamare, the wife of Joseph Cellamare, was unlicensed to perform HVAC contracting in the State of Florida at all times material to this action and held no license, registration, or certification authorizing her to perform or supervise any contracting function. In performing the contracting functions described herein, Darlene Cellamare, deemed the manager, not the qualified agent, acted within the scope of her employment with First Charlotte and in furtherance of First Charlotte's standard operational practice of conducting contracting work through unlicensed people. Darlene Cellamare made the initial representation to Plaintiff that the company was licensed, was present at the July 12, 2022 Notice of Commencement signing, signed the Claim of Lien as 'Manager' on August 4, 2022 (OR Book 5029, Pages 1487–1488, INSTR #3136320) without valid corporate authority as an unlicensed person, and signed the Contractor's Final Payment Affidavit on August 19, 2022, falsely swearing under oath that all work had been fully completed — a statement she knew to be false because she had personal knowledge that the first inspection had failed on August 5, 2022, that the living room received zero drops, and that no physical corrections were ever made to the installation. That false sworn statement was recorded in the Charlotte County Official Records through the county's electronic recording system. Darlene Cellamare's signing of the fraudulent

22

Claim of Lien as the named signatory, combined with her false sworn Final Payment Affidavit, makes her individually liable under Florida Statute §713.31 for all damages caused by the fraudulent lien — including four years of clouded title on Plaintiff's property, $96,000 in foregone rental income, loss of 2022 peak Southwest Florida market sale value, and all litigation costs flowing from the invalid lien. Darlene Cellamare is sued individually.

17.    Defendant **Joseph Cellamare** holds Florida HVAC contractor license CAC057579 and is the licensed qualifying agent of First Charlotte A.C. & Refrigeration, Inc. on record with the DBPR. Joseph Cellamare is an employee and the sole licensed agent of First Charlotte at all times material to this action. In June 2022, Joseph Cellamare personally visited the property at 820 Conreid Drive NE, Port Charlotte, Florida 33952, to assess its HVAC needs. That site visit established as a matter of professional obligation that the installation would constitute a first-time central HVAC installation in a home that had never had central air conditioning — a condition the contractor's own two-page estimate confirmed with its first line item: Home has never had air.' Joseph Cellamare's June 2022 site visit triggered mandatory professional obligations to produce, at minimum, a Manual J residential load calculation, a Manual S equipment selection document, and a Manual D duct design document based on actual site conditions. He produced none prior to the estimate or installation. Joseph Cellamare personally observed during his June 2022 assessment that the property had floor-to-ceiling jalousie windows across the front, zero wall insulation, an uninsulated concrete

slab, and approximately 50-year-old degraded blown-in ceiling insulation. Rather than designing the system based on those actual observed conditions, Joseph Cellamare designed the system around equipment he had predetermined to install — most likely from existing inventory — and thereafter instructed Taylor Cellamare to create a CoolCalc Manual J load calculation with falsified inputs that would artificially reduce the calculated load to justify the predetermined equipment selection. Every falsified input — R-11 wall insulation instead of zero, NFRC-rated clear glass instead of jalousie, R-21 ceiling insulation instead of degraded blown-in, R-10 slab insulation instead of zero — worked in the same direction, artificially reducing the load. Not one input was wrong in the direction that would have required a larger system. This is not error — it is a predetermined outcome. Joseph Cellamare knew from his personal observation that the living room was the largest room surrounded by solid walls, yet the installation included zero supply drops to the living room — the room his own CoolCalc showed requiring 5,501 BTU/H of cooling. The Tropic Supply invoice confirms the 5kW heat strip installed was not purchased for this job and is designated emergency use only — the smallest heat strip available and wholly inadequate for a home with the characteristics Joseph personally observed. The heat strip installed bears its own serial and model number but does not appear on the Tropic Supply invoice, indicating it was sourced from existing contractor inventory rather than purchased new for this installation, while the estimate falsely represented a 10-year warranty on all essential parts. Joseph Cellamare thereafter created and submitted fraudulent affidavits to the court in the underlying state court proceedings, swearing to facts he knew to be false based on his personal

observations — including affidavits supporting the adequacy of the system design and installation. Joseph Cellamare permitted the permit to be filed as a Level 1 Replacement — a classification he knew from his own site visit to be false — to avoid the rigorous documentation requirements triggered by the correct Level 2 Alteration classification. He thereafter appeared at the property on approximately August 2, 2022, for approximately fifteen to twenty minutes, gave verbal instructions without a written diagram, and left without completing supervisory inspection, returning August 3, 2022, solely to demand payment. He signed no contract, no lien instrument, and no load calculation, and performed no qualifying agent functions required by Florida Statutes §§ 489.119 and 489.105(4). His license was used by First Charlotte to provide false legitimacy to a transaction conducted entirely by unlicensed employees. As qualifying agent, Joseph Cellamare is individually responsible under Florida Statute §489.119 for all work performed under his license by unlicensed persons, regardless of the corporate structure of First Charlotte A.C. & Refrigeration, Inc. Joseph Cellamare is sued individually.

18.    Defendant **Carmen C. Thompson** is a Florida Notary Public, Commission No. HH 235773, and was at all times material an employee and agent of First Charlotte A.C. & Refrigeration, Inc. As a commissioned Florida notary public, Thompson was independently bound by Florida Statutes § 117.107 to refuse to notarize a document if the signer was not in her presence, and by § 117.105 which makes false notarization a felony of the third degree — obligations that exist separately from and in addition to any employment relationship. In performing the notarization described herein, Thompson

acted within the scope of her employment with First Charlotte and in furtherance of First Charlotte's practice of processing contractor documentation through its own employees regardless of legal requirements. On July 13, 2022, Thompson notarized the Notice of Commencement, OR Book 5018, Page 473, certifying that Plaintiff personally appeared before her — when Plaintiff had in fact signed the document on July 12, 2022, at First Charlotte's office during her lunch break, as confirmed by the July 11, 2022, email chain, and was not present before Thompson on July 13 or any other date. The notarization block recorded the name 'Terry Dunn-Fischer' rather than Plaintiff's legal name 'Terry Lynn Dunn-Fischer,' demonstrating that no government-issued identification was examined. Thompson was an employee of First Charlotte A.C. & Refrigeration, Inc., the direct beneficiary of the NOC being recorded — making her an interested party notary whose notarization is void under Florida notary law on that ground alone. Thompson's false notarization is the proximate cause of a complete causal chain of harm: the false notarization allowed the NOC to be recorded on July 14, 2022; the recorded NOC activated Permit No. 20220729013; the activated permit authorized unlicensed workers to perform the August 2, 2022 installation under cover of a facially valid permit; the permit gave the county inspector jurisdiction to conduct the August 5 inspection which failed; the failed inspection triggered the fraudulent retroactive CoolCalc submission on August 8; the county's acceptance of the fabricated CoolCalc on August 10 provided the governmental validation that became the evidentiary cornerstone of four years of litigation against Plaintiff. Without Thompson's false notarization there is no recorded NOC, no valid permit, no inspection, no retroactive CoolCalc, no governmental

26

validation, and no four-year litigation. Every category of harm Plaintiff suffered —

clouded title, foregone rental income, lost 2022 peak market sale, litigation costs, lost

travel nursing income — flows directly and proximately from Thompson's individual act

of notarizing a document she never witnessed being signed, for an employer who was the

interested beneficiary, writing the wrong name because she never examined

identification. Thompson is sued individually.

19.     Defendant **Charlotte County, Florida**, is a political subdivision of the

State of Florida. Charlotte County operates a building and permitting system that, at all

times material, had no identity verification mechanism to confirm that permit applicants

were the licensed qualifying agents they claimed to represent — confirmed by the

permit's issuance under account "ADMIN ADMIN" via "Automated Issuance" by

PUBLICUSER13897 with no named responsible individual. Charlotte County's own

permit record for Permit No. 20220729013 correctly identifies the property owner as

DUNN-FISCHER TERRY LYNN while accepting every contractor-generated document

bearing the incorrect name "Terry Dunn-Fischer" without flagging the discrepancy.

Miller's own discovery record establishes that Taylor Cellamare — an unlicensed

individual identified in First Charlotte's own produced documents as Office Manager —

was the individual who handled the permit submission process using Joseph Cellamare's

licensed contractor credentials, CAC057579. That submission constitutes unlicensed

contracting under Florida Statute § 489.127, a criminal violation. The electronic

submission of a permit application by an unlicensed individual using a licensed

27

contractor's credentials through Charlotte County's online portal constitutes a wire fraud predicate under 18 U.S.C. § 1343. Charlotte County's permitting infrastructure accepted that unlicensed submission, McStravic retroactively validated the defective permit derived from it, and county officials at multiple levels knew of this conduct and chose silence over correction. Charlotte County's liability under Monell arises from an official policy or unspoken custom of accepting retroactive documentation to validate defective permits rather than voiding them and requiring new applications — a practice that protects contractors at the expense of homeowners and that was implemented by McStravic, ratified by McNulty through written acknowledgment and inaction, and concealed by the county attorney's post hoc assessment that buried the county's exposure rather than correcting the record. The county's position that it could not intervene because the matter was in active litigation inverts the actual sequence of events. The county's failure to act correctly on August 8, 2022, is what made the matter a legal dispute. The county's failure to correct the record in September 2023 when it had actual knowledge of the fraud is what kept the matter in litigation. The county's continued silence through March 2026 is what allowed a final judgment to be entered based on a permit validation the county knew was fraudulent. The county did not stay out of a legal matter — it created a legal matter, concealed its role in creating it, and then cited the existence of that legal matter as its justification for continued concealment. A state court action against Charlotte County would be an inappropriate venue for these claims. Florida Statute § 768.28 sovereign immunity protections, damage caps, and pre-suit notice requirements were designed for ordinary tort claims — not for institutional Monell

28

violations in which the county's own permitting infrastructure was the mechanism through which criminal unlicensed contracting was converted into an officially validated permit, protected through four years of institutional silence, and shielded by a county attorney's deliberate decision not to correct the record during active litigation. Federal court under 42 U.S.C. § 1983 is the correct and only appropriate venue for these claims. Congress enacted § 1983 specifically to provide a federal remedy when state and local government actors violate constitutional rights and state courts either cannot or will not provide adequate relief — precisely the circumstance presented here, where the judicial conduct of the state court is itself part of the factual narrative. Charlotte County is named as a defendant under 42 U.S.C. § 1983 for Monell liability arising from its policies, practices, and customs and for ADA Title II violations arising from its judicial and quasi-judicial proceedings.

20.    Defendant **Jack D. McStravic** was, at all times material, Deputy Building Official of Charlotte County Community Development, as confirmed by his own email signature block — a policymaking position within the department. McStravic has since departed Charlotte County employment, confirmed by Building Official Shawn McNulty's July 14, 2025, written statement. On August 8, 2022, McStravic reclassified Plaintiff's permit from Level 1 Replacement to Level 2 Alteration — formally acknowledging the original classification was fraudulent — and on the same date directed acceptance of a retroactive CoolCalc load calculation uploaded to the county system by contractor account "firstcharlo," commenting: "No additional work being done for

customer. Please finalize inspection. Thank you." On August 9, 2022, Plaintiff transmitted the full text of R403.7 directly to McStravic's confirmed county email jack.mcstravic@charlottecountyfl.gov. He approved the installation August 10 without requiring compliance with a single provision. McStravic's August 8, 2022, conduct was not a neutral administrative decision — it was a series of affirmative acts that transformed a failed inspection into a passed inspection by accepting a fabricated retroactive document rather than voiding the permit and requiring a new application as the correct procedure mandated. That affirmative choice — made by a Deputy Building Official with policymaking authority — became the foundation upon which First Charlotte based four years of litigation. The permit validation McStravic created on August 8, 2022, is the same validation Miller cited repeatedly as proof of adequate performance throughout those four years. The county created the conditions for the litigation and then used the litigation as its shield against accountability — claiming it could not intervene in an active legal dispute while that dispute existed only because of the county's own prior failure to act correctly. McStravic is sued individually. His personal address for service is to be confirmed through county records.

21.     Defendant **Ben Bailey is Community Development Director**, Building Official, and Floodplain Manager of Charlotte County Community Development, 18400 Murdock Circle, Port Charlotte, FL 33948, ben.bailey@charlottecountyfl.gov, 941.743.1211. Bailey's individual liability attaches from August 11, 2022 — the morning after Plaintiff's defective-system complaints — when Plaintiff transmitted the first of four

30

documented direct written communications to Bailey regarding the malfunctioning system. Bailey responded to Plaintiff's August 19, 2022, second email by claiming not to have received the August 11 email sent to the identical address — a non-credible denial constituting an affirmative evasive act. Bailey received four documented written communications between August 11, 2022, and July 5, 2023, participated in the September 20, 2023, formal roundtable meeting convened specifically regarding Permit No. 20220729013, and on March 182026,26 issued Charlotte County's final written refusal: "At this time, no further action will be taken by Charlotte County regarding this permit" — issued the same day Plaintiff explicitly invoked the four-year statute of limitations in writing. The September 20, 2023, roundtable is of particular significance. By that date Plaintiff had been in active litigation for nearly one year, having repeatedly reported that the installed system did not function properly despite having passed inspection. Plaintiff requested the roundtable specifically to ask the county how a malfunctioning system could have passed code. Plaintiff did not yet know, and had not yet documented, the specific CoolCalc falsification issues that she would not discover until 2025. Bailey and the other county officials present at the roundtable possessed the answer to Plaintiff's question in the county's own permit file — the August 8, 2022 misclassification and retroactive CoolCalc acceptance — and chose not to disclose it, instead patronizing and dismissing Plaintiff's inquiry without substantive explanation. The Charlotte County Attorney participated in or assessed the September 2023 roundtable in her official capacity as legal representative of the county. Her assessment after the fact — made with knowledge that the county's own permitting conduct was the

31

subject of active litigation — and her failure to acknowledge the problem, correct the permit record, refer the matter to higher authority within the county's governmental structure, or disclose the county's conduct to the court, constitutes a deliberate institutional decision to protect the county's legal exposure at Plaintiff's expense. Under Florida Bar Rule 4-1.13 an attorney representing an organization who knows that an officer or employee has engaged in conduct that is a violation of law must refer the matter to higher authority within the organization. The county attorney's failure to do so — or higher authority's failure to act if she did refer it — is a policymaker-level decision binding the county under Monell. The roundtable produced no official minutes. Plaintiff's Chapter 119 public records request seeking the minutes and electronic permit submission records produced no responsive documents. The absence of minutes from an official governmental meeting convened specifically to address Plaintiff's direct question about how a malfunctioning system passed code is itself evidence of institutional concealment, particularly given that the county possessed but withheld the answer it later admitted in writing in 2025. Bailey and the other roundtable participants had the authority and the professional obligation to correct the permit record, notify the court, or refer the matter for investigation. They chose none of those options. Under 42 U.S.C. § 1983, a government official who is present and aware of a constitutional violation and has the ability to prevent continued harm but chooses not to act is liable for that failure to intervene. From September 20, 2023, forward, Bailey's silence was not neutrality — it was knowing failure to intervene in an ongoing constitutional violation that the county's own prior conduct had set in motion. Bailey is sued individually.

32

22.    Defendant **Shawn McNulty is Building Official** and Floodplain Administrator of Charlotte County Community Development, shawn.mcnulty@charlottecountyfl.gov, 941.743.1314. McNulty was newly hired by Charlotte County in or around September 2023 and was present at the September 20, 2023, formal roundtable meeting in a design capacity. As a new employee who was not involved in the August 2022 permitting decisions, McNulty did not have and could not be expected to have institutional authority or personal knowledge of the August 2022 events at that meeting. His September 2023 presence is context, not a primary liability anchor. McNulty's individual liability attaches from his July 2025 conduct in his fully established role as Charlotte County's Building Official. By July 2025 McNulty had access to the full permit history, the complete record of what happened in August 2022, and the full context of nearly three years of active litigation. On July 14, 2025 — in his official capacity as Building Official — McNulty issued a written response to Plaintiff's demand letter that constitutes Charlotte County's official institutional position, admitting: "The building department later learned that the scope of work was not a change out/replacement of existing equipment, but rather a new system installed in previously unconditioned space." This admission, by Charlotte County's Building Official, validates in writing every position Plaintiff has maintained since August 3, 2022. McNulty's July 14, 2025, written admission is significant precisely because it was made with full institutional knowledge — by a policymaker who had the complete record before him, who understood the admission's implications for active litigation, and who nonetheless issued a written acknowledgment of the misclassification and took no corrective action.

33

McNulty's admission directly contradicts Miller's June 20, 2025, discovery filing arguing the Replacement permit classification was valid because the installation replaced wall unit air conditioners. Miller filed his wall unit replacement theory on June 20, 2025. McNulty issued his written admission contradicting that theory on July 14, 2025 — less than thirty days later. A supervisory official who issues a written acknowledgment of a constitutional violation and takes no corrective action has ratified that violation. Under Monell, ratification by a policymaker is sufficient to establish municipal liability. McNulty's July 14, 2025, written admission is the county's own Building Official ratifying McStravic's August 8, 2022, conduct through deliberate inaction nearly three years after the fact — made with full knowledge, during active litigation, with a formal written acknowledgment that simultaneously confirmed the problem and buried it. McNulty is sued individually.

23.    Defendant **Roger H. Miller III, Esq.,** Florida Bar No. 055908, is a partner at Farr Law Firm, P.A. At all times material, Miller served as counsel for First Charlotte A.C. & Refrigeration, Inc. and the Cellamares in the underlying state court proceedings. Miller advanced the Housecall Pro 'Customer Approved' theory after discovery closed — based on a profile created in Plaintiff's incorrect legal name, on an account Plaintiff never opened, through a verification process Plaintiff never completed — and misrepresented the platform amount to the court (stating $8,863.00 when the platform record shows $8,853.00). Miller submitted a proposed Final Judgment containing a false Maine residency statement with actual knowledge from the transcript of Plaintiff's travel nurse

34

status. His cover letter stated 'We request that you enter same.' Judge Rouse signed the order the morning after receiving Plaintiff's written objection identifying false statements. Miller submitted and relied upon contractor-generated instruments bearing the name 'Terry Dunn-Fischer' with actual and constructive knowledge that those instruments did not bear the legal name of the property owner of record. The Housecall Pro theory is documented as trial by ambush by the filing record itself: when Plaintiff filed her Second Updated Amended Answer and Counter Complaint, DIN 91, on or about March 31, 2025 — granted by Powell at the May 30, 2025, hearing — Miller's responsive pleading was due within twenty days under Florida Rule of Civil Procedure 1.140, making the deadline June 19, 2025. Miller filed his Answer and Affirmative Defenses to Defendant's Second Amended Answer and Counter Complaint on June 20, 2025 — one day late — without prior leave of court. Miller then filed a motion after the fact, DIN 102, seeking to excuse the lateness, which cited inapplicable federal rules and was stricken at the November 24, 2025, omnibus hearing. Miller thereafter filed a second motion, DIN 125, seeking extension of time, which was granted through his own DIN 221 order. The June 20, 2025, late filing — sixteen pages addressing the contract, the Lien, the CoolCalc, and multiple affirmative defenses — contains no mention of Housecall Pro anywhere in the document. Not once in sixteen pages does Miller identify Housecall Pro as the contract formation mechanism, as a platform through which Plaintiff approved the work, or as evidence of any kind. The operative contract theory in Miller's last filed pleading before the Housecall Pro theory appeared was the Estimate plus the Notice of Commencement. Housecall Pro emerged after this pleading cycle closed, after discovery closed, and in a

35

context where Plaintiff had no opportunity to conduct targeted discovery on the platform records, the account creation process, the identity verification failure, or the Customer Approved versus Pro Approved distinction. Furthermore, in his June 20, 2025, pleading Miller admitted at paragraph 12 that First Charlotte 'initially did not submit the Florida Building Code Energy Conservation R403.7 with the permit application' — a sworn admission that the permit was filed without mandatory documentation. At paragraph 22 Miller admitted that 'the Load Calculation Report was submitted to Charlotte County Building Department on August 8, 2022, after the scheduled final inspection on August 5, 2022' — a sworn admission that the CoolCalc was retroactive. At paragraph 13 Miller claimed the Replacement permit classification was accurate because the installation was 'replacing wall-unit air conditioners' — a new theory never pleaded in the original complaint, directly contradicted by McNulty's July 14, 2025, official written admission that the work was 'a new system installed in previously unconditioned space,' issued less than thirty days after Miller's wall-unit replacement theory was filed. Miller's Reply and Motion to Strike, also filed June 20, 2025, attached the fabricated CoolCalc as Exhibit A and submitted it to the court as proof of system adequacy — thereby introducing into the court record a document containing all five falsification categories Plaintiff had identified, including Venice Pier weather station, nonexistent R-11 wall insulation, NFRC-rated clear glass windows applied to jalousie units, nonexistent R-10 slab insulation, and the living room room detail showing 5,501 cooling BTUH required for the room that received zero supply drops. Miller filed the fabricated CoolCalc as his own exhibit and relied upon it as proof of adequacy while it simultaneously documented the

36

falsification of every material input. The discovery record confirms the Housecall Pro theory was introduced to Plaintiff for the first time through Miller's own discovery request. In First Charlotte's First Request for Production served September 29, 2025 — Request No. 2 — Miller asked Plaintiff to produce all text messages and emails received from "Housecall Pro" or any third party related to the estimate. In Plaintiff's sworn response filed November 15, 2025, Plaintiff stated: "Defendant is not aware of any communications from Housecall Pro." That sworn response documents that September 29, 2025, was the first time Plaintiff had ever encountered the name Housecall Pro — three years after the installation, after discovery had effectively closed, and shortly before Miller advanced Housecall Pro as the contract formation mechanism in summary judgment proceedings. If Plaintiff had approved an estimate through Housecall Pro as a customer, she would have received a platform email notification — the very document Miller asked her to produce. She had none. Because none were ever sent. Because the "Customer Approved" designation was entered from the contractor's own PRO account on July 5, 2022 — the same day the estimate was texted to Plaintiff — not through any customer-facing authentication. The contractor-side Housecall Pro screenshots produced in discovery, captured September 4, 2025 from the URL https://pro.housecallpro.com/app/estimates/est_c848d87870984ef6a0ab8767e12122ca — the contractor's own PRO account portal, inaccessible to any customer — show the approval notation as "Approved by Terry Dunn-Fischer on 07/05/2022," entered in the incorrect legal name Terry Dunn-Fischer rather than Terry Lynn Dunn-Fischer, with no customer account, no login, no identity verification, and no E-SIGN Act compliant

37

electronic signature process. The same screenshots show First Charlotte tagged Plaintiff's customer profile as "DO NOT SERVICE" and "DO NOT RETURN" while simultaneously pursuing a foreclosure judgment against her property. First Charlotte's discovery production further confirms the supervision fraud through the Housecall Pro invoice for Job #356230, dated August 2, 2022: under "Service completed by" the invoice lists Gary Battaglia, Jed Alston, Blade Thompson, Billy Thompson, and Joe Cellamare — five individuals, with Joseph Cellamare listed last as a crew member alongside four unlicensed workers, not as a supervising qualifying agent. This invoice constitutes First Charlotte's own business record confirming that Joseph Cellamare was present as a co-worker, not a supervisor — consistent with Request 24's sworn admission that no documents showing supervision by Joseph Cellamare exist. The same invoice shows the condensing unit, air handler, and heater all listed at $0.00, confirming these components were sourced from existing contractor inventory rather than purchased for this job, and reflects an amount due of $9,085.00 — not the $8,863.00 Miller represented to the court. In December 2025, after Plaintiff had filed for indigent status in the lower tribunal, Miller initiated a private mediation arrangement through Wotitzky Mediation Center, LLC totaling $1,350 — $675 per party on a 50/50 split — rather than utilizing Charlotte County's mediation program, which cost only $60. Miller's $675 fee demand, invoiced December 5, 2025, with payment due by December 10, 2025, was issued without providing Plaintiff notice of estimated costs or fee responsibility prior to scheduling and was demanded of Plaintiff despite her having no open counterclaims at that time, those claims having been voluntarily withdrawn for improper venue. Miller's

38

$675 fee demand directly compelled Plaintiff to file an Application for Determination of Civil Indigent Status in the lower tribunal on December 4, 2025, and a formal Objection to Mediation Fees on December 5, 2025, citing the absence of informed consent, the absence of any open claims subjecting her to mediation costs under Florida Statute §44.102, and her documented indigent status. Plaintiff's objection succeeded; she paid nothing. When mediation ultimately proceeded through the Charlotte County mediation program, it lasted approximately 15 minutes and cost $60 total — paid entirely by Miller's own client, First Charlotte A.C. & Refrigeration, Inc. The $1,350 private arrangement Miller initiated was therefore unnecessary and disproportionate, served no legitimate litigation purpose, exposed his own client to needless expense, and had as its only practical effect the forced filing of protective legal documents by an indigent, disabled, pro se litigant against her own opposing counsel's fee demand. Much of the procedural volume in this litigation traces directly to Miller's own conduct. Miller's Answer and Affirmative Defenses, due June 19, 2025, under Florida Rule of Civil Procedure 1.140's twenty-day deadline, was filed one day late on June 20, 2025, without prior leave of court. Miller then filed DIN 102 after the fact seeking to excuse the lateness — citing inapplicable federal rules — which was later stricken at the November 24, 2025, omnibus hearing. He then filed a second motion, DIN 125, seeking extension of time, which was granted through his own self-drafted order, DIN 221. Each of these instances — the late filing, the improper excuse motions, the self-drafted retroactive order, and the disproportionate mediation fee demand — required Plaintiff, as an indigent pro se litigant, to respond, object, and engage procedurally simply to protect her position.

39

The volume of Plaintiff's filings throughout this litigation is the direct and necessary consequence of Miller's own pattern of procedural misconduct, not evidence of vexatious or excessive litigation conduct by Plaintiff. Miller is sued individually.

At the certified November 24, 2025, omnibus hearing — six weeks before filing his Motion for Summary Judgment claiming full performance of the HVAC installation contract — Miller was directly confronted with evidence that a mandatory system component could not be accounted for. Plaintiff identified on the certified record that the installed thermostat was a Honeywell product — a different manufacturer from the Allied system specified in the estimate — and stated: "It's not an Allied thermostat, Your Honor. It's a Honeywell thermostat. It's an essential item." Miller responded on the same certified record: "I will endeavor to obtain any paperwork that exists on the thermostat in particular. I don't know if that is a component that comes with the unit or not." Certified Transcript of November 24, 2025, Hearing, pp. 60–64. Judge Powell thereupon entered a court order directing Miller to supplement his discovery response with thermostat documentation within 20 days — a deadline of approximately December 14, 2025. Plaintiff corrected Powell's reference to manufacturer as distributor, establishing on the certified record that First Charlotte's documented purchase source was Tropic Supply — and the Tropic Supply distributor invoice for this job contains no thermostat line item of any kind. Miller filed his Motion for Summary Judgment on December 31, 2025 — after the court-ordered deadline — without any thermostat documentation in the MSJ, without any thermostat documentation in the Hoff affidavit, and without any thermostat

40

documentation anywhere in the record. Miller's failure to comply with Powell's court-ordered discovery supplementation directive, followed six weeks later by filing a Motion for Summary Judgment claiming full and complete performance while knowing he could not account for a mandatory component's brand, source, specification, warranty, or installation location, constitutes obstruction of discovery under 18 U.S.C. §1503 and an additional predicate act of fraud on the court — filing a dispositive motion on full performance with actual knowledge that a mandatory system component was entirely undocumented and unaccounted for.

24.    Defendant **Farr & Farr Law Firm, P.A.,** is a Florida professional association, 99 Nesbit Street, Punta Gorda, FL 33950. Winston S. Hudson, Esq., Florida Bar No. 1033252, of Farr Law Firm, filed the original state court complaint on October 10, 2022, Filing No. 158910654, containing three provably false statements of fact at paragraphs 7, 8, and 10 — each refuted by Charlotte County's own timestamped permit records. The complaint was captioned against 'TERRY DUNN-FISCHER' — not Plaintiff's correct legal name — while the Charlotte County permit record correctly identified the owner as DUNN-FISCHER TERRY LYNN. Farr Law Firm's institutional liability for fraud on the court runs from October 10, 2022. Miller thereafter inherited and extended that fraud through four years of litigation. Farr Law Firm is sued for institutional liability.

**Interested Parties and Material Witnesses**

24a.    The **Honorable Michael Powell, County Judge, Charlotte County**, Florida, Twentieth Judicial Circuit, Charlotte County Justice Center, 350 E. Marion Avenue, Punta Gorda, FL 33950, is identified as an interested party and material witness. Judge Powell presided over the underlying state court proceedings in Case No. 22-000945-CC from 2023 through January 2026. Judge Powell is not named as a defendant. He is identified as a material witness to the following events, each documented in the certified record: the oral grant of Plaintiff's ADA accommodation on September 25, 2025 (DIN 159); his refusal to sign a written order memorializing that accommodation; his subsequent use of his own refusal to sign as the mechanism to deny the very accommodation he had verbally granted at the February 6, 2026 hearing — as documented in Plaintiff's sworn indigency affidavit filed in the Sixth District Court of Appeal; his conferral of order-drafting authority on opposing counsel after Plaintiff prevailed at the May 30, 2025 hearing; his signature on DIN 221 containing the incorrect year and bundling counsel's own unruled-upon motion; his denial of his own recusal without transfer for sufficiency review in violation of Florida Rule of Judicial Administration 2.330; his sua sponte statement "how dare you work out of state while you have an open case in court" documented in the certified November 24, 2025 transcript; his restructuring of case management on December 2, 2025 to require in-person attendance with actual knowledge that Plaintiff held a full-time State of Maine nursing position and resided in Maine with her daughter and grandson; his deliberate refusal to rule on Plaintiff's multiple Zoom motions filed in January and February 2026, leaving the in-person requirement in force as a mechanism of economic coercion that

42

forced Plaintiff to forfeit her Maine nursing income, break her Maine lease, lose her security deposit, and relocate to Florida — all documented in Plaintiff's sworn indigency affidavit; his confirmation at the February 6, 2026 hearing that he was aware his order required Plaintiff's physical presence and had deliberately refused to grant the pending Zoom motions; his refusal to honor the Sixth District Court of Appeal's December 9, 2025 indigency determination after Plaintiff filed it in the lower court at DIN 230; and his appearance without docket authority at the February 6, 2026 hearing, at which he denied Plaintiff the ability to record the proceedings. Judge Powell's conduct is described in the Factual Background solely to provide context for the federal claims asserted herein. No claim for damages is asserted against Judge Powell in this action.

24b.    The **Honorable Turner A. Rouse, County Judge, Charlotte County**, Florida, Twentieth Judicial Circuit, Charlotte County Justice Center, 350 E. Marion Avenue, Punta Gorda, FL 33950, is identified as an interested party and material witness. Judge Rouse was appointed to the Charlotte County bench by Governor DeSantis in January 2026 and presided over the final dispositive phase of Case No. 22-000945-CC. Judge Rouse is not named as a defendant. He is identified as a material witness to the following events, each documented in the certified record: his denial of Plaintiff's ability to record the February 23, 2026 hearing — a direct denial of the AI assistive technology accommodation granted by Judge Powell and documented in DIN 159; his sua sponte direction of attorney fees before hearing any merits argument, confirmed by Miller's March 3, 2026 cover letter; his signature on Miller's proposed Final Judgment (DIN 264)

43

the morning after receiving Plaintiff's written objection identifying specific false statements, without any independent judicial analysis; his denial of the Motion for Reconsideration (DIN 280) without acknowledging three pending supplements, including the CoolCalc photographic evidence and Housecall Pro audit log compel, using an incorrect DIN number twice in the order; and his entry of post-jurisdictional void orders DIN 281 and DIN 282 on March 24–25, 2026, after jurisdiction transferred to the Sixth District Court of Appeal on March 23, 2026 at 3:41 PM — with DIN 282 striking Plaintiff's jalousie window photographs and CoolCalc falsification evidence, and DIN 281 imposing a blanket filing bar on an ADA-accommodated pro se litigant without any finding of vexatious conduct. Judge Rouse's conduct is described in the Factual Background solely to provide context for the federal claims asserted herein. No claim for damages is asserted against Judge Rouse in this action.

## FOUNDATIONAL DOCUMENTS AND EXHIBITS

This complaint is filed on July 1, 2026 — four days before the four-year anniversary of July 5, 2022, the date of the first predicate act in the scheme described herein — establishing that all claims are timely filed within the applicable limitations period. The following documents are incorporated by reference throughout this complaint as foundational instruments establishing the framework for all factual allegations that follow. Given the substantial volume of the complete evidentiary record accumulated over four years of related proceedings, Plaintiff physically attaches the exhibits most directly probative of the core federal claims (Exhibits B, D, E, F, G, L, and M, N, O). The

44

remaining exhibits (A, C, H, I, J, and K) consist of public records, official court records, and county records already part of the record in Charlotte County Case No. 22-000945-CC and Sixth District Court of Appeal Case No. 6D2026-0615 and are available to the Court and to Defendants upon request, subject to judicial notice under Fed. R. Evid. 201, or producible in the ordinary course of discovery. This action is not a relitigating of the underlying state court HVAC dispute; the attached exhibits were selected specifically because they bear directly on the distinct federal claims asserted here — principally Charlotte County's own actions and documented failures to act despite repeated written notice, which form the evidentiary basis for Plaintiff's Monell, due process, and ADA Title II claims against the County and its officials.

**Exhibit A (Available upon request; part of the Sixth DCA record) — AI-Assisted Transcript of September 25, 2025, ADA Accommodation Hearing.** Produced by Plaintiff pursuant to the AI assistive technology accommodation Powell granted at the outset of that same hearing. Filed in the Sixth District Court of Appeal in writ proceedings and thereby made part of the official appellate record. This is the only complete hearing transcript produced in four years of proceedings in Case No. 22-000945-CC. Every other critical hearing was either conducted without a court reporter, with Plaintiff denied her accommodation to record, or produced official minutes omitting key judicial acts. This transcript documents: (1) Powell's exact grant language at timestamp 07:01–07:17 — unconditional, unlimited as to device type, covering both remote and in-person proceedings, uncontested by Miller who was present and silent; (2)

Plaintiff's two formal objections to Taylor Cellamare's presence at a confidential disability proceeding — objections that appear in the transcript and do not appear in DIN 159; (3) Powell's acknowledgment of the second objection — "Your Objection is Noted, Thank You" — which also does not appear in DIN 159; and (4) the complete case management business conducted without notice at a hearing noticed solely as an ADA accommodation proceeding. The discrepancy between what this transcript documents and what DIN 159 records is itself a constitutional violation. This transcript is the evidentiary foundation for Counts Three and Nine.

**Exhibit B (ATTACHED) — DIN 120 — Plaintiff's Request for Reasonable Accommodation, filed July 14, 2025.** An administrative accommodation request under ADA Title II and 28 C.F.R. §35.107 — not a motion in the adversarial proceedings. Powell converted this administrative request into a noticed adversarial hearing — DIN 148 — attended by opposing counsel and Taylor Cellamare, a named defendant in this action. That conversion is an independent ADA Title II violation. It transformed a confidential disability process into a public adversarial proceeding; gave Miller advance notice of the specific accommodations being requested; and enabled Taylor Cellamare to be physically present when Plaintiff's disability was discussed and her accommodation was granted — providing First Charlotte real-time knowledge of the exact scope of the grant that Rouse subsequently violated five months later at the February 23, 2026 hearing.

**Exhibit C (Available upon request; part of the state court record) — DIN 148 — Notice of Hearing, filed September 2, 2025.** This notice identified the September 25 hearing solely as a hearing on Plaintiff's ADA accommodation request. It disclosed no case management business — no mediation scheduling, no deposition disputes, no trial dates, no November hearing schedules, no jury trial status. Yet Powell conducted all of that business at the hearing without separate notice, without Plaintiff's opportunity to prepare, and in the presence of a named defendant whose attendance was enabled by the conversion of a confidential administrative process into an open adversarial noticed hearing.

**Exhibit D (ATTACHED) — DIN 159 — Official Court Minutes of September 25, 2025 Hearing.** A single pre-printed county court form bearing one checked checkbox next to "ADA Hearing — GRANTED." This document does not record Powell's exact grant language; the scope of the accommodation; Plaintiff's two formal objections to Taylor Cellamare's presence; Powell's acknowledgment of the second objection; the case management business conducted without notice; Miller's silence at the moment of the grant; or any case management rulings issued at the hearing. The checkbox in DIN 159 was sufficient to defeat Plaintiff's second writ petition to the Sixth DCA as evidence of judicial responsiveness, while its inadequacy as an enforcement instrument was the mechanism by which the accommodation was simultaneously granted and nullified — a designed system proven by comparing Exhibit A against Exhibit D.

47

**Exhibit E (ATTACHED) — Charlotte County Complete Permit History for Permit No. 20220729013 (Composite Exhibit, two parts). Exhibit E-1: Conditions Page showing CC PERMIT condition entry by Jill Barber, dated July 12, 2022, Status: Released, with verbatim instruction "UPLOAD NOC. THEN, EMAIL ONLINEPERMITTING@CHARLOTTECOUNTYFL.GOV TO HAVE LOCK REMOVED" — establishing that Charlotte County's permitting system released the permit lock on July 12, 2022, upon upload of the unnotarized NOC, one day before Carmen C. Thompson's notarization and two days before recording. Exhibit E-2: Inspections Page showing Transaction 945 HVAC Final entries for August 5, 8, 9, and 10, 2022, including the August 8, 2022 entry by Deputy Building Official Jack D. McStravic: "Scop of work was adding Condition Air to an Existing Non Condition Air Building (Residential). Per FBC Existing Building is a Level 2 Alteration and needs to comply with FBC Energy Conservation R403.7" — constituting official written admission that the scope of work was a new installation in a previously unconditioned space, directly contradicting the Level 1 Replacement permit classification.** Obtained in person and through Chapter 119 public records request. Authenticated by McStravic personally on September 7, 2023, bearing his system identifier "MCSTRAVICJ" on each page as the complete official county record. Contains Transaction 945 documenting McStravic's two conflicting August 8, 2022, entries. Contains the CoolCalc upload timestamp of August 8, 2022, under account "firstcharlo." Contains the August 10 approval comment: "Additional information was submitted to the Building Office and approved." Does not contain a duct leakage test

48

report. Does not contain Manual S or Manual D documentation. Does not contain any document produced by Plaintiff or her contractors. Contains six Job-Card documents uploaded by user "miller" on June 18, 2025, during active litigation.

**Exhibit F (ATTACHED) — Authenticated Text Thread Screenshots (Composite Exhibit A to Authentication Affidavit).** Complete text message thread between Plaintiff and First Charlotte A.C. & Refrigeration, Inc. at +1 (941) 241-2230, June 22, 2022, through August 10, 2022. Photographed June 17, 2026, from original device preserved in airplane mode.

**Exhibit G (ATTACHED) — Affidavit of Terry Lynn Dunn-Fischer in Support of Authentication of Text Message Evidence.** Twenty-five paragraph sworn affidavit authenticating the complete text thread, establishing Plaintiff never created a Housecall Pro customer account, documenting the July 5 contractor-side approval sequence, and establishing the August 9 wire fraud predicate.

**Exhibit H (Available upon request; public record) — McNulty July 14, 2025, Written Admission.** Charlotte County Building Official's written acknowledgment that the scope of work was "a new system installed in previously unconditioned space" — the county's own official concession of the permit misclassification Plaintiff documented from August 3, 2022.

**Exhibit I (Available upon request; public record) — Bailey March 18, 2026, Final Written Refusal.** Charlotte County's institutional closure — "At this time, no further

49

action will be taken by Charlotte County regarding this permit" — issued the same day Plaintiff explicitly invoked the four-year statute of limitations in writing.

**Exhibit J (Available upon request; public record) — Stasio September 27, 2023, Letter.** County Attorney's letter closing the administrative matter while referring Plaintiff to consumer rights protections and acknowledging no due process mechanism exists for civil rights complaints — and omitting any reference to the CoolCalc, the permit reclassification, the county's own role in the fraudulent approval, Plaintiff's private right of action under §553.84 for Building Code violations, or the void contract doctrine arising from the permit misclassification — constituting both an institutional concealment of county liability and a failure to provide meaningful access to administrative remedies under ADA Title II.

**Exhibit K (Available upon request; Sunbiz public record, DIN 303) — Sunbiz Annual Reports 2022–2024 Documenting Darlene Cellamare Corporate Title Progression.** Five authenticated exhibits from Florida's official Secretary of State public records filed as DIN 303, authenticated by sworn affidavit notarized by Janet Campbell, Commission HH 488188, documenting Manager (2022) to Manager/Secretary (2023) to VP (2024) — a three-stage corporate title modification during active litigation constituting a party admission that Darlene Cellamare lacked corporate authority to execute a real property lien in August 2022.

**Exhibit L (ATTACHED) — Objection to Mediation Fees, December 5, 2025, with Composite Exhibits A – B.** Plaintiff's sworn Objection to Mediation Fees filed pro se in

the lower tribunal December 5, 2025, asserting that mediation was court-ordered and not voluntary, that Plaintiff had no open claims subjecting her to mediation costs under Florida Statute §44.102, and that Miller intentionally misrepresented Plaintiff's financial responsibility without providing required notice of estimated costs. Exhibit A to the objection is the Wotitzky Mediation Center, LLC invoice dated December 5, 2025, reflecting a balance due of $675.00 as Plaintiff's portion of a $1,350 private mediation arrangement, due December 10, 2025. Exhibit B to the objection is Plaintiff's Application for Determination of Civil Indigent Status, signed December 4, 2025, documenting zero net income, total liabilities of $38,000, and cash on hand of $1,000. The objection succeeded; Plaintiff paid nothing. Mediation subsequently proceeded through the Charlotte County mediation program, lasted approximately 15 minutes, and cost $60.00 total, paid entirely by Miller's client, First Charlotte A.C. & Refrigeration, Inc.

**Exhibit M (ATTACHED) — Plaintiff's Verified Charlotte County Notice Chain, August 2022 through September 2023, Composite Exhibits M-1 through M-6.** Six original email records retrieved from Plaintiff's AOL Mail account, each bearing the original sender, recipient, date, and timestamp metadata, establishing the complete and accurate chronology of Plaintiff's pre-2025 communications with Charlotte County officials. Exhibit M-1: August 9, 2022, 10:43 AM EDT, email from Plaintiff to jack.mcstravic@charlottecountyfl.gov transmitting the complete text of Florida Building Code Section R403, with subject line referencing "placement of New HVAC system" and

51

explicitly requesting duct work testing in any upcoming inspection. Exhibit M-2: August 11, 2022, 5:50:05 AM EDT, email from Plaintiff to Ben.Bailey@CharlotteCountyFL.gov requesting a face-to-face meeting and characterizing Permit No. 20220729013 as a "NEW INSTALL." Exhibit M-3: August 19, 2022, 8:39 AM, second email from Plaintiff to Bailey noting no response received and stating the permit was "filed incorrectly and modified by your deputy inspector." Exhibit M-4: July 5, 2023, two emails from Plaintiff to Bailey at 11:23 AM and 11:56 AM, the first forwarding a January 24, 2023, estimate from EZE Air Solutions and stating intent to file a DBPR complaint, the second re-forwarding the August 11, 2022, email after Bailey claimed non-receipt and invoking the Home Improvement Protection Act. Exhibit M-5: September 7, 2023, email exchange between Plaintiff and Jack McStravic, copied to Ben Bailey, Shawn McNulty, and Claire Jubb, in which Plaintiff requested a complete hard copy of her permit file. Exhibit M-6: September 15, 2023, 10:40 AM email from Plaintiff to Bailey, McNulty, McStravic, and Jubb documenting a telephone consultation with a DBPR Construction Department representative in Tallahassee and requesting that minutes be taken at the scheduled September 20, 2023, roundtable meeting. No responsive minutes were ever produced by Charlotte County, confirmed by Plaintiff's subsequent Chapter 119 public records request returning no responsive documents.

**Exhibit N (ATTACHED) — Notice of Commencement, OR Book 5018, Page 473, recorded July 14, 2022, at 9:17 AM.** Official recorded instrument bearing Carmen C. Thompson's notarization stamp dated "this 13 day of July" — one day after Plaintiff's

sole visit to First Charlotte's office on July 12, 2022, and one day after Charlotte County official Jill Barber released the permit lock upon upload of the unnotarized NOC. The July 14 recording stamp compared against the permit history's July 12 unlock entry establishes the false notarization sequence with documentary precision. The instrument records Plaintiff's name as "Terry Dunn-Fischer" rather than her legal name Terry Lynn Dunn-Fischer.

**Exhibit O (ATTACHED) — Claim of Lien, OR Book 5029, Pages 1487–1488, INSTR #3136320, signed August 4, 2022, by Darlene Cellamare as "Manager," notarized by Gayle Lube (Commission #GG 316657, Expires April 1, 2023).** The notary page identifies "Document produced by: Taylor Cellamare, Office Manager" — confirming Taylor Cellamare's direct role in producing the instruments submitted to the county and used in state court proceedings. Darlene Cellamare's title at execution was "Manager" only, as confirmed by concurrent **Sunbiz -2022 and 2023** annual reports (Exhibit K), establishing the Claim of Lien was executed without valid corporate authority. Note: Gayle Lube is a different notary from Carmen C. Thompson, who notarized the NOC (Exhibit N). Both instruments bear separate notarization defects addressed in the corresponding counts of this Complaint.

**Exhibit P (ATTACHED) — Contractor's Final Payment Affidavit, signed August 19, 2022, by Darlene Cellamare.** Sworn instrument in which Darlene Cellamare falsely certified that all subcontractors and suppliers had been paid in full and that no Liens were outstanding, when in fact the installation had been performed by unlicensed workers and

53

the system was defective as documented by independent contractor inspections. This instrument constitutes a RICO predicate act under 18 U.S.C. § 1343 (wire fraud) as part of the scheme to fraudulently obtain final payment from Plaintiff.

## FACTUAL BACKGROUND

### A. The Property and the Initial Misrepresentation

25.     In January 2021, Plaintiff purchased the property at 820 Conreid Drive NE, Port Charlotte, Florida 33952, for cash with intent to renovate and resell at the 2022 peak market. The property has never carried property insurance from the date of purchase — a short-term cash investment property held for quick resale during an active renovation period. First Charlotte's unlicensed installation, fraudulent Lien filed August 4, 2022, before any payment was owed, and four-year litigation converted a planned short-term resale into a four-year forced holding of an uninsured investment property in a Florida hurricane zone. Hurricane Ian made direct landfall in Charlotte County on September 28, 2022 — seven weeks after First Charlotte's installation and 54 days after the fraudulent Lien was filed — exposing the uninsured property to catastrophic casualty loss during an active major hurricane strike. The defective HVAC system installed by First Charlotte's unlicensed workers — missing three components, delivering zero supply drops to the living room, approved only through a fraudulent retroactive CoolCalc — has operated in an uninsured property since August 2, 2022. Any casualty damage sustained during the uninsured period is a direct consequential damage flowing from the fraudulent lien that prevented Plaintiff from selling the property and ending the exposure.

54

26.    In June 2022, Joseph Cellamare, the licensed qualifying agent of First Charlotte A.C. & Refrigeration, Inc., personally visited the property to assess its HVAC needs. He observed that the property had never had central air conditioning. That observation triggered mandatory professional obligations under Florida law and ACCA/ASHRAE standards — specifically, the preparation of a Manual J residential load calculation, a Manual S equipment selection document, and a Manual D duct system design document, all based on actual site conditions. Joseph Cellamare produced none of these documents. His June 2022 site visit therefore establishes actual knowledge — not constructive knowledge — that every subsequent act in this transaction was professionally and legally deficient.

27.    In early July 2022, Plaintiff went to First Charlotte's office. The door was locked. Darlene Cellamare answered. Plaintiff's first question was: 'Are you licensed?' Darlene Cellamare answered yes. That representation — made by a person without authority to bind the licensed entity, and false as to the persons who would actually perform all contracting functions — induced Plaintiff to enter into the entire transaction.

28.    On July 5, 2022, Taylor Cellamare, unlicensed, sent Plaintiff a two-page preliminary cost two-page estimate by text message. The estimate contained no Manual J load calculation, no site assessment documentation, and no terms and conditions and no Lien notice. It was based on contractor inventory, not the thermal characteristics of the property. The first line item stated: 'Home has never had air.' The contract, as identified by Hudson's own judicial admission at paragraph 9 of the original complaint — 'The

55

Estimate is attached hereto as Exhibit D' — is this two-page document. No five-page integrated contract was identified as the operative contract by First Charlotte's own attorney.

B. The Notice of Commencement — False Notarization

29. On or about July 11, 2022, Plaintiff emailed Taylor Cellamare confirming she would come to the office on July 12, 2022, to sign the Notice of Commencement. That email, produced as an exhibit to DIN 261 in the lower court record, confirms the July 12 signing date and destroys the false statement in Hudson's complaint paragraph 10 that Plaintiff signed on July 13.

30. On July 12, 2022, Plaintiff visited First Charlotte's office once — and only once — to sign the Notice of Commencement during her lunch break, with Darlene Cellamare present. No notary was present. First Charlotte uploaded the unnotarized NOC to the Charlotte County permitting portal that same day. Charlotte County official Jill Barber released the permit lock on July 12, 2022, upon receipt of the unnotarized document — before any notarization occurred. The county's own condition entry records the instruction verbatim: "UPLOAD NOC. THEN, EMAIL ONLINEPERMITTING@CHARLOTTECOUNTYFL.GOV TO HAVE LOCK REMOVED." This language confirms that the county's permitting system required only upload of the NOC — not a notarized NOC — as the precondition for lock release. Charlotte County's acceptance of an unnotarized NOC to release the permit lock is itself a Monell predicate: the county's automated permitting system contained no mechanism

to verify that a Notice of Commencement had been properly notarized before releasing the lock, permitting contractors to use unnotarized instruments to activate permits and supply the notarization retroactively.

31.    On July 13, 2022 — the day after Plaintiff signed and the day after the permit lock was released using the unnotarized NOC — Defendant Carmen C. Thompson notarized the Notice of Commencement, OR Book 5018, Page 473, certifying that Plaintiff personally appeared before her. Plaintiff was not present. The NOC was recorded on July 14, 2022, at 9:17 AM. The notarization block records 'Terry Dunn-Fischer' — not Plaintiff's legal name — demonstrating no government-issued identification was examined. Thompson's false notarization constitutes a violation of Florida Statutes § 117.105. The county's own permit condition entry confirms the mechanism: the condition description reads verbatim "UPLOAD NOC. THEN, EMAIL ONLINEPERMITTING@CHARLOTTECOUNTYFL.GOV TO HAVE LOCK REMOVED" — proving the county's system required upload of the NOC as a precondition to lock removal, and that no notarization verification occurred before Jill Barber released the lock on July 12, 2022.

C. The Fraudulent Permit — Wrong Classification, Automated Issuance

32.    On July 11, 2022, Permit No. 20220729013 was submitted and classified as a Level 1 Replacement. The classification was fraudulent: the property had never had central air conditioning. The permit was issued under account 'ADMIN ADMIN' via 'Automated Issuance' by PUBLICUSER13897 — a generic automated account with no

named responsible individual, confirming the absence of any human identity verification at the point of issuance. The permit's own description of work states 'Install 2-ton split system and duct work' — using the word install — while the Type of Work field classifies the job as Replacement. The county's own permit is internally contradictory on its face.

33.    The permit was submitted in the name of Joseph Cellamare's license CAC057579 without Joseph Cellamare's participation or knowledge of the submission. Charlotte County's permitting system contained no mechanism to verify that the person submitting the permit was the licensed qualifying agent of record.

D. The Installation — Unlicensed Workers, Missing Components

34.    On August 2, 2022, unlicensed workers installed the HVAC system. Joseph Cellamare appeared for approximately fifteen to twenty minutes to deliver components and direct workers, then left for the entire day without completing supervisory inspection. He never returned to inspect the work.

35.    The equipment installed deviated from the Tropic Air invoice in at least three material respects: the Honeywell thermostat, the Honeywell air filter box, and the 5kW heating element were not present in the installation — confirmed by the EZE Air corrective estimate of January 24, 2023, documenting the absence of these components. The missing Honeywell thermostat additionally violates Florida Building Code § R403.1.1, which mandates at least one thermostat for each separate heating and cooling system.

36. On August 3, 2022 — the morning after the installation — Plaintiff called Charlotte County Code Enforcement and spoke directly with investigator Tom Atkinson, seeking guidance on how to get the contractor to fix a system that was not working properly, including missing components (Honeywell thermostat, Honeywell air filter box, 5kW heating element), improper duct placement, and incorrect sizing that Plaintiff had personally observed. Plaintiff did not submit any written document to Charlotte County on August 3, 2022. Atkinson advised Plaintiff to provide formal notice to the contractor under Florida Statutes Chapter 558 before pursuing any complaint against the contractor's license and advised Plaintiff not to pay until the job met code. Plaintiff did so. The complete text message thread between Plaintiff and First Charlotte A.C. & Refrigeration, Inc. at +1 (941) 241-2230, spanning June 22, 2022, through August 10, 2022, is preserved on Plaintiff's original mobile device maintained in airplane mode and authenticated by Plaintiff's sworn Affidavit. That thread documents: (a) Plaintiff's August 2, 2022 texts at 6:15 PM and 6:17 PM — "This job is not complete" and "I don't understand why you would leave when it's not complete" — sent the evening of installation day and before any feedback request; (b) First Charlotte's August 2, 2022 feedback request at 6:13 PM via https://pro.housecallpro.com/review/RqtggsRQJV — a contractor-PRO domain URL sent two minutes before Plaintiff's defect notice, while the installation was defective and incomplete; (c) Plaintiff's August 3, 2022 MMS photographs sent at 5:57 AM documenting the wall opening where the return air opening was installed and the wall insert that was removed without Plaintiff's consent — First Charlotte removed the entire wall insert rather than cutting only the bottom eleven inches

59

needed for the return air grille, discarding Plaintiff's property rather than preserving it, leaving a full-size wall opening that Plaintiff was required to drywall, putty, and paint at her own expense; (d) Taylor Cellamare's August 3 response at 8:01 AM — "Joe will be in contact with you today about this matter" — acknowledging Plaintiff's complaint without disputing it; (e) Taylor's August 8, 2022 text explicitly identifying "the ac system and duct work" as requiring inspection — First Charlotte's own written party admission that new ductwork was installed, triggering the mandatory duct leakage test under Florida Building Code Section R403.3.3 and the Manual D duct design requirement that was never submitted; (f) Taylor's August 9, 2022 text — "Terry, everything has been validated and is correct. The inspection will be completed tomorrow" — transmitted by interstate wire communication on August 9 when the county had administratively accepted the CoolCalc on August 8 but the physical reinspection had not yet occurred, constituting a materially false statement through interstate wire communication that the submitted documentation had been physically validated against the actual conditions of Plaintiff's property, when no inspector had returned to the property and no duct leakage test had been performed; this is a RICO wire fraud predicate under 18 U.S.C. §1343. The wall insert removal without consent caused specific documented property damage: out-of-pocket costs for drywall, putty, paint, and labor to repair the opening First Charlotte created by removing the entire insert rather than cutting only the portion needed for the return air grille.

37.    On August 3, 2022, Defendant Joseph Cellamare returned to the property to demand payment, refused to enter the home necessary to inspect the defective installation, and refused to remedy the reported defects.

E. The Fraudulent Lien — Filed Within 24 Hours of Statutory Defect Notice

38.    On August 4, 2022 — within twenty-four hours of Plaintiff's Chapter 558 statutory defect notice and within forty-eight hours of her written defect notice to the contractor — Darlene Cellamare filed a Claim of Lien, recorded at OR Book 5029, Page 1488, Instrument No. 3136320. The face of the recorded instrument identifies Taylor Cellamare as the document producer. The Lien was executed by Darlene Cellamare as 'Manager' without corporate authority to bind the licensed contractor entity. It was notarized by Gayle Lube with a blank date. The Lien was filed before any passing inspection, while Plaintiff's written dispute of completion was in First Charlotte's possession. First Charlotte's response to a statutory pre-suit defect notice was not an offer to cure but a coercive Lien — the hallmark of a fraudulent Lien under Florida Statutes § 713.31.

F. The Failed Inspection and the Retroactive CoolCalc Fabrication

39.    On August 5, 2022, Charlotte County Inspector Jeremy Cartagena denied the installation inspection. The county's own permit record for that date confirms: 'Per Homeowner: is going to speak with contractor about adding a supply and placement of T-Stat and would inspection after additional work is complete.' Plaintiff's presence and the T-Stat deficiency are documented in the county's own August 5 record, at No time did the

61

inspector inform the homeowner that the permit filed and granted for the job by Charlotte County was an errored permit. The county's August 5, 2022, inspection record attributes the failure to what the homeowner reported — the missing living room supply drop and thermostat placement — not to an independent inspector finding of code non-compliance. Plaintiff had every reason to believe the inspection failed

because of the physical defects she had reported on August 3 — not because of permit misclassification or missing mandatory Manual J documentation. The county did not inform Plaintiff on August 5, on August 8, on August 10, or at any point across four years of documented correspondence that the inspection failure had a separate regulatory dimension involving fraudulent permit misclassification and missing mandatory pre-installation documentation. Plaintiff discovered the fraudulent permit misclassification and the five CoolCalc falsification categories through her own independent research during litigation — not through any disclosure by the governmental entity that had actual knowledge of both from August 8, 2022. There is no blow test document attached to the permit record.

40.    On August 8, 2022, two conflicting entries were made in the same official county permit record on the same date. The first, attributed to the Deputy Building Official, formally documented: 'Scop of work was adding Condition Air to an Existing Non Condition Air Building (Residentail). Per FBC Existing Building is a Level 2 Alteration and needs to comply with FBC Energy Conservation R403.7 Heating and Cooling Equipment. All information needed for this section is to be submitted to the

building Dept and attached to Permit.' The second entry, entered the same date, directed: 'No additional work being done for customer. Please finalize inspection. Thank you.' — attributed to McStravic. These two entries, made on the same date by different county officials, document the precise moment Charlotte County's own compliance requirements were overridden by a directive to close out the failed installation without the required documentation. McStravic's August 8 reclassification entry formally acknowledged on the official county record that the original Level 1 classification was fraudulent. He documented this acknowledgment in Transaction 945. He did not notify Plaintiff of the reclassification. He did not notify Plaintiff that the permit she had signed the Notice of Commencement for had been fraudulently classified from the date of filing. He did not notify Plaintiff that a retroactive Manual J load calculation had been submitted to the county by the contractor on her property's permit. He directed finalization on the same date — simultaneously acknowledging the fraudulent misclassification in the official record and directing its administrative closure through a retroactive document submission Plaintiff was never told had occurred.

41.    On August 8, 2022, a CoolCalc Manual J load calculation was uploaded to the county permit system. The county's own attachment record reflects a modification date of 08/08/2022, uploaded by user account 'firstcharlo' — First Charlotte's county system account. The document is undated on its face, bears no professional stamp, and carries no engineer's or architect's certification. It contains five categories of materially false data: (a) wrong weather station — Venice Pier (Sarasota County) used instead of the

correct Charlotte County station; (b) nonexistent wall insulation — R-11 cavity insulation claimed; (c) NFRC-rated windows falsely listed when the actual windows are approximately sixty-year-old jalousie-style louvered units none of which are NFRC ratable by definition and which cannot be sealed or independently tested for thermal performance; (d) nonexistent floor insulation — R-10 slab insulation claimed when no slab insulation exists; and (e) omitted attic/ceiling category — the single largest heat gain factor in any Florida residential structure, entirely absent from all sixteen pages. Every false entry understates the cooling load. Every falsification supports the same undersized, predetermined unit already installed. The document was engineered to justify a predetermined equipment selection rather than to determine the actual needs of the property. The unified direction of all five falsifications proves the CoolCalc was not a good-faith attempt to calculate the actual thermal requirements of the property. A genuine Manual J calculation containing errors would show falsifications in both directions — some inputs too high, some too low. The CoolCalc contains falsifications in only one direction: downward. Every input category understates the cooling load. Every falsification supports the same predetermined undersized 2-ton unit. This is not measurement error. It is a document engineered backward from a predetermined equipment selection to a calculation that would justify it. Joseph Cellamare personally observed the jalousie windows, the absent wall insulation, the uninsulated slab, and the degraded attic insulation during his June 2022 site visit. He then directed creation of a CoolCalc with inputs that did not reflect any of those actual observed conditions — inputs that reflected what a property would need to look like to justify the 2-ton unit he

had already predetermined to install. The weather station selection confirms this. Venice Pier is a coastal barrier island station in Sarasota County subject to Gulf breezes. Plaintiff's property is an inland ground-level structure in a Charlotte County flood zone subject to higher summer temperatures, elevated ground-level humidity, and none of the coastal temperature moderation Venice Pier reflects. The flood zone designation is additionally relevant to equipment placement under Manual S and Manual D — a ground-level outdoor unit subject to flooding risk, requires analysis that a coastal station cannot support. Venice Pier was most likely selected because it would produce the lowest possible design temperature — and therefore the lowest possible calculated cooling load — for a property whose actual thermal conditions demanded a significantly larger system.

42. On August 9, 2022, at 10:43 AM EDT, Plaintiff transmitted by email to McStravic at his confirmed county email address the full text of Florida Building Code Section R403, specifically requesting that all R403 requirements be included in any upcoming inspection. McStravic therefore had actual personal notice — in his individual county email inbox — of the specific statutory requirements governing the installation's compliance the day before the inspection was approved. None of those requirements had been met.

43. On August 10, 2022, the installation was approved. No physical corrections had been made between the August 5 failure and the August 10 approval. The county's own August 10 comment states: "Additional information was submitted to the Building

Office and approved" — acknowledging that a document submission, not physical corrections or compliance verification, was the basis for approval. The permit history document was printed and authenticated by McStravic personally on September 7, 2023, as the complete official county record, bearing his system identifier "MCSTRAVICJ" on each page.

43a.    The August 10, 2022, inspection passed without satisfaction of a single mandatory inspection requirement. Florida Building Code, 7th Edition (2020), Section R403.3.3 — the applicable code at the time — mandates that duct tightness be verified by pressure testing in accordance with ANSI/RESNET/ICC 380, performed and certified by a licensed individual under Florida Statute §489.105(3)(f), (g), or (i), with a signed test report submitted to the code official. This mandatory duct leakage test applies to all new duct installations not located entirely within the building thermal envelope. The ductwork at 820 Conreid Drive NE runs through an unconditioned attic and the installation involved 100% new ductwork — far exceeding the 50% threshold triggering mandatory testing under most Florida jurisdictions. No duct leakage test report appears anywhere in the complete Charlotte County permit file for Permit No. 20220729013, obtained by Plaintiff through a Chapter 119 public records request. Taylor Cellamare's August 8, 2022, text message to Plaintiff— "the Charlotte County inspector will need to return to finish inspecting the ac system and duct work" — constitutes First Charlotte's own written acknowledgment that new ductwork was installed and required inspection, thereby triggering the mandatory Section R403.3.3 duct leakage test requirement.

Charlotte County Inspector Jeremy Cartagena arrived at the property on August 10, 2022, without duct leakage testing equipment and did not access the attic — making physical performance of the mandatory test impossible. The qualifying agent Joseph Cellamare was not present during the installation, at its completion, on August 5, or on August 10 — and therefore no licensed individual under §489.105(3)(f), (g), or (i) was ever present to perform or certify the mandatory test. The absence of the duct leakage test report from the complete permit file is not an administrative oversight. A duct leakage test produces a specific one-page document containing numerical measurements — total leakage in CFM25, conditioned floor area, leakage rate per 100 square feet, and the signature of the licensed tester certifying compliance — that either exists or does not exist. It does not exist. Because the test was never performed. Because the licensed qualifying agent was never present to perform or supervise it. Because unlicensed workers cannot certify it under §489.105(3)(f). Because Inspector Cartagena arrived without the equipment to conduct it. The county passed the August 10 inspection in violation of its own mandatory Section R403.3.3 requirement — consistent with McNulty's July 14, 2025, written admission that Charlotte County's policy was to accept retroactive documentation without physical verification. No CoolCalc substitutes for the duct leakage test. The CoolCalc is a pre-installation design document. The duct leakage test is the post-installation performance verification. They have separate mandatory requirements serving separate purposes. Even accepting the CoolCalc at face value — which Plaintiff does not — it cannot substitute for or satisfy the duct leakage test requirement. The missing duct leakage test report is proof, written in the negative space of the official

67

county permit file, that Joseph Cellamare never supervised the installation — because a qualifying agent who supervises a new duct system installation performs the mandatory duct leakage test, generates the signed report, and submits it to the county. That document does not exist.

44.    The permit attachment record further shows that six 'JobCard' documents — identified as Housecall Pro job records — were uploaded directly into the Charlotte County permit system on June 18, 2025, under the user identifier 'Miller' — three years after the installation, during active litigation. The introduction of litigation-generated documents into the official government permitting record during active proceedings raises serious questions regarding chain of custody, authenticity, and the integrity of the official record.

44a.    On May 22, 2026, Plaintiff filed in the lower court a Defendant's Notice of Filing Supplemental Evidence in Support of Defendant's Objection to Plaintiff's Motion for Attorney's Fees, DIN 303, accompanied by a sworn Affidavit of Terry Lynn Dunn-Fischer notarized by Janet Campbell, Commission HH 488188, and five authenticated exhibits drawn from Florida's official Secretary of State public records. Those exhibits document a three-stage corporate title modification pattern for Darlene Ruth Cellamare within First Charlotte A.C. & Refrigeration, Inc.: (a) The 2022 Florida Profit Corporation Annual Report, filed January 27, 2022 — the year the Claim of Lien was executed — lists Darlene Ruth Cellamare exclusively as "MANAGER," with no officer designation of any kind; (b) The 2023 Annual Report, filed January 19, 2023 — after this litigation

68

commenced — retroactively inserted the title "SECRETARY"; (c) The 2024 Annual Report, filed February 2, 2024 — during active litigation — shifted her designation to "VP," a second corporate modification during the same litigation; (d) The official Sunbiz Master Detail printed May 22, 2026 confirms the full progression. Under Florida law, a lien's validity is fixed at the exact moment of recording. *Stresscon v. Madiedo,* 581 So. 2d 158 (Fla. 1991). The three-stage title modification — Manager (2022) to Manager/Secretary (2023) to VP (2024) — spanning twenty-four months of active litigation, constitutes a party admission that Darlene Ruth Cellamare lacked the requisite corporate authority to execute a real property lien in August 2022. This sworn supplemental evidence, authenticated from official Secretary of State public records at DIN 303, directly supports Count Ten and Count Eight.

G. EZE Air — Independent Confirmation of Defects

45.     In January 2023, Plaintiff engaged EZE Air Solutions to perform corrective work. EZE Air's January 24, 2023, estimate, produced as Exhibit C to DIN 36, documented corrections required of the undersized 2-ton unit, including raising the plenum, closing the thermostat drop, adding a living room supply drop, and cutting excess flex duct. Plaintiff forwarded the EZE Air estimate to Bailey on July 5, 2023, requesting it be added to the permit file. It was not added to the permit file — the complete permit history printed by McStravic on September 7, 2023, contains only contractor-generated documents, confirming the county added only what the contractor wanted in the record. In January 2023, a second independent contractor — Dale's Air

Conditioning and Heating, P.O. Box 380029, Murdock, Florida 33938 — performed an independent assessment and issued Estimate #31573774 dated January 19, 2023, for $2,200.00, documenting the need for ductwork correction and balancing, specifically: "Installation of new properly sized trunk line between plenum and mix box and installation of new can, grill and duct into main living room. Balancing of all air flow." This is a second licensed independent contractor independently confirming that the living room — the largest room in the home, at 19 feet by 12 feet — had no adequate supply drop and required a new properly sized trunk line. In December 2024, a third independent contractor — Titanz Plumbing and Air Conditioning, 17436 Seymour Ave, Port Charlotte, Florida 33953 — performed an independent assessment and issued Estimate #86477184 dated December 5, 2024. Titanz specified a Champion Split 2.5-ton system — condenser TCE2B30S21S and air handler JHETB30DBAS2N1, AHRI certified system #208625180 — at $7,181.00 for equipment alone, confirming that a 2.5-ton system is required for the property. First Charlotte installed a 2-ton system. The Titanz assessment establishes that the system was not merely defectively installed — it was fundamentally undersized for the property it was installed in. Three independent licensed HVAC contractors — EZE Air, Dale's Air, and Titanz — all independently assessed the same property and documented the same categories of defect: inadequate supply distribution, living room with no effective air delivery, and undersized system capacity and the blocked returns. No reasonable interpretation of the evidence supports the conclusion that the system was adequate. Miller's argument that the passed inspection proves adequacy rests entirely on McStravic's retroactive acceptance of a fabricated

70

CoolCalc — a document that three independent licensed contractors have collectively proven cannot reflect the actual conditions of the property it purports to analyze. Miller's June 20, 2025, discovery admission that the Replacement permit was valid because the installation was "replacing wall-unit air conditioners" is independently significant as an admission of intentional permit fraud. Joseph Cellamare personally visited the property in June 2022 and observed the wall unit air conditioners. He knew he was installing a complete central split system with new ductwork throughout a home that had never had central air. He then filed the permit as Level 1 Replacement. Miller's defense — that Cellamare classified it as Replacement because he was replacing the wall units — means Cellamare looked at window units, knew he was installing a new central system, and deliberately chose the Replacement classification to avoid the new installation documentation requirements, including the mandatory pre-installation Manual J. This was not a mistake. A licensed HVAC qualifying agent who personally inspects a property, observes window units, and then installs a complete central split system with six new supply drops, new ductwork, new air handler, and new condenser knows the difference between a replacement and a new installation. The permit description Cellamare filed says "Install 2-ton split system and duct work" — using the word install in the work description while checking Replacement in the type field. A contractor who writes install in the description while checking Replacement in the type field is not making an honest classification error. He is deliberately creating a document that serves his interest — avoiding the Manual J requirement — while containing language that could later be reinterpreted in either direction. Miller's wall unit defense converts that

71

deliberate choice into an admission of knowing permit fraud. McNulty's July 14, 2025, written admission that the scope was a new system in previously unconditioned space contradicts Miller's wall unit theory and confirms that even the county's own Building Official ultimately acknowledged what Joseph Cellamare knew from day one.

H. The Charlotte County Institutional Notice Chain — August 2022 Through March 2026

46.     Plaintiff's complete documented notice chain to Charlotte County officials, verified by her original email records, is as follows: August 3, 2022 — telephone call to Code Enforcement investigator Tom Atkinson seeking guidance on the malfunctioning system, no written document sent; August 9, 2022, 10:43 AM — email to McStravic transmitting the complete text of Florida Building Code Section R403, explicitly requesting duct work testing in any upcoming inspection and characterizing the work as a "New HVAC system"; August 11, 2022, 5:50 AM — first email to Bailey requesting a face-to-face meeting, characterizing Permit No. 20220729013 as a "NEW INSTALL" requiring review; August 19, 2022, 8:39 AM — second email to Bailey, noting no response received and stating the permit was "filed incorrectly and modified by your deputy inspector" without yet naming McStravic specifically; July 5, 2023, 11:23 AM — email to Bailey forwarding a January 24, 2023 estimate from EZE Air Solutions and stating intent to file a written complaint with the Florida Licensure Board; July 5, 2023, 11:56 AM — second email to Bailey re-forwarding the original August 11, 2022 email after Bailey claimed non-receipt, invoking the Home Improvement Protection Act;

72

September 7, 2023 — email exchange with McStravic, CC'd to Bailey, McNulty, and Claire Jubb, in which Plaintiff requested a complete hard copy of her permit file after McStravic's electronic production proved incomplete; September 15, 2023, 10:40 AM — email to Bailey, McNulty, McStravic, and Jubb documenting a consultation with a DBPR Construction Department representative in Tallahassee and requesting that minutes be taken at the scheduled September 20, 2023 meeting; September 20, 2023 — formal roundtable meeting with Bailey, McStravic, and McNulty; no minutes were ever produced despite Plaintiff's written request, confirmed by Plaintiff's subsequent Chapter 119 public records request returning no responsive documents; September 27, 2023 — County Attorney Jean D. Stasio letter closing the matter while acknowledging no due process mechanism exists for civil rights complaints; July 11–14, 2025 — demand letter, Bailey forwards to McNulty, McNulty admits new installation misclassification in writing; March 16, 2026 — formal §489.129 complaint filed with Contractor Licensing and DBPR identifying five CoolCalc falsification categories discovered through Plaintiff's 2025 independent investigation; March 17, 2026 — Bailey institutional ratification, seven officials CC'd including Commissioner Tiseo; March 17, 2026 — conflict of interest objection filed against investigator Tom Atkinson, who had been assigned as investigator for Plaintiff's 2026 licensing complaint despite being the same official who advised Plaintiff in August 2022; March 18, 2026 — Bailey final "no further action" issued the same day Plaintiff explicitly invoked the four-year statute of limitations. Plaintiff's August 2022 and 2023 communications put Charlotte County on notice that the installed system did not function properly and that the permit process

73

appeared procedurally irregular. Plaintiff did not discover, and could not have provided written notice of, the specific underlying fraud — the August 8, 2022, misclassification, the retroactive CoolCalc submission, and the five categories of falsified data — until her independent investigation in 2025. At no point between August 11, 2022 and the September 20, 2023 roundtable — despite five documented written communications to five named county officials, two of which specifically requested review of the permit as a new installation — did any Charlotte County official inform Plaintiff that: (a) the August 5 inspection failure had a regulatory dimension involving permit misclassification and missing mandatory Manual J documentation under R403.7; (b) the permit had been reclassified on August 8, 2022 from Level 1 to Level 2 by McStravic; (c) the August 10 passed inspection was based on a retroactive document submission by the contractor rather than physical correction of the defects Plaintiff had reported; or (d) the document submitted to pass the inspection contained five categories of materially false data. Officials present at the September 20, 2023, roundtable possessed the answer to Plaintiff's direct question — how did a malfunctioning system pass code — in the county's own permit file, and chose not to disclose it. The county's non-disclosure across this period is not passive silence. It is active institutional concealment of the basis for a governmental approval that became the evidentiary cornerstone of a foreclosure action against Plaintiff's property.

47.    McNulty's July 14, 2025, official written admission — 'The building department later learned that the scope of work was not a change out/replacement of

existing equipment, but rather a new system installed in previously unconditioned space' — is Charlotte County's official concession that the permit was misclassified exactly as Plaintiff alleged from August 3, 2022. This admission Estops Charlotte County from asserting in federal court that the Level 1 classification was proper.

48. Charlotte County official Tom Atkinson, who advised Plaintiff on August 3, 2022, to give Chapter 558 notice and participated in the September 2023 roundtable, was assigned in March 2026 as the investigator for Plaintiff's formal contractor licensing complaint. Plaintiff formally objected on conflict of interest grounds. The assignment of an investigator with documented prior personal involvement from the first day of the dispute is institutional bad faith and denial of neutral process.

I. The State Court Proceedings — The Deception Continuum

49. The original complaint filed by Winston S. Hudson, Esq., of Farr Law Firm, P.A., on October 10, 2022, Filing No. 158910654, was captioned against 'TERRY DUNN-FISCHER' — not Plaintiff's legal name — while the Charlotte County permit record correctly identified the owner as DUNN-FISCHER TERRY LYNN. Farr Law Firm filed a lien foreclosure against a property owner using a name that did not match the deed of record, the county tax records, or the county's own permit system.

50. Hudson's complaint paragraph 7 states First Charlotte 'produced a Load Calculation for the Property in accordance with the ACCA Manual J Residential Load Calculations Codes and Standards.' The county's August 8, 2022 CoolCalc timestamp proves this is false. Paragraph 8 states equipment selection was made 'In accordance with

the Load Calculation' — a sequence physically impossible given that the CoolCalc postdated the installation. Paragraph 10 states Plaintiff 'signed a Notice of Commencement' on July 13, 2022 — the notarization date — when Plaintiff signed on July 12, as confirmed by the July 11 email to Taylor Cellamare. Paragraph 9 constitutes a binding judicial admission identifying the Estimate — Exhibit D — as the contract, judicially estopping Farr Law Firm and Miller from advancing any five-page integrated contract theory. The original complaint was filed July 14, 2022, with the permit record attachment list showing the NOC was uploaded by 'firstcharlo' — the county's own system confirms Thompson's July 13 notarization occurred after the permit lock was released on the July 12 unnotarized document.

51.    The underlying state court action was filed as a breach of contract claim rather than a Chapter 713 lien foreclosure action — a deliberate pleading mechanism that avoided the statutory lien scrutiny, validity requirements, and unlicensed contractor bar that § 713 enforcement would have required. By filing as breach of contract, First Charlotte was able to pursue collection of the full $8,863.00 while simultaneously maintaining the recorded Claim of Lien to cloud title on Plaintiff's property — preventing sale, blocking refinancing, and eliminating access to equity for hurricane repairs and other emergencies — without ever having to satisfy § 713's validity requirements in a lien enforcement proceeding. Plaintiff's Notice of Contest of Lien filed August 9, 2022 (OR Book 5031, Pages 1858–1859, INSTR #3137841) triggered a 60-day window under Florida Statute § 713.22 within which First Charlotte was required to file

suit to enforce the lien. The breach of contract filing mechanism bypassed that 60-day enforcement window and the statutory framework designed to protect homeowners from fraudulent liens.

52.    In 2023, Judge Bell issued DIN 59 finding design defect and installation defect, constituting law of the case. That order was recorded in the Charlotte County Official Records as Instrument No. 3334289.

53.    On September 25, 2025, Judge Powell granted Plaintiff's ADA accommodation from the bench as reflected in hearing minutes DIN 159 — the ADA Accommodation Ruling — recognizing her language-based learning disability and authorizing AI assistive technology at all hearings and court proceedings. Powell refused to reduce that ruling to a signed written order despite Plaintiff's submission of a proposed order consistent with his bench ruling, leaving the accommodation enforceable only through hearing minutes with no signed judicial order. That ruling was violated on at least four documented occasions before Judge Powell and at further occasions before Judge Rouse.

53a.    The September 25, 2025, ADA accommodation hearing — DIN 159 — was noticed as a response to Plaintiff's DIN 120 Request for Reasonable Accommodation filed July 14, 2025. DIN 148, filed September 2, 2025, is the Notice of Hearing for the September 25 proceeding. That notice identified the subject as Plaintiff's ADA accommodation request. It did not identify mediation scheduling, deposition disputes, trial date confirmation, November hearing dates for pending motions, or jury trial status

as topics to be addressed. There was no notice that First Charlotte would send a representative to the proceeding. There was no notice that case management business would be conducted at the hearing.

Powell granted the accommodation in the first three minutes of the hearing. He then conducted a full case management conference covering topics for which Plaintiff had received no notice: Miller's claim that he had emailed Plaintiff four times about deposition scheduling; Powell's ruling that Plaintiff cannot dictate the form of discovery; scheduling of five November hearing dates for all pending motions; October 15 pretrial conference logistics; jury trial status and conflicting notices in the file. Every one of these topics was addressed from a proceeding noticed as an ADA accommodation hearing — without any separate notice, without any opportunity for Plaintiff to prepare for adversarial case management business, and while Taylor Cellamare sat in the courtroom as First Charlotte's designated representative.

Taylor Cellamare — a named defendant in this federal action, the individual who created the Housecall Pro profile in Plaintiff's incorrect legal name without identity verification, created and submitted the fraudulent CoolCalc to Charlotte County, produced the Claim of Lien, and handled all contractor documentation — was present at Plaintiff's September 25, 2025, ADA accommodation hearing as First Charlotte's designated representative. Plaintiff objected on the record that the hearing was confidential and that adverse parties should not be present. That objection is documented in the certified transcript at timestamp 21:07–21:16. Miller confirmed on the record that

78

Taylor works for First Charlotte. Powell overruled Plaintiff's objection, stating the plaintiff has the right to have a representative present. The presence of a named adverse defendant at a disability accommodation hearing — particularly one whose conduct is the subject of eleven federal counts — gave First Charlotte and its principals direct real-time knowledge of the specific accommodations being requested and granted. Rouse's subsequent denial of those same accommodations at the February 23, 2026, in-person hearing cannot be characterized as inadvertent when one of the named defendants had been physically present at the hearing where those accommodations were explicitly and unambiguously granted five months earlier.

The conversion of Plaintiff's ADA accommodation hearing into a general case management conference without notice constitutes an independent due process violation under the Fourteenth Amendment and an independent ADA Title II violation. Under Florida Rule of Civil Procedure 1.100 and fundamental due process, a party is entitled to notice of what will be addressed at a hearing sufficient to allow meaningful preparation. Notice of an ADA accommodation hearing does not provide notice of a case management conference covering deposition disputes, mediation scheduling, trial dates, hearing schedules, and jury trial status. Plaintiff appeared prepared for one proceeding and was subjected to another — with adverse rulings issued on topics she was not noticed to address, in the presence of a named defendant whose attendance was enabled by the recharacterization of the proceeding from confidential ADA hearing to open case management conference. The court's use of Plaintiff's disability accommodation request

as the vehicle to conduct unnoticed case management business — without separately noticing those topics, without giving Plaintiff the opportunity to prepare, and without ensuring the accommodation proceeding remained focused on Plaintiff's disability needs — constitutes the court taking procedural advantage of Plaintiff's ADA request in violation of Title II's guarantee of meaningful access to judicial proceedings.

The foundational ADA violation predates September 25 hearing itself. Plaintiff's DIN 120, filed July 14, 2025, was a Request for Reasonable Accommodation — an administrative request under ADA Title II and 28 C.F.R. §35.107 directed to the court's accommodation process, not a motion in the adversarial proceedings. Powell converted Plaintiff's administrative accommodation request into a noticed adversarial hearing — DIN 148, filed September 2, 2025 — and conducted that hearing as an open case management conference. That conversion accomplished three simultaneous constitutional violations. First, it transformed a confidential disability process into a public adversarial proceeding, exposing Plaintiff's disability and accommodation needs to opposing counsel and First Charlotte's representative in open court. Second, it enabled Taylor Cellamare — a named defendant in this federal action, the individual who created the Housecall Pro profile in Plaintiff's incorrect legal name, submitted the fraudulent CoolCalc to Charlotte County, and produced the Claim of Lien — to be physically present in the courtroom when Plaintiff's disability was discussed and her accommodation was granted. Rouse's subsequent denial of those same accommodations at the February 23, 2026, in-person hearing cannot be characterized as inadvertent when one of the named defendants had

80

been physically present at the hearing where those accommodations were explicitly and unambiguously granted five months earlier, and when Miller — who was present at both hearings — never disclosed to Rouse the scope of the accommodation he had witnessed being granted. Third, the conversion used Plaintiff's accommodation request as the vehicle to conduct case management business — mediation scheduling, deposition disputes, trial dates, November hearing schedules, jury trial status — for which Plaintiff received no notice and for which she appeared unprepared, with adverse rulings issued while Taylor Cellamare sat in the courtroom. A pro se litigant with a court-recognized language-based learning disability who appears for a focused ADA proceeding and is instead subjected to an unnoticed case management conference in the presence of an adverse party representative — with case management rulings issued on matters she was not noticed to address — is denied the meaningful access to judicial proceedings that ADA Title II and the Fourteenth Amendment guarantee.

Charlotte County's ADA Title II violation extends beyond the judicial proceedings to the county's administrative response to Plaintiff's permit complaint. Charlotte County Attorney Jean D. Stasio's September 27, 2023, administrative closing letter was the county's official response to Plaintiff's documented complaint about the permitted installation. Plaintiff holds a court-recognized language-based learning disability — DIN 159 — that affects her ability to independently research and identify complex statutory frameworks. ADA Title II and *Tennessee v. Lane,* 541 U.S. 509 (2004) require that public entities provide disabled individuals meaningful access to their services, programs,

and activities — including administrative complaint processes. A meaningful administrative response to a permit complaint from a disabled property owner requires identification of the specific statutory remedies available to her — not referral to a general consumer rights category that does not address the legal consequences of permit misclassification. Stasio's letter referred Plaintiff to consumer rights protections while never identifying: §553.84 private right of action for Building Code violations; the void contract doctrine arising from the permit misclassification; DBPR disciplinary remedies under §489.129(1); or the mandatory documentation failures that proved the misclassification. A county official who provides a disabled property owner with inapplicable general guidance instead of the specific statutory framework that applies to her situation has failed the meaningful access obligation under ADA Title II — because meaningful access requires guidance that is actually useful, not guidance that points the disabled person away from the remedies that would protect her. The consumer rights referral denied Plaintiff the meaningful access to the county's administrative process that ADA Title II requires — and that denial directly contributed to the four-year litigation that followed by leaving Plaintiff without the legal framework to challenge the fraudulent permit and the void contract before the state court proceedings reached a foreclosure judgment.

54.     Albert L. Hoff was disclosed as an expert witness after the close of discovery. His affidavit was based exclusively on the fabricated retroactive CoolCalc

82

containing five categories of false data. The Hoff affidavit was challenged by Plaintiff on Daubert grounds in her Supplement to Motion for Reconsideration filed March 15, 2026.

55.     Defendant Miller represented at hearing that Plaintiff 'clicked approved on the estimate, which sent that customer approved estimate number 2301 for 8863.00, which was automatically sent to First Charlotte.' The platform record shows $8,853.00 — a $10.00 discrepancy proving the record was manually entered, not automatically generated. The county permit record lists construction cost as $8,759.00 — a third irreconcilable amount across three contractor-generated documents, further proving no single authenticated contract governed this transaction. Plaintiff never created a Housecall Pro account, never completed the platform's customer verification process, and encountered the platform login wall preventing access. The Housecall Pro profile was created in the name 'Terry Dunn-Fischer' — not Plaintiff's legal name — without her knowledge, participation, or consent.

56.     On February 6, 2026, Plaintiff created and filed the hearing notice for her own dispositive motion for summary judgment. Powell's name had been removed from the case docket prior to February 6, 2026. Despite that removal, Powell appeared and presided at the February 6 hearing without advance notice to Plaintiff that he would be doing so. Plaintiff had no knowledge Powell would preside — his appearance was a surprise. A judge who has been removed from a case docket and thereafter appears to preside over and rule on a dispositive motion is acting without authority. Powell's rulings at the February 6, 2026, hearing are therefore void for lack of authority, for the same

reason that DIN 281 and DIN 282 entered after jurisdiction transferred to the Sixth DCA are void. At that hearing Powell denied Plaintiff the ability to record the proceedings — a direct denial of the AI assistive technology accommodation granted at the September 25, 2025, hearing — ensuring no complete record exists of Powell's unauthorized conduct at this hearing. The February 6 hearing transcript documents the following exchange on the official record. Powell addressed Plaintiff and she responded: "I am sorry, Your Honor, I can hardly hear you." Powell repeated himself without correcting the microphone problem, explaining he had one screen with Zoom and one screen with the pleading. Miller then stated on the record: "Your Honor, when you pivot in the chair, it is a little bit hard to hear you, probably, because you are looking at your computer." Miller separately asked: "Were you speaking to me or Ms. Dunn-Fischer, Your Honor?" — because Powell's microphone avoidance had made it impossible to determine who was being addressed. Powell acknowledged the setup and continued without correction. Three facts are established by this exchange: first, Plaintiff documented her inability to hear the presiding judge on the official record in real time; second, Miller corroborated the access problem and confirmed Powell was looking away from the microphone; and third, Miller himself could not determine who was being addressed — meaning neither party could reliably hear or follow the proceeding. This exchange occurred at a hearing where Plaintiff had been denied her ADA recording accommodation and had no independent means of creating a complete record. Powell, further refused on the record to address the name discrepancy — Terry Dunn-Fischer versus Terry Lynn Dunn-Fischer — ruling it was not part of the summary judgment motion, protecting from examination at the

84

dispositive stage the foundational instrument defect that appears on every contractor-generated document in the case. Plaintiff raised on the record at that hearing that First Charlotte had never verified her identity as the property owner — never asked for a driver's license or any legal identification — which is the precise identity verification failure underlying the Housecall Pro "Customer Approved" fraud: "they never acquired inception, you know, for statutory rights to deem it a contract in the beginning, because they never even identified me as the property owner by asking for a driver's license, or any legal clarification." Powell cut off that argument as not part of the summary judgment motion. The February 6 hearing therefore documents in a single proceeding: Powell appearing without docket authority, denying the ADA recording accommodation, conducting the hearing while audibly inaccessible to both parties, refusing to address the foundational name and identity verification defects, and cutting off Plaintiff's Housecall Pro identity argument at the dispositive stage. Powell's post-November 24, 2025, case management restructuring requiring all hearings be conducted in person was used to resist Plaintiff's Zoom appearance even on her own dispositive motion — with Powell stating on the record "you wanted Zoom" as an acknowledgment of and response to Plaintiff's pending Zoom motions he had deliberately refused to rule on. Taylor Cellamare, an adverse party representative, was present during discussion of Plaintiff's ADA accommodations, violating the confidential nature of ADA accommodation proceedings. The February 6, 2026, hearing was Powell's final unauthorized act before Rouse assumed the case and entered the Final Judgment.

57. On February 23, 2026, Judge Rouse conducted a critical pre-summary-judgment hearing. At that hearing Rouse denied Plaintiff the ability to record the proceedings — a direct denial of the AI assistive technology accommodation reflected in DIN 159 — ensuring no complete transcript exists of what Rouse directed at that hearing. No court reporter was present. The February 23 hearing minutes do not reflect the direction Rouse gave Plaintiff to produce a memorandum of law. Plaintiff produced that memorandum — a comprehensive legal brief submitted to the court a week before the summary judgment ruling — in direct response to that direction. Rouse thereafter signed Miller's proposed Final Judgment, DIN 264, on March 5, 2026, the morning after receiving Plaintiff's written objection identifying specific false statements, without acknowledging the memorandum Plaintiff had been directed to produce and had timely submitted. Summary judgment cannot be granted by default under Florida Rule of Civil Procedure 1.510 — the movant retains the burden of demonstrating the absence of a genuine dispute of material fact regardless of the opposing party's response — and Plaintiff had in fact responded with a court-directed memorandum of law. The Final Judgment was signed by verbatim adoption of Miller's proposed order and includes a false Maine residency statement Miller submitted with actual knowledge of Plaintiff's travel nurse status. On March 6, 2026, Plaintiff filed a Motion for Reconsideration of the Final Judgment, DIN 266, raising specific documented legal errors including the CoolCalc fabrication evidence, the Housecall Pro platform fabrication, the wrong legal name running through every contractor-generated instrument, the unlicensed contracting bar under §489.128, and the pleading/remedy mismatch between the breach of contract

complaint and the foreclosure judgment. On March 23, 2026, at 3:41 PM, Judge Rouse signed the Order Denying Motion for Reconsideration, DIN 280. That order identifies the Final Judgment as "DIN 26" rather than DIN 264 — twice, with the clerk's own (sic) notation flagging the error — establishing that Rouse did not read the order he signed. The entirety of the court's legal analysis is one sentence: "There is no basis in law or fact to reverse the Summary Final Judgment In Foreclosure." No citation to any legal authority. No engagement with any argument Plaintiff raised. The dispositive ruling is "DENIED WITH PREJUDICE" — claim-preclusion language applied to a motion for reconsideration, which is a procedural vehicle, not a claim — constituting either a fundamental misunderstanding of procedural terminology or a deliberate attempt to manufacture a preclusion defense against Plaintiff's withdrawn counterclaims before they could be refiled in federal court. The 3:41 PM March 23, 2026, timestamp of DIN 280 is the moment jurisdiction transferred to the Sixth District Court of Appeal. Orders DIN 281 and DIN 282 entered March 24 and 25, 2026 — after jurisdiction transferred — are void under Florida Rule of Appellate Procedure 9.020(h). DIN 282 struck Plaintiff's jalousie window photographs directly impeaching the false NFRC window data in the retroactive CoolCalc — entered without jurisdiction, the day after a one-sentence reconsideration denial that misstated its own DIN number. Every dispositive order from DIN 264 through DIN 282 is a default-based order: signed without independent judicial analysis, without engagement with Plaintiff's documented arguments, and in at least one instance with the wrong DIN number identifying the very judgment being reconsidered. The specific content of DIN 281 and DIN 282 confirms the purpose of the post-jurisdictional

sequence. DIN 281, entered March 24, 2026 at 4:35 PM — 25 hours after jurisdiction transferred — denied production of the complete Housecall Pro job file and audit log as moot, expressly using the void DIN 280 reconsideration denial as the basis for mooting the discovery motion; ordered that no evidentiary hearing would be held on reconsideration; and in paragraph 3, in bold capitals, ordered Plaintiff to stop filing supplements or motions to compel or motions for discovery however characterized unless granted leave after an in-person hearing with all parties present — a blanket prior restraint on court access requiring in-person appearance, imposed on a Maine-based ADA-accommodated litigant, without any finding of bad faith or vexatious litigation, entered without jurisdiction. The Housecall Pro audit log is the document that would prove whether the Customer Approved designation was manually entered by Taylor Cellamare on the contractor side — resolving definitively the central contract formation dispute on which the entire judgment rests. Its elimination was not incidental. DIN 282, entered March 25, 2026, at 2:10 PM — 47 hours after jurisdiction transferred — struck with prejudice Plaintiff's Supplement to Motion for Reconsideration, DIN 278, which the order's own title identifies as: Notice Of Filing Photographic Exhibits And Identification Of Fraudulent Entries In Plaintiff's COOLCALC ACC MJ8 Calculation In Further Support Of *Daubert Challenge* To Affidavit Of Albert L. Hoff. DIN 282 therefore eliminated simultaneously: the jalousie window photographs physically proving the CoolCalc NFRC window inputs were false; the documented identification of the five specific CoolCalc falsification categories; and the Daubert challenge to Hoff's affidavit — the only expert opinion supporting the adequacy of the installation, which was based

88

entirely on the fraudulent CoolCalc. DIN 282 repeats the blanket filing restriction from DIN 281 verbatim. The title of Rouse's own strike order — appearing in the official DCA record — contains the words Identification of Fraudulent Entries in Plaintiff's CoolCalc. A Rouse-signed order acknowledging in its own title that the document being suppressed identified fraudulent CoolCalc entries, and striking that document without jurisdiction, is itself part of the official appellate record and cannot be erased from it. The complete post-jurisdictional sequence — DIN 280 through DIN 282 — eliminated the three evidentiary pillars that would have defeated the Final Judgment: the Housecall Pro audit log proving fabricated contract formation, the photographic and analytical evidence proving CoolCalc fabrication, and the *Daubert challenge* to the expert opinion bootstrapped on that fabrication. Each elimination was accomplished using the void DIN 280 as the bootstrap, entered after the court lost jurisdiction, in furtherance of enabling a §45.031 foreclosure sale through which First Charlotte, as the judgment creditor, may credit-bid the judgment amount and acquire Plaintiff's property without paying cash — the economic endpoint the entire four-year scheme was designed to reach.

57a.    The ADA violations and due process denials described herein were systematically insulated from appellate review through a pattern of record suppression spanning multiple hearings and two judges. Powell granted AI assistive technology accommodation on September 25, 2025, then refused to sign a written order — ensuring no enforceable written accommodation order existed. The origin point of the access denial pattern was the November 24, 2025, omnibus hearing, documented in ¶ 56d below.

Powell thereafter appeared without docket authority at the February 6, 2026, hearing — a hearing noticed by Plaintiff on her own dispositive motion — and denied Plaintiff the ability to record the proceedings, constituting the first denial of the accommodation he refused to memorialize and a void ruling by a judge acting without authority. Rouse denied Plaintiff the ability to record the February 23, 2026, hearing — the second consecutive denial at the critical pre-judgment hearing — ensuring no transcript exists of the directives Rouse issued that day, including his direction to produce the memorandum of law that he then ignored. The February 23 hearing minutes do not reflect what Rouse directed. Rouse signed Miller's proposed order the morning after receiving Plaintiff's memorandum and written objection with no acknowledgment of either. Rouse thereafter entered DIN 281 and DIN 282 after jurisdiction had transferred — void orders, with DIN 282 destroying Plaintiff's jalousie window photographs, the direct impeachment evidence of the CoolCalc falsification. At every critical juncture where a reviewable record would have documented a constitutional violation, the record was either not created, denied to Plaintiff, or entered without jurisdiction. Plaintiff's AI-assisted transcript of the September 25, 2025, ADA hearing — produced pursuant to the accommodation Powell granted and submitted to the Sixth District Court of Appeal in writ proceedings — is the only complete hearing transcript in this case and stands as proof of the violations because it was the only hearing at which Plaintiff was permitted to exercise her accommodation before it was systematically denied at every subsequent proceeding.

90

57b.    The September 25, 2025, hearing illustrates the systematic mechanism by which Charlotte County Court denied Plaintiff meaningful access throughout this litigation. The hearing was noticed and set specifically as an ADA accommodation hearing. Plaintiff, a pro se litigant with a court-recognized language-based learning disability, prepared accordingly. What occurred was a combined ADA hearing and full case management conference — covering

mediation status, deposition scheduling, motion backlogs, trial dates, and jury trial waiver issues — for none of which did Plaintiff receive advance notice. A pro se litigant with a language-based learning disability who prepares for a focused ADA proceeding and instead faces an unnoticed case management conference addressing multiple substantive case issues is denied meaningful participation in those proceedings — constituting an independent ADA Title II violation and a due process notice violation under the Fourteenth Amendment. The accommodation grant recorded in DIN 159 consists solely of a checked checkbox next to "ADA Hearing — GRANTED" on a pre-printed county court form. No written order was produced. Powell did not direct the clerk to enter the minutes as the operative order. Powell refused to sign Plaintiff's proposed order submitted September 28, 2025, which memorialized the scope of the grant — AI assistive technology for real-time assistance, audio recording, and transcription — in terms consistent with Powell's own bench statement. Under Florida procedure, a ruling becomes an enforceable order when a judge signs a written order or directs that minutes serve as the operative order. Powell did neither. The checkbox notation in DIN 159

91

creates a one-word official record of a ruling whose scope, terms, and applicability to future proceedings are entirely undefined in any court-generated document. The absence of a signed order was not inadvertent — Powell had Plaintiff's proposed order in hand by September 28, 2025, three days after the hearing, was placed on formal written notice that failure to sign constituted an ADA violation and a due process violation and declined to act. The two formal objections Plaintiff raised during the hearing to the presence of Taylor Cellamare — an adverse party representative — during a confidential ADA proceeding are absent from DIN 159. Powell explicitly acknowledged the second objection on the record: "Your Objection is Noted, Thank You." That acknowledgment does not appear in the official minutes. The timing of the September 25, 2025, hearing in relation to Plaintiff's pending second writ petition before the Sixth DCA is not coincidental. The hearing generated a checkbox entry — "ADA Hearing — GRANTED" — sufficient to present to the appellate court as evidence of judicial responsiveness, while Powell simultaneously ensured the accommodation would have no enforceable effect by refusing to produce a written order, omitting the scope of the grant from the minutes, omitting Plaintiff's formal objections, and converting the noticed ADA hearing into an unnoticed case management conference with an adverse party representative present. The Sixth DCA denied the second writ. The checkbox entry that defeated the writ bore no relationship to the actual proceeding it purported to document. The absence of a signed written order was the direct and foreseeable cause of the recording denials at the February 6, 2026, hearing before Judge Powell and the February 23, 2026, hearing before Judge Rouse — because without an enforceable written order, each subsequent

92

judge faced no binding judicial mandate requiring compliance with the accommodation Powell had granted. The three violations are not isolated incidents; they constitute a single continuing ADA violation originating in Powell's deliberate refusal to produce an enforceable written order on September 28, 2025.

57c.    Plaintiff exhausted state remedies seeking judicial removal through three separate writ petitions to the Sixth District Court of Appeal. The first writ arose from the May 30, 2025, motion hearing at which Plaintiff was the prevailing party. Despite Plaintiff's prevailing status, Powell granted Miller — counsel for the losing party — the authority to draft the order memorializing that hearing outcome. Allowing the losing party's attorney to draft a post-hearing order over a prevailing pro se litigant with a recognized disability established the template that governed order-drafting throughout the remainder of the case, culminating in Rouse signing Miller's proposed Final Judgment on March 5, 2026 — the morning after receiving Plaintiff's written objection identifying specific false statements. Before filing a recusal motion, Plaintiff raised the order-drafting misconduct directly before Powell at the June 26, 2025, case management hearing, DIN 100. Plaintiff presented Powell with the documented sequence showing that DIN 221 — an order Powell had signed — disposed of Miller's own unruled-upon Motion to Strike DIN 199 through the order-drafting mechanism, without Powell ever separately granting it, as confirmed by the certified November 24 transcript. Powell declined to address his own conduct. The official June 26, 2025, hearing minutes, DIN 100, record only scheduling matters — trial period, docket date, mediation — and contain no reference to

93

Plaintiff's objection, consistent with the record-omission pattern documented throughout these proceedings. DIN 100 also reflects the continuing wrong-name pattern: the court's own case management minutes identify the defendant as "DUNN-FISCHER, TERRY" — not Plaintiff's correct legal name — four years into litigation. Powell's affirmative refusal to address the manipulated order when directly confronted constituted ratification of the fraudulent order-drafting scheme at the judicial level. Every subsequent proceeding that relied on DIN 221 as a valid order rested on a foundation Powell was asked to examine and chose to protect. Plaintiff filed a motion to recuse Powell based on his conferral of order-drafting authority on opposing counsel after Plaintiff prevailed. Powell denied his own recusal. Plaintiff filed the first writ. The Sixth DCA denied it. The template was thereby appellate-validated and remained operative through the Final Judgment. The second writ was filed based on accumulated judicial misconduct and was pending before the Sixth DCA at the time Powell convened the September 25, 2025, hearing. As documented in ¶ 56b, that hearing generated a checkbox entry in DIN 159 sufficient to present to the appellate court as evidence of judicial responsiveness while the accommodation was simultaneously rendered unenforceable. The Sixth DCA denied the second writ. Plaintiff thereafter filed a motion to disqualify Judge Powell in the lower court. Powell denied the motion. Under Florida Rule of Judicial Administration 2.330, a judge presented with a legally sufficient disqualification motion cannot rule on its merits — the judge must either grant the motion or transfer it for determination of legal sufficiency only. Powell's denial of his own disqualification motion was itself a procedural violation of Rule 2.330, independent of the underlying grounds. Plaintiff filed

94

a third writ petition based on Powell's improper denial of the disqualification motion. The Sixth DCA denied the third writ. Three separate petitions to the state appellate court, each presenting documented evidence of judicial misconduct, each denied, constitute complete exhaustion of available state remedies and demonstrate that no adequate state remedy exists for the systematic due process and ADA violations described herein. The federal claims presented in this Complaint are not a first resort — they are the only remedy remaining after the state appellate system declined three times to act on documented evidence of constitutional violations at the trial court level.

57d. The November 24, 2025, omnibus motions hearing is the origin point of the coordinated access denial pattern that ran through the February 6 and February 23, 2026, hearings. On October 2, 2025, opposing counsel Miller filed a Notice of Hearing scheduling approximately 20 separate motions for a single 90-minute hearing before Judge Powell on November 24, 2025, at 9:30 a.m. That structure allotted approximately 4.5 minutes per motion, making meaningful argument on any single motion mathematically impossible. The motions listed included DINs 97, 102, 103, 105, 106, 107, 108, 111, 112, 116, 117, 118, 119, 125, 128, 129, 131, 166, 170, 171 and 172. The notice listed only the Charlotte County Justice Center as the place of hearing with no Zoom link, no meeting ID, no password, and no remote access information of any kind, despite Miller having actual knowledge that Plaintiff resided in Maine. The same notice included standard ADA accommodation boilerplate directing persons with disabilities to contact Administrative Services Manager Jon Embury, constituting an acknowledgment

within the same document that ADA accommodation requirements applied, while simultaneously filing a notice that denied Plaintiff any means of remote participation. Among the 20 motions listed was DIN 171, Plaintiff/Defendant's Objection to the September 25, 2025, ADA Hearing, meaning Miller scheduled Defendant's ADA hearing objection#x2019;s Objection to the September 25, 2025 ADA Hearing, meaning Miller scheduled Plaintiff/Defendant's Objection to the September 25, 2025 ADA Hearing, meaning Miller scheduled Defendant's ADA hearing objection#x2019;s ADA hearing objection to be disposed of at a hearing that itself violated Defendant's ADA accommodations. On October 3, 2025, Plaintiff filed an objection to Miller's notice, expressly citing ADA rights and the September 25 accommodation grant. On October 8, 2025, the Court issued an Order Granting Remote Appearance, signed by the court's secretary rather than by Powell, technically granting remote participation but failing to provide the Zoom link, meeting ID, or password necessary to actually access the hearing, rendering the order functionally useless. On November 7, 2025, Plaintiff filed a Motion to Clarify and Produce a Clear Order for ADA Accessibility identifying the deficiency precisely and requesting a judge-signed order specifying all motions scheduled, time, place, duration, and full Zoom access information. Powell never ruled on the October 3 objection or the November 7 Motion to Clarify. The hearing proceeded on November 24 only after Defendant's court reporter's manager#x2019; court contacted Powell's judicial assistant (JA) directly and applied external pressure to obtain a Zoom link. Plaintiff hired her own court reporter and recorded the November 24, 2025, hearing independently, creating the only complete record of that proceeding. At that hearing Powell stated on the

96

record words to the effect of "how dare you work out of state while you have an open case in court", an explicit expression of judicial hostility toward Defendant's profession as a travel nurse, the same profession the contractor knew about before installing a defective HVAC system on a property Defendant needed to sell quickly. Immediately following the November 24 hearing Powell restructured the case management plan to require that all future hearings be conducted in person, knowing Defendant was based in Maine. That restructuring was not a neutral case management decision. It was a targeted retaliatory order designed to make continued meaningful participation economically impossible for a travel nurse working out of state with a court-recognized language-based learning disability. The in-person requirement was thereafter used to resist Defendant's telephonic appearance at the February 6, 2026, hearing, a hearing noticed by Plaintiff on her own dispositive motion, even after Powell appeared at that hearing without docket authority. The November 24 hearing thus established the structural mechanism of exclusion through access restriction that Powell and Rouse employed at every subsequent critical hearing through the entry of the Final Judgment on March 5, 2026. The certified transcript of the November 24, 2025, hearing, produced by Mikulice Reporting Services, Christina Rios, CER, certified March 23, 2026, establishes the following on the official record: (1) Powell acknowledged from the bench that he had not reviewed Miller's Motion to Strike Affirmative Defenses (DIN 97) and had not reviewed Plaintiff's response, stating "I'll be candid. This one slipped by me in preparing for all these things, so I apologize" and "I certainly have not reviewed the response," Tr. 53:3-15, and directed the parties to reset DIN 97 for a separate hearing that was never held before

97

Final Judgment; (2) Powell ruled only on DIN 182 on timeliness grounds, Tr. 44:14-45:12 — he never separately granted Miller's Motion to Strike (DIN 199) as a motion, referencing it at Tr. 46:18-19 only descriptively without adjudicating it, yet Miller's resulting order DIN 221 Item 14 bundled DIN 199 into the denial paragraph as if Powell had granted it, disposing of Miller's own unruled-upon motion through the order-drafting mechanism; (3) Powell explicitly invited both parties to submit proposed orders, Tr. 62:18-20, stating "you're welcome to if you want, also, Ms. Dunn-Fischer," yet Miller's DIN 221, filed five days later, was the order Powell signed without the review he told the parties he would conduct — the wrong year ("2026" instead of "2025") in the title of DIN 221 itself demonstrates the absence of meaningful judicial review before signature; (4) Powell went searching for a prior deadline order that would have made Plaintiff's summary judgment motion untimely and could not find one, concluding on the certified record: "In the absence of any firm deadlines prior to me taking over the case, 'cause I didn't see any — I can't really say, well, that motion's untimely," Tr. 32:12-14, yet the Final Judgment was entered March 5, 2026 while Plaintiff's timely summary judgment motion remained pending without a hearing; (5) the Zoom credentials for the November 24 hearing were transmitted by Powell's judicial assistant exclusively to Plaintiff's independently-retained court reporter — not to Plaintiff directly — confirmed in DIN 224 and the email chain establishing that Plaintiff obtained access only through her court reporter's intervention, not through any court-initiated notice. Furthermore, Miller's statement at the November 24 hearing, Tr. 18:17-19, that he "never told her she couldn't submit a proposed order or prepare an order," is directly contradicted by his email of June

98

26, 2025 at 3:46 PM in which he stated: "I do not recall the judge instructing you to submit an order, nor do the Court minutes reflect that" — a statement made to Plaintiff five months before his denial to Powell, preserved in the documentary record, constituting a false statement of material fact made to the tribunal in violation of Florida Rule of Professional Conduct 4-3.3(a)(1). Additionally, Powell's own judicial assistant, Reena Bozich, identified in her email of June 26, 2025, at 6:23 PM — copied to Miller — that Miller's proposed order submitted June 24, 2025, carried an expired cut-off date of June 19, 2025, stating it "may not be processed thereafter," yet Powell signed that procedurally defective order anyway. That same email from Bozich contains Plaintiff's first formal written ADA notice to Powell's chambers, transmitted June 26, 2025, at 4:51 PM — three months before the September 25, 2025, ADA hearing — identifying her dyslexia as a language-based disability under ADA Title II and requesting "clear direct instruction and written clarification of Orders." Powell's chambers therefore had documented written notice of Plaintiff's disability and accommodation needs from June 26, 2025, extending the ADA violation timeline backward from September 25, 2025, by three months.

57e.    The period from November 29, 2025, through January 20, 2026, documents a coordinated sequence of financial coercion and procedural manipulation directed by Miller and Farr Law Firm against Plaintiff as a documented indigent pro se litigant. On November 29, 2025, Plaintiff filed her Notice of Voluntary Withdrawal of Counterclaim Without Prejudice, DIN 220, recorded in the Charlotte County Official Records as

99

Instrument No. 3595418, formally stating that her damages exceeded the $30,000 county court jurisdictional limit under Florida Statutes § 34.01, that the Circuit Court was the proper forum, and that the withdrawal did not constitute an adjudication on the merits and did not bar refiling in the appropriate court. Miller was served DIN 220 on November 29, 2025 — five days before he filed DIN 221 and ten days before the Second Amended Non-Jury Trial Order — giving him formal written notice that Plaintiff had identified that the federal court as the proper forum for her claims before either of those orders was entered. On December 2, 2025, Miller filed DIN 221 — the order purporting to memorialize the November 24 hearing — drafted by Miller as designated order-drafter, containing the wrong year ("2026") in the title, bundling his own unruled-upon Motion to Strike DIN 199 into item 14 without Powell ever separately granting it, referencing a "DIN 20" that appears nowhere in the certified transcript or Miller's own prior filings, and formally placing the case on the non-jury trial docket — an affirmative case management action that went beyond any bench ruling at the hearing. A direct comparison of the official clerk's handwritten court minutes, DIN 215, against Miller's DIN 221 order reveals a critical discrepancy on the most legally significant ruling of the hearing. The clerk's minutes record Powell's disposition of DIN 97 — Miller's Motion to Strike Plaintiff's Affirmative Defenses — as follows: "Reviews DIN 97, motion denied, motion to strike have not reviewed or response. Request to set for different hearing." The clerk recorded Powell's own admission that he had not reviewed the motion or the response, and his direction to set it for a different hearing. Miller's DIN 221 Item 1 states: "DIN 97 — Plaintiff's Motion to Strike Defendant's Affirmative Defenses is hereby

100

CONTINUED. Plaintiff shall reset its Motion to Strike Defendant's Affirmative Defenses." Miller's drafted order omits Powell's admission of non-review entirely — converting the judge's acknowledgment that he had not read the motion or the response into a neutral scheduling continuance that makes the disposition appear routine rather than documenting that the judge was signing an order on a motion he had not read. This is not a paraphrase. It is a material omission that removed the most legally significant fact Powell stated about DIN 97 from the official order. The clerk's handwritten minutes — the court's own contemporaneous record — contradict Miller's drafted order on this point. DIN 97 was never subsequently reset for hearing and was never ruled upon before the Final Judgment was entered. On December 3, 2025, Plaintiff filed her Defendant's Objection to November 24, 2025 Omnibus Hearing and Request to Strike Resulting Orders for Lack of Notice and Due Process, DIN 224, stating that "a hearing conducted without proper notice is voidable and cannot be the basis for any ruling," explicitly identifying DIN 221 as drafted by Plaintiff's counsel, objecting to its filing, validity, and use for any further purpose, and preserving all objections including notice failures, ADA accommodation failures, denial of procedural due process, judicial bias, and the Court's reliance on Plaintiff's proposed order. Powell never ruled on DIN 224. On December 5, 2025, Wotitzky Mediation Center — a private mediator selected by Miller without Plaintiff's knowledge, consent, or disclosure of the county mediator option — transmitted an invoice to Plaintiff in the amount of $675.00 due December 10, 2025, five days later. Miller arranged this private mediation after receiving DIN 220 establishing Plaintiff had no active claims and after the November 24 hearing at which Powell permitted Zoom

101

attendance for mediation — knowing Plaintiff was in Maine with no nursing income from the forfeited contract caused by the in-person order Miller had drafted. On December 4, 2025, the day before the invoice arrived, Plaintiff filed an Application for Determination of Civil Indigent Status documenting zero net income, $38,000 in total liabilities, and cash on hand of $1,000. On December 5, 2025, Plaintiff filed her Objection to Mediation Fees, formally identifying Miller's arrangement of the private mediator as an intentional misrepresentation creating the appearance of Plaintiff's financial responsibility, invoking Florida Rule 1.700 et seq. and Florida Statutes § 44.102, and attaching the indigency application as Exhibit B. Following Plaintiff's objection and documented indigency, Miller switched to the Charlotte County court-appointed mediator at a cost of $60.00 to his client — the option that had been available throughout. The $675.00 private mediation demand, made on five days notice to a documented indigent litigant who had formally withdrawn her counterclaims and had no active claims in the proceeding, after Miller arranged the mediator without disclosure of the county option or required cost notice, constitutes wrongful use of legal process to impose financial burden under threat of non-compliance with a court-ordered proceeding — an additional predicate act of extortion through legal process consistent with the fraudulent lien filed within 24 hours of Plaintiff's Chapter 558 notice in August 2022. On December 8, 2025 — five days after Plaintiff filed DIN 224 objecting to the November 24 hearing as void and requesting the resulting orders be stricken — Powell entered the Second Amended Order Setting Non-Jury Trial and Mandatory Pre-Trial Conference, containing a mandatory in-person attendance requirement for all hearings and trial on

102

page one and a standard ADA accommodation notice on page seven, without any individualized ADA analysis and without ruling on DIN 224. The internal contradiction between the in-person mandate and the ADA accommodation notice within the same document, entered five days after a documented due process and ADA objection that was never adjudicated, is itself an ADA Title II violation. The complete sequence from November 29, 2025 through December 8, 2025 — DIN 220 formally routing claims to federal court, DIN 221 defectively disposing of Miller's own unruled-upon motions, DIN 224 challenging the hearing as void and never ruled on, the $675 private mediator demand on an indigent litigant, and the mandatory in-person order entered without ADA analysis in response to a due process objection — documents Miller and Farr Law Firm's control of the post-November 24 proceedings and the institutional response to Plaintiff's documented resistance to each successive maneuver.

57f.    The coordinated sequence beginning at the February 23, 2026, hearing and culminating in DIN 281's post-jurisdictional filing bar constitutes a discrete and documented pattern of due process denial, ADA accommodation violation, and judicial predetermination that operates as a complete unit and must be understood as such.

58.    Defendant Miller and Farr Law Firm, as officers of the court, submitted and relied upon contractor-generated instruments bearing the name 'Terry Dunn-Fischer' with actual and constructive knowledge that those instruments did not bear the legal name of the property owner of record. The deed to 820 Conreid Drive NE is recorded in the Charlotte County Official Records in the name Terry Lynn Dunn-Fischer. The Charlotte

County Property Appraiser and Tax Collector records for the parcel reflect Terry Lynn Dunn-Fischer as owner of record — public records accessible online. Miller had no fewer than two independent publicly accessible county record systems confirming the correct legal name before submitting a single instrument to the court. His submission of instruments bearing the incorrect name as evidence of a binding contract, without disclosing the discrepancy, constitutes fraud on the court in violation of Florida Rules of Professional Conduct 4-3.3(a)(1), 4-3.3(a)(3), 4-8.4(c), and 4-8.4(d). The complete fraud on the court was accomplished through a three-stage litigation scheme: Stage One — file as breach of contract to avoid Chapter 713 lien validity scrutiny, because the lien was invalid and a Chapter 713 action would have required defending it immediately; Stage Two — when Plaintiff filed a dispositive motion challenging the absence of a valid contract, introduce a fabricated Housecall Pro Customer Approved theory after discovery closed, because without a contract the entire case collapsed; Stage Three — having survived on a breach of contract theory, draft the proposed Final Judgment not as a money judgment consistent with that theory but as a full Chapter 713 foreclosure judgment with a §45.031 sale mechanism, credit-bid provision, and Certificate of Title authority, none of which were demanded in the complaint or available under a breach of contract pleading. Appellee knew its lien was invalid so it filed breach of contract. It knew its contract was invalid so it fabricated one. It knew a money judgment was insufficient so it took a foreclosure judgment it never had the right to seek. The entire judgment — from the theory it was built on to the remedy it delivers — rests on fraud. Additionally, the Final Judgment is entered against Terry Dunn-Fischer for property titled

in Terry Lynn Dunn-Fischer — two legally distinct names. The Clerk cannot issue a Certificate of Title conveying property owned by Terry Lynn Dunn-Fischer on the basis of a judgment against Terry Dunn-Fischer. The foreclosure sale mechanism is unenforceable on its own terms. Miller compounded this fraud through two additional acts in the proposed Final Judgment, DIN 264. First, the underlying complaint filed by Farr Law Firm attorney Hudson on October 10, 2022, was pleaded as a breach of contract action — not a Chapter 713 lien foreclosure action — a deliberate pleading choice made to avoid Chapter 713's lien validity requirements, unlicensed contractor bar, and 60-day enforcement window triggered by Plaintiff's Notice of Contest of Lien. Despite pleading breach of contract, Miller's proposed Final Judgment, which Rouse signed verbatim, grants full Chapter 713 foreclosure relief: a foreclosure sale under Florida Statutes § 45.031, a superior Lien on the property, attorney fees under § 713.29, and a Certificate of Title mechanism. A judgment cannot grant relief unavailable under the pleading as filed. Miller obtained foreclosure remedies through a breach of contract pleading that was specifically structured to avoid the statutory framework that would have barred those remedies — representing to the court that foreclosure was an available remedy when the pleading he filed did not support it. Second, Miller's proposed Final Judgment at paragraph 18 recited that Plaintiff's Motion to Strike DIN 243 "was denied by the Court on February 23, 2026" — disposing of a timely filed, noticed, pending motion through opposing counsel's proposed order language, with no separate order, no transcript, and no independent judicial record of adjudication, while simultaneously arguing untimeliness to the court without disclosing that DIN 243 was filed four days after service. These acts,

105

individually and collectively, constitute fraud on the court extending from the date of the original filing through the entry of the Final Judgment on March 5, 2026.

First — the recording denial as the mechanism. The accommodation Powell granted on September 25, 2025, explicitly covered in-person hearings. Powell's exact words were: "if we have an in-person hearing in the court, to bring a device, laptop, whatever electronic assistance you want to bring using artificial intelligence, you're more than welcome to do that." The February 23, 2026, hearing before Rouse was an in-person hearing. Miller was present at both the September 25, 2025, accommodation grant and the February 23, 2026, hearing where Rouse denied recording. Miller cannot claim he was unaware of the accommodation's scope — he was present in the courtroom when Powell explicitly authorized AI assistive technology at in-person hearings and said nothing. Rouse's denial of recording at the February 23 in-person hearing was therefore a direct denial of an accommodation Powell had explicitly authorized for in-person hearings in language so clear that Miller, who was present at both hearings, could not claim any ambiguity about its scope. At the February 23, 2026, hearing Rouse denied Plaintiff the ability to record the proceedings — a direct denial of the AI assistive technology accommodation reflected in DIN 159. No court reporter was present. The February 23 hearing minutes at DIN 259 do not reflect what Rouse directed. The recording denial ensured that what Rouse did next occurred entirely off the record.

Second — the sua sponte fee direction in the unrecorded gap. Rouse raised attorney fees sua sponte — on a matter not on the hearing notice, not raised by any party,

not grounded in any pleading — before hearing a single argument on the merits. This is confirmed by Miller's own March 3, 2026, cover letter: "You requested the legal authority to award Plaintiff its attorneys' fees and costs in this action." Miller did not raise fees. The court raised them for Miller before hearing any merits. The ADA recording denial is the mechanism that made this predetermination unverifiable from the official record.

Third — the disinterested attorney affidavit condition was never satisfied. Miller's March 3 cover letter states in future tense: "I will file a separate motion for attorney's fees supported by affidavits, including an affidavit from a disinterested attorney." The affidavit did not exist when Miller asked Rouse to sign the proposed Final Judgment. Rouse signed the fee award anyway the morning after receiving Plaintiff's written objection at DIN 263 identifying this deficiency.

Fourth — the concealed $42,000 fee demand. At mediation on January 30, 2026, Miller disclosed that attorney fees exceeded $42,000. Miller's March 3 cover letter to Rouse does not disclose this figure. Rouse signed a fee award without knowing the total recovery sought exceeded $54,000 on an $8,863 claim — more than six times the amount in controversy.

Fifth — the March 6 docket call and the absence of any behavioral basis for a filing restriction. On March 6, 2026, Plaintiff appeared on the scheduled docket call confirmed at DIN 265. Rouse acknowledged her presence politely, noted he had ruled the day before, and Plaintiff acknowledged his ruling and departed. That two-minute

interaction was the only in-person contact Rouse ever had with Plaintiff before entering the filing bar eighteen days later. Plaintiff was not defiant. She was not disruptive. She was procedurally correct. There was no behavioral basis for treating her as a vexatious filer requiring a blanket pre-filing injunction. Judge Powell — who presided over this case for more than a year during which Plaintiff filed extensively — never entered a blanket filing restriction. The only judge who entered one was Rouse — eighteen days into his involvement.

Sixth — the supplements Rouse never read. Between March 8 and March 15, 2026, while the lower court retained jurisdiction and Plaintiff's Motion for Reconsideration remained pending, Plaintiff filed three supplements in direct support of that motion: DIN 268 on March 8 — the Housecall Pro supplement; DIN 274 on March 11 — the Motion to Compel the complete Housecall Pro audit log; and DIN 278 on March 15 — the CoolCalc photographs directly challenging the Hoff affidavit. All three were filed before Rouse denied reconsideration on March 23. None were filed after his ruling. Rouse denied the Motion for Reconsideration at DIN 280 without acknowledging any of the three supplements — proving he did not read the motion or the docket before ruling.

Seventh — the filing bar entered on a factual misreading of the docket. Rouse denied reconsideration with prejudice on March 23 without recognizing that three supplements were pending in support of that motion. Believing — incorrectly — that those filings postdated his ruling, he entered a blanket filing bar at DIN 281 on March 24.

108

DIN 268 was filed March 8 — fifteen days before his denial. DIN 274 was filed March 11 — twelve days before. DIN 278 was filed March 15 — eight days before. Every filing he reacted to predated his ruling. The filing bar was entered without jurisdiction, without required findings, based on a factual error as to the dates of the filings it purported to address, against a pro se litigant with court-recognized ADA accommodations.

Eighth — the bifurcation trap. Rouse created the bifurcated fee track — Track 2 — sua sponte on February 23 without hearing any merits. He then denied Track 1 reconsideration with prejudice on March 23, conflating Track 1 closure with Track 2 closure. He then entered a filing bar that effectively barred Plaintiff from participating in the Track 2 fee proceedings he himself had created. A judge cannot create a bifurcated fee proceeding and simultaneously bar the affected party from filing anything in that proceeding. That is a trap, not a judicial act.

Ninth — the void cleanup orders confirming non-review. After entering the filing bar on March 24 — after jurisdiction had transferred — Rouse entered two additional void post-jurisdictional orders. DIN 281 denied the Motion to Compel Housecall Pro records. DIN 282 struck DIN 278 with prejudice — the photographic evidence proving the CoolCalc falsification and implicating Charlotte County. The selective striking of county-implicating photographic evidence while leaving contractor-only evidence untouched — without jurisdiction — is consistent with institutional protection of county liability. The convergence of the summary judgment termination and the void evidentiary striking orders is significant when viewed against the complete factual background. The

CoolCalc falsification evidence struck by DIN 282 is the same evidence that would have exposed Charlotte County's August 8, 2022, conduct to jury scrutiny. County officials had known since September 2023 that the CoolCalc was the evidentiary foundation of active litigation and had chosen institutional silence rather than correction. When that evidence finally surfaced in DIN 278 in March 2026 — after Plaintiff independently discovered it outside the discovery period the county's concealment had foreclosed — it was struck by a void order entered without jurisdiction. Judicial immunity protects judges from damages claims for judicial acts. Judges Powell and Rouse are identified as material witnesses rather than defendants in this action. However, judicial immunity does not prevent the judicial conduct from being evaluated as part of the broader factual pattern establishing that the constitutional violations documented herein were protected through a sequence of governmental and judicial acts that together ensured no jury ever examined the evidence of those violations. The state court did not just make errors. It terminated the case before trial, conferred order-drafting authority on the party that benefited from the violations, adopted the benefiting party's proposed orders verbatim, and entered void orders without jurisdiction that struck the specific evidence most damaging to a named federal defendant. That pattern — from McStravic's August 8, 2022, affirmative acts through Rouse's March 25, 2026, void order striking the evidence of those acts — is the spine of the federal complaint. The county created the conditions for the litigation. The county concealed its role for four years. The court terminated the case before the evidence could reach a jury. And the void post-jurisdictional orders ensured the evidence

was struck from the lower court record before the appellate court could evaluate it in context. Federal court under 42 U.S.C. § 1983 exists precisely for circumstances in which this convergence of governmental and institutional conduct deprives a citizen of constitutional rights that state court proceedings could not or did not protect.

Tenth — the complete sequence as a constitutional violation. The ADA accommodation Powell refused to memorialize in writing → the recording denial ensuring no transcript of the sua sponte fee direction → the sua sponte fee direction confirmed by Miller's own cover letter → the verbatim proposed Final Judgment signed the morning after Plaintiff's written objection → the Motion for Reconsideration denied without reading three pending supplements → the void DIN 281 filing bar entered on a factual misreading of the docket → the void DIN 281 denying the Housecall Pro compel → the void DIN 282 striking the CoolCalc photographs → the Motion for Leave filed June 3, 2026 just to request a hearing the lower court ignored for seventy-one days → constitute a single continuous due process violation, a single continuous ADA Title II violation, and multiple RICO predicate acts. Each element enabled the next. A constitutional violation that is architecturally self-concealing — where the mechanism of violation is also the mechanism that prevents proof of the violation — is not a series of errors. It is a designed system.

## CAUSES OF ACTION

### COUNT ONE

42 U.S.C. § 1983 — Fourteenth Amendment Due Process — Monell Liability

111

Against Defendant Charlotte County, Florida

59.     Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

60.     At all times material, Charlotte County maintained a building and permitting system with no identity verification mechanism to confirm that permit applicants were the licensed qualifying agents they purported to represent — confirmed by the ADMIN ADMIN automated issuance system. Charlotte County Code Enforcement displays notice that unlicensed contracting is a felony, establishing institutional knowledge that unlicensed contracting causes harm.

61.     Charlotte County's own permit record for Permit No. 20220729013 correctly identifies the property owner as DUNN-FISCHER TERRY LYNN while the system accepted every contractor-generated document bearing the incorrect name without flagging the discrepancy — demonstrating the system's failure to cross-reference its own ownership data.

62.     Charlotte County received at least ten documented written and verbal contacts from Plaintiff across four years to five named officials at multiple levels of authority, none of which resulted in corrective action. The earliest of these contacts, beginning in August 2022, put the county on notice that the installed system did not function properly and did not meet code. Plaintiff did not discover, and was therefore unable to provide the county with written notice of, the underlying permit fraud — the misclassification, the retroactive CoolCalc submission, and the five categories of falsified

data — until 2025, following her own independent investigation. Once discovered, Plaintiff formally communicated those findings to the county, including in her March 16, 2026, §489.129 complaint to Contractor Licensing and DBPR identifying the five CoolCalc falsification categories. McNulty's July 14, 2025, official written admission — issued by Charlotte County's Building Official himself — does more than admit the misclassification. It describes Charlotte County's official institutional policy for handling permit misclassifications, and that policy description is the Monell predicate.

McNulty stated: "The department required the contractor/applicant to submit additional documentation to amend the permit as is allowed by the Florida Building Code." McNulty is the Building Official — a policymaking position. When a policymaker describes how his department handles a category of permit problem, he is describing official institutional policy. His use of "the department required" — not "we required in this case" — confirms standard institutional practice.

The policy has three elements: First — a contractor can file a misclassified permit to avoid mandatory pre-installation documentation requirements. Second — when the misclassification is discovered during inspection, the county will allow the contractor to submit the required documentation retroactively. Third — the county will pass the inspection based on that retroactive submission without requiring physical corrections and without any mechanism to verify that the submitted documentation accurately reflects the actual conditions of the installed system.

That third element — the absence of any verification mechanism — is the constitutional defect. A policy allowing retroactive documentation submission with no mechanism to confirm accuracy enables contractors to launder fraudulent documentation through official governmental approval. Once the county places its institutional imprimatur on a fraudulent document that document becomes effectively immune from challenge in subsequent proceedings.

Applied to Plaintiff's case the policy produced the following documented result. First Charlotte filed a Level 1 replacement permit to avoid the Manual J requirement. The August 5 failed inspection triggered the Level 2 reclassification. Consistent with its established policy, Charlotte County required documentation submission. First Charlotte submitted a CoolCalc on August 8, 2022, containing five categories of materially false entries all understating the actual cooling load. Charlotte County's policy contained no mechanism to verify the accuracy of that submission. The county accepted it and passed the inspection on August 10. No physical corrections were ever made. The county's own August 10 comment states: "Additional information was submitted to the Building Office and approved" — acknowledging that a document submission, not physical corrections, was the sole basis for approval.

The downstream causal chain is direct and documented. The fraudulent CoolCalc acceptance became the basis for closing Permit No. 20220729013. The closed permit became the basis for Hoff's expert affidavit. Hoff's affidavit became Final Judgment paragraph 15. The Final Judgment became the instrument for a §45.031 foreclosure sale

against Plaintiff's paid-off property. One county policy. One fraudulent document. One governmental acceptance with no verification. Four years of litigation. A foreclosure judgment against Plaintiff's property.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is liable under §1983 when a constitutional deprivation results from an official policy or custom that is the moving force behind the violation. McNulty identified the policy in writing. The permit record documents its application. The five falsification categories prove the policy had no accuracy verification. McNulty's July 2025 institutional ratification — "Our inspector verified that the work performed under this permit met those requirements, and the permit was properly closed" — proves the policy was never corrected across four years. Charlotte County is liable under Monell for the constitutional deprivation caused by that policy.

Additionally, Charlotte County official Tom Atkinson advised Plaintiff on August 3, 2022, to give formal Chapter 558 notice to the contractor. Plaintiff followed that advice. First Charlotte's response was to file the retaliatory Lien within 24 hours. Charlotte County's own official set in motion the statutory clock the contractor weaponized against Plaintiff — and that same official was assigned four years later as the investigator for Plaintiff's formal contractor licensing complaint against the same contractor. Plaintiff formally objected to Atkinson's assignment on conflict of interest grounds on March 17, 2026. That objection is in the official record. This is institutional bad faith and an additional Monell predicate.

63.     The County Attorney's September 27, 2023, letter explicitly acknowledged Plaintiff's civil rights violation allegations and stated the county 'has no such process in place to address your complaints' — an admission that Charlotte County provided no due process mechanism for constitutional claims, itself constituting a constitutional violation. Stasio's September 27, 2023, letter addressed workmanship concerns, contract validity, lien rights, Notice of Commencement defects, and various fraud allegations. It did not address — in any form, in any sentence — the retroactive CoolCalc submission, the August 8 permit reclassification, the county's acceptance of a document containing materially false entries as the basis for passing the August 10 inspection, or Charlotte County's responsibility for the governmental validation that became the evidentiary cornerstone of four years of litigation. Stasio confirmed she reviewed the pending foreclosure case No. 22000945CC and county staff responses. She addressed every allegation pointing at contractor liability and omitted every allegation pointing at county liability. A county attorney who reviews a complaint package containing specific allegations of fraudulent permit misclassification and retroactive documentation submission and writes a response letter that never once mentions the CoolCalc, has made a deliberate litigation decision — identifying county liability and declining to address it — while simultaneously closing the administrative matter that would have provided Plaintiff a non-litigation remedy.

The coordinated pattern across all three county responses documents institutional concealment. McNulty admitted the misclassification and described the retroactive

documentation policy. Bailey defended it and issued a final refusal. Stasio closed the administrative matter without mentioning the CoolCalc at all. Three officials. Three responses. Three levels of authority. All avoiding the same issue. All protecting the same institutional liability across four years.

Stasio's concealment caused direct and specific harm to Plaintiff's ability to defend herself. If Stasio had disclosed in September 2023 what the county knew from August 8, 2022 — that the inspection failed because the permit was misclassified, that McStravic reclassified it to Level 2, that R403.7 required a Manual J, and that the inspection was passed based on a retroactive document submission — Plaintiff would have had that information in September 2023. She would have known to request the CoolCalc from the county permit file. She would have had the document during the discovery period running through December 31, 2025. She would have had two years and three months to conduct discovery on the CoolCalc — to depose McStravic, to subpoena internal county communications, to retain an HVAC engineering expert, and to challenge Hoff's affidavit before summary judgment was decided. Instead Plaintiff discovered the CoolCalc falsification categories through her own independent research in 2026 — as she explicitly stated to Bailey on March 18, 2026: "This issue was not raised in 2023 because I had not yet discovered it." She presented that evidence for the first time in DIN 278 on March 15, 2026 — after discovery closed, after the Final Judgment was entered. Rouse then struck DIN 278 through void post-jurisdictional DIN 282 — eliminating from the lower court record the evidence Plaintiff had no opportunity to present during discovery because the

117

county concealed its basis for four years. The county's concealment cost Plaintiff the discovery timeline, the expert testimony, and the evidentiary foundation for her defenses during the period when they could have changed the outcome. That is §1983 causation from the concealment itself — independent of the harm from the fraudulent approval. Charlotte County did not just approve a fraudulent document. It concealed the fraudulent approval long enough to ensure that by the time Plaintiff discovered it, the procedural mechanisms for challenging it had expired.

Stasio's administrative closing letter compounded the concealment by actively misdirecting Plaintiff toward an inapplicable remedy. The letter referred Plaintiff to consumer rights protections without identifying any of the following: that the permit misclassification documented in Charlotte County's own permit history voided the agreement under Florida's illegality doctrine; that Florida Statute §553.84 gives any person damaged by a Building Code violation a private right of action against the responsible contractor for the specific violations — §110.1 unauthorized work, §R403.1 no pre-construction Manual J, and §R403.3.3 no duct leakage test — each of which is documented in Charlotte County's own permit record; that the contractor's own estimate on its first line states the home has never had a central system — directly contradicting the replacement permit classification the county accepted; that DBPR disciplinary action under §489.129(1) was available for the contractor's willful disregard of applicable building codes; or that the mandatory pre-construction documentation package — Manual J, Manual S, and Manual D — was required to be submitted with the permit

118

application before the permit was issued and was never submitted. Consumer rights protections do not address void contracts, void permits, or §553.84 private rights of action arising from Building Code violations. The specific legal consequences of the permit misclassification — the consequences that would have given Plaintiff the legal framework to challenge the foreclosure action filed one year before Stasio's letter — were never identified in the county's official administrative response despite being fully documented in the county's own permit record, which Stasio confirmed she had reviewed. The County Attorney's decision to refer Plaintiff to an inapplicable general consumer remedy while withholding the specific statutory framework that applied to her situation — including the private right of action under §553.84 that would have given Plaintiff affirmative damages claims against First Charlotte for the Building Code violations — is not a legal error. It is a documented institutional choice by the county's highest legal officer to protect the county from the liability exposure that would follow from acknowledging that its own permit acceptance practices enabled unauthorized work on Plaintiff's residential property. Plaintiff holds a court-recognized language-based learning disability, DIN 159. A county official who knows a property owner has a disability affecting her ability to independently research and identify complex statutory frameworks, and responds to her documented complaint with a general consumer rights reference instead of identifying the specific statutory remedies that apply, has failed the meaningful access obligation under ADA Title II and Tennessee v. Lane, 541 U.S. 509 (2004). The consumer rights referral was not guidance. It was misdirection — documented in an official closing letter that terminated the administrative pathway while

119

pointing Plaintiff away from every legal remedy that would have exposed the county's role in what happened.

64.    Charlotte County's deliberate indifference deprived Plaintiff of her property interests without due process of law, in violation of the Fourteenth Amendment. Plaintiff sustained damages including four years of carrying costs, the lost 2022 peak market sale opportunity, corrective HVAC costs, and all litigation costs.

## COUNT TWO

42 U.S.C. § 1983 — Conspiracy Under Color of Law

Against Defendants McStravic, Bailey, First Charlotte, Taylor Cellamare, and Darlene Cellamare

65.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

66.    Defendant McStravic, acting under color of state law as Deputy Building Official, acted in concert with the contractor defendants to retroactively validate a defective installation. On August 8, 2022 — the same date the CoolCalc appeared in the county system — McStravic simultaneously reclassified the permit and directed finalization without requiring compliance. His comment 'No additional work being done for customer. Please finalize inspection' demonstrates approval was based on document submission, not physical corrections.

67.     Defendant Bailey, acting under color of state law as Community Development Director and Building Official, affirmatively responded to Plaintiff's August 19, 2022 notice by denying receipt of her August 11 email sent to the identical address — an affirmative act to undermine documented notice of permit fraud.

68.     This coordinated action under color of law deprived Plaintiff of property interests without due process, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. Plaintiff sustained damages as described in Count One.

## COUNT THREE

Americans with Disabilities Act, Title II — 42 U.S.C. § 12132

Against Defendant Charlotte County, Florida

69.     Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

70.     On September 25, 2025, Judge Powell granted Plaintiff's ADA accommodation from the bench, as reflected in the official hearing minutes DIN 159 — the ADA Accommodation Ruling — recognizing Plaintiff's language-based learning disability and authorizing AI assistive technology at all hearings and court proceedings. Powell thereafter refused to reduce that ruling to a written signed order despite Plaintiff's submission of a proposed order consistent with his bench ruling — constituting an independent ADA violation by nullifying an accommodation through refusal to memorialize it. The ADA Accommodation Ruling, DIN 159, constitutes judicial

acknowledgment of Plaintiff's qualified disability status. Tennessee v. Lane, 541 U.S. 509 (2004).

71.    Charlotte County violated the ADA Accommodation Ruling on at least eight documented occasions: (a) order refusal — Powell granted the accommodation from the bench on September 25, 2025 but refused to sign a written order memorializing his own ruling despite Plaintiff's submission of a proposed order on September 28, 2025, leaving the accommodation unenforceable as a formal judicial act; (b) November 24 access denial — Miller created the November 24, 2025 omnibus hearing notice without Zoom or telephonic access, targeting a Maine-based pro se litigant with a recognized disability; Powell never ruled on Plaintiff's Motion to Clarify or Motion to Appear Telephonically; Zoom access was obtained only after Plaintiff's court reporter's manager applied direct pressure to Powell's judicial assistant; Powell then expressed explicit judicial hostility toward Plaintiff's travel nursing profession on the record and immediately restructured case management to require all in-person hearings — a retaliatory order targeting a Maine-based disabled pro se litigant; (c) Powell recording denial — at the February 6, 2026 hearing, Powell appeared without docket authority and denied Plaintiff the ability to record the proceedings — a direct denial of the AI assistive technology accommodation he had granted on September 25, 2025 — ensuring no complete transcript exists of that unauthorized hearing; (d) confidentiality violation — Taylor Cellamare, an adverse party representative, was present during discussion of Plaintiff's ADA accommodations at the February 6, 2026 hearing, violating the

confidential nature of ADA accommodation proceedings; (e) hearing access — the February 6 transcript was confirmed 'hard to hear' by opposing counsel documenting Plaintiff's unaddressed hearing access difficulty; (f) physical presence order — Powell issued an in-person appearance order at the February 6 hearing without ADA analysis, directly contradicting his own September 25 bench ruling; (g) Rouse recording denial — at the February 23, 2026 pre-summary-judgment hearing, Judge Rouse denied Plaintiff the ability to record the proceedings, a direct denial of the accommodation reflected in DIN 159, ensuring no complete transcript exists of the directives Rouse issued that day; (h) economic harm — Plaintiff forfeited a Maine nursing contract, broke a lease, lost a security deposit, and incurred travel costs as a direct result of the retaliatory in-person order. The pattern of access denial originating at the November 24, 2025, hearing and running through recording denials at two consecutive critical hearings by two separate judges — Powell on February 6 and Rouse on February 23 — constitutes a systemic institutional denial of Plaintiff's accommodation rather than isolated procedural rulings. Plaintiff documented the September 25, 2025, ADA hearing through an AI-assisted transcript produced pursuant to the accommodation granted at that hearing — the only complete hearing transcript in this case — submitted to the Sixth District Court of Appeal in writ proceedings and thereby made part of the official appellate record.

## COUNT FOUR

Fraud and Fraudulent Inducement

Against Defendants Darlene Cellamare, First Charlotte, Taylor Cellamare, Joseph Cellamare, and Roger H. Miller III

72.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein. Pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).

73.    Darlene Cellamare falsely represented to Plaintiff that the company was licensed in response to Plaintiff's direct question. The representation was false. Plaintiff relied on it and entered the transaction.

74.    Hudson's paragraphs 7 and 8 falsely represent that the CoolCalc preceded equipment selection. The county's August 8, 2022, timestamp destroys this representation. Paragraph 10 falsely states Plaintiff signed the NOC on July 13 — destroyed by the July 11 email confirming the July 12 signing.

75.    Miller represented Plaintiff 'clicked approved' on the estimate generating an automatic Customer Approved designation. The platform record shows $8,853.00 vs. Miller's stated $8,863.00 — a $10.00 discrepancy proving manual entry, not automatic generation. The profile was created in Plaintiff's incorrect legal name without her participation.

76.    These misrepresentations were made knowingly, with intent that Plaintiff rely upon them, causing direct economic harm.

## COUNT FIVE

Florida Statutes § 117.105 — False Notarization

Against Defendant Carmen C. Thompson

77.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein. Pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).

78.    On July 13, 2022, Thompson notarized the Notice of Commencement, OR Book 5018, Page 473, certifying Plaintiff personally appeared before her. Plaintiff visited First Charlotte's office once and only once — on July 12, 2022 — to sign the Notice of Commencement during her lunch break, as confirmed by the July 11, 2022, email to Taylor Cellamare scheduling that visit. Plaintiff was not present before Thompson on July 13 or any other date. The contractor arranged the notarization without Plaintiff's appearance, participation, or knowledge.

79.    The permit history for Permit No. 20220729013 proves the sequence with documentary precision. The county's own condition entry reads verbatim: "UPLOAD NOC. THEN, EMAIL ONLINEPERMITTING@CHARLOTTECOUNTYFL.GOV TO HAVE LOCK REMOVED" — confirming that upload of the NOC was the county's own precondition for permit lock release, with no requirement that the NOC be notarized before upload. Charlotte County official Jill Barber released the permit lock on July 12, 2022 — the same day Plaintiff visited and signed — upon receipt of the uploaded unnotarized NOC. The NOC was recorded in official records on July 14, 2022, at 9:17 AM. Thompson's notarization stamp records "this 13 day of July" — the day after the permit lock was released using the unnotarized document, and the day before recording. This sequence establishes that First Charlotte uploaded the NOC without notarization on

July 12 to unlock the permit, then had Thompson stamp it on July 13 without Plaintiff present, before recording on July 14. The Claim of Lien (INSTR #3136320), a separate instrument, was notarized by Gayle Lube (Commission #GG 316657) and identifies "Document produced by: Taylor Cellamare, Office Manager" on its notary page — confirming Taylor Cellamare's direct role in producing the contractor instruments used in this case, separate from Thompson's false notarization of the NOC.

80.     The notarization block records 'Terry Dunn-Fischer' — not Plaintiff's legal name of Terry Lynn Dunn-Fischer — demonstrating no government-issued identification was examined. Defendant Roger H. Miller III, having accessed the Charlotte County permit file on six documented occasions during litigation, never attached the NOC to any court filing. Attaching the NOC would have revealed the July 14, 2022 recording stamp which, compared against the permit history's July 12 unlock entry and the county's own verbatim condition "UPLOAD NOC. THEN, EMAIL ONLINEPERMITTING@CHARLOTTECOUNTYFL.GOV TO HAVE LOCK REMOVED," proves that the county released the permit lock on an unnotarized document before Thompson's July 13 stamp — the precise sequence that establishes the false notarization. The Claim of Lien (INSTR #3136320) and Contractor's Final Payment Affidavit were each notarized by Gayle Lube (Commission #GG 316657) — a separate notary from Thompson — and represent distinct fraudulent instruments in the same scheme. Thompson's false notarization of the NOC constitutes a violation of § 117.105 and caused Plaintiff harm through recording of a fraudulent instrument used as the

foundation of lien rights asserted in four years of state court proceedings, while simultaneously clouding title on Plaintiff's property.

## COUNT SIX

Florida Statutes §§ 489.128 and 489.119 — Unlicensed Contracting — Void Contract

Against Defendants First Charlotte, Taylor Cellamare, Darlene Cellamare, and Joseph Cellamare

80.     Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

81.     Florida Statutes § 489.128 provides that contracts entered into by an unlicensed contractor are unenforceable in law or equity. § 489.119 requires that a licensed qualifying agent personally supervise and be responsible for all work. CAM Bradford Homes, LLC v. Arrants, 2025 WL 1715893 (Fla. 5th DCA 2025).

82.     Every contracting function was performed by unlicensed persons. Joseph Cellamare, the licensed qualifying agent, signed no contract, performed no load calculation, conducted no supervisory inspection, and exercised no qualifying agent authority. His license was used in name only. His June 2022 site visit establishes actual knowledge of the conditions that made his subsequent abdication harmful.

83.    The contract is void and unenforceable under §§ 489.128 and 489.119 and

Earth Trades, Inc. v. T&G Corp., 108 So. 3d 580 (Fla. 2013). Plaintiff is entitled to

rescission and recovery of all sums paid.

## COUNT SEVEN

Florida Deceptive and Unfair Trade Practices Act — § 501.201 et seq.

Against Defendants First Charlotte, Taylor Cellamare, and Darlene Cellamare

84.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set

forth herein.

85.    Defendants engaged in the following deceptive and unfair trade practices:

(a) falsely representing to Plaintiff that the company was licensed; (b) creating a

Housecall Pro platform profile in Plaintiff's incorrect legal name without her knowledge

or consent and presenting a fabricated 'Customer Approved' designation; (c) failing to

disclose that three material components — Honeywell thermostat, Honeywell air filter

box, and 5kW heating element — were not installed; (d) failing to disclose the system

was sized for contractor inventory rather than the property's thermal requirements; (e)

filing a Claim of Lien within 24 hours of a statutory Chapter 558 defect notice as a

coercive collection instrument; (f) filing the permit as Level 1 Replacement to avoid the

Manual J load calculation requirement that a proper new installation designation would

have triggered, when the licensed agent's own June 2022 site visit established the

professional obligation to produce such calculations; (g) creating all contractual

documents in an incorrect legal name without verified identity and then attempting to

enforce those documents as a binding integrated contract. These practices occurred in trade or commerce and caused actual damages.

85a. The deceptive and unfair trade practices described herein were directed at a consumer with a documented language-based learning disability. Plaintiff's dyslexia was disclosed on the official court record on December 6, 2023, in a certified hearing transcript before Judge Bell — with Miller present and listening — establishing actual notice of Plaintiff's disability to both the court and Miller from December 2023 forward. Plaintiff formally requested ADA accommodation in June 2025 and received judicial recognition of her disability at DIN 159 on September 25, 2025. Notwithstanding this notice, Defendants engaged in the following disability-targeted deceptive practices: (a) Creating a Housecall Pro contractor-side platform profile in Plaintiff's incorrect legal name without identity verification — bypassing the documentation review process required for informed consent by a consumer with a language-based learning disability; (b) Filing a retaliatory Claim of Lien within 48 hours of Plaintiff's statutory Chapter 558 defect notice against an out-of-state disabled consumer on a travel nursing assignment — before any passing inspection — exploiting the practical barriers facing a disabled pro se litigant separated from her property by geography; (c) Using a contractor-controlled electronic platform to create what First Charlotte claimed was a binding electronic contract without Plaintiff's identity verification, without ensuring Plaintiff saw the Terms and Conditions, and without the licensed qualifier's involvement; (d) Miller's December 6, 2023 statement before Judge Bell suggesting Plaintiff's legal research may have

involved ChatGPT — a factually false suggestion when Plaintiff was not using AI at any point in 2023 and did not discover AI as an assistive tool until July 2025 — made four minutes before Plaintiff disclosed her dyslexia on the same certified record, constituting a misrepresentation to a judicial officer designed to undermine the independent manual legal research of a pro se litigant with dyslexia. Under FDUTPA courts examine whether a business took unfair advantage of a consumer's specific vulnerabilities. The documented pattern constitutes predatory practices targeting a consumer's documented disability in violation of Florida Statute §501.204.

## COUNT EIGHT

18 U.S.C. § 1962 — Federal Civil RICO

Against Defendants First Charlotte, Taylor Cellamare, Darlene Cellamare, Joseph Cellamare, Carmen C. Thompson, McStravic, Miller, and Farr Law Firm

86.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein. Pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).

87.    The Enterprise. Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), operating for the common purpose of conducting unlicensed HVAC contracting under cover of Joseph Cellamare's license, enforcing payment for defective work through fraudulent instruments, fabricating documentation to conceal the defective and unlicensed nature of the work through the litigation phase, and ultimately acquiring investment properties through a lien-to-foreclosure pipeline in which the HVAC installation serves as the entry point and the

§45.031 foreclosure sale serves as the exit. The enterprise targets properties with characteristics that make them valuable acquisition candidates: cash-purchased investment properties whose owners may be out of state, properties without existing central air conditioning that justify a new installation invoice, and owners whose financial position or geographic distance makes sustained litigation economically exhausting. The mechanism: an unlicensed installation is performed and fails inspection; a fraudulent retroactive load calculation is submitted to cure the inspection failure and create governmental validation; a lien is filed within hours of the statutory defect notice to cloud title and prevent sale; the action is filed as breach of contract rather than Chapter 713 lien foreclosure to avoid statutory lien validity scrutiny; years of litigation exhaust the property owner financially; a foreclosure judgment is obtained on a void contract; the owner, rendered indigent by years of lost equity access and litigation costs, cannot redeem within three days of the sale date; and the contractor credit-bids the judgment amount under the Final Judgment's paragraph 38 provision, acquiring the property without paying cash and extinguishing the owner's equity entirely. The $8,863 invoice was never the economic objective. The property was.

88.    Pattern of Racketeering Activity. Defendants engaged in a pattern of racketeering activity including: 88(a). Wire Fraud — 18 U.S.C. §1343 — Seven Documented Predicate Acts:

Predicate One: July 5, 2022 — Housecall Pro estimate transmission. Taylor Cellamare transmitted the two-page estimate by interstate text message without

disclosure of Terms and Conditions, without identity verification, without the licensed qualifier's involvement, and without disclosing that viewing the estimate would be characterized as creating a binding electronic contract.

Predicate Two: July 5, 2022 — Customer Approved designation. Taylor Cellamare manually entered the Customer Approved designation on the contractor side of the Housecall Pro platform without Plaintiff's participation. Plaintiff never created a Housecall Pro account. The wrong name "Terry Dunn-Fischer" proves no identity verification occurred. Miller's own Exhibit A to the Stay Response shows Taylor Cellamare created Job #356230, converted Estimate #2301 to Job #356230, and scheduled the job — all contractor-side actions — and the approval was recorded before Plaintiff's text response was sent. Plaintiff's texts "But I have some questions" and "Please have someone call me" immediately preceding any approval prove no unambiguous assent. This contractor-side entry is the only basis for Miller's Housecall Pro theory — introduced for the first time on December 31, 2025, two years and twenty-five days after a certified December 6, 2023, hearing before Judge Bell at which Miller argued contract formation for nineteen minutes without mentioning Housecall Pro once. Three independent legal bars operate simultaneously: equitable estoppel because Plaintiff was prejudiced by the three-year concealment; judicial estoppel because the theory contradicts First Charlotte's own complaint paragraph 9 and the December 6, 2023, hearing position; and statutory voidness under §489.128 and Earth Trades regardless of formation theory.

Predicate Three: July 14, 2022 — ERECORDED Notice of Commencement, OR Book 5018, Page 473. Wire transmission of a falsely notarized instrument. Carmen Thompson certified Plaintiff's physical presence when Plaintiff was not present. The wrong name "Terry Dunn-Fischer" in the notary block proves no identification was examined. Thompson was a First Charlotte employee notarizing an instrument that directly benefited her employer — an interested party notarization void under §117.107(7).

Predicate Four: August 4, 2022 — ERECORDED Claim of Lien, OR Book 5029, Pages 1487-1488, Instrument No. 3136320. Wire transmission of a Lien executed by Darlene Cellamare as "Manager" without corporate officer authority — confirmed by the 2022 Annual Report showing Darlene listed as "MANAGER" only — and produced by Taylor Cellamare as documented on the face of the recorded instrument. The May 22, 2026, sworn supplemental evidence at DIN 303 authenticates the corporate record modification sequence proving the execution defect.

Predicate Five: August 4, 2022 — First Charlotte email. Wire communication falsely representing that Plaintiff had approved the estimate through a verified customer process when the approval was entered unilaterally by Taylor Cellamare on the contractor side — confirmed by Miller's own Exhibit A.

Predicate Six: August 8, 2022 — CoolCalc submission to Charlotte County through online permit portal. Charlotte County's own Building Official confirmed in writing July 14, 2025: "The permit in question was applied for and issued online" —

establishing the interstate wire transmission. The submitted document contained five categories of materially false entries all understating the actual cooling load: (a) wrong weather station — Venice Pier, Sarasota County coastal station used instead of correct Charlotte County inland station, producing a lower design temperature for a property in a Charlotte County inland flood zone where the ground-level outdoor unit is subject to flooding risk and elevated humidity that a coastal station cannot capture; (b) nonexistent wall insulation — R-11 cavity insulation claimed when zero insulation exists; (c) NFRC-rated windows falsely listed when actual windows are approximately sixty-year-old jalousie-style louvered units that cannot be NFRC rated by definition; (d) nonexistent floor insulation — R-10 slab insulation claimed when none exists; (e) attic and ceiling category entirely omitted — the single largest heat gain factor in any Florida residential structure. Every falsification works in the same direction — downward — understating the cooling load. Not one input was wrong in a direction that would have required a larger system. This is not error. It is a document engineered backward from a predetermined equipment selection to a calculation that would justify it. The submission violated Florida Statute §817.535 — a third-degree felony for knowingly filing any instrument containing materially false statements with a public entity affecting an owner's interest in real property. Note: §817.535(6) excludes fraudulent construction Liens governed by §713.31 but does not exclude the CoolCalc permit document. Case law: *Viyella Co. v. Gomes*, 657 So. 2d 83 (Fla. 3d DCA 1995); *Delta Painting, Inc. v. Baumann*, 710 So. 2d 663 (Fla. 3d DCA 1998); *Hobbs Construction & Development, Inc. v. Presbyterian Homes*, 440 So. 2d 673 (Fla. 1st DCA 1983).

Predicate Seven: May 18, 2026 — Miller's electronic filing of the Stay Response with Exhibit A to the Sixth DCA. Miller submitted a document that disproves his own contract formation theory while simultaneously arguing that theory. His own Exhibit A shows: (1) Taylor transmitted "Approval received" before Plaintiff's "Ok..ty" response — approval was recorded before Plaintiff's text was sent; (2) Plaintiff expressed questions and requested a call immediately prior — proving no unambiguous assent; (3) the platform log shows Taylor created the job, converted the estimate, and scheduled the installation — all contractor-side actions. Miller submitted this exhibit without personal knowledge of the July 5, 2022, transaction — his own page 17 admission states he did not work on the case until August 2023. Predicate Eight: August 9, 2022 — Taylor Cellamare's interstate text message transmission. Taylor transmitted by interstate text message: "Terry, everything has been validated and is correct. The inspection will be completed tomorrow." This transmission was made on August 9, 2022, when: (a) the county had administratively accepted the CoolCalc on August 8 based on document submission without physical verification; (b) no inspector had returned to the property since the August 5 failed inspection; (c) no physical corrections had been made to the defective installation; (d) no duct leakage test had been performed; (e) the physical reinspection was not scheduled until August

10 — the following day. Taylor transmitted a materially false statement — that the submitted documentation had been validated as correct for Plaintiff's specific property — through interstate wire communication, with actual knowledge that the county had

accepted the CoolCalc administratively without physical verification, that no inspector had compared the CoolCalc inputs against the actual conditions of the property, and that the mandatory duct leakage test had not been performed. The transmission was made to prevent Plaintiff from investigating or objecting to the fraudulent administrative acceptance while it was being finalized. This constitutes wire fraud under 18 U.S.C. §1343: a materially false statement transmitted by interstate wire in furtherance of the scheme to pass a permit on a defective installation without physical correction or mandatory testing. Predicate Eight is preserved on Plaintiff's original device in airplane mode and authenticated by Plaintiff's sworn Affidavit.

Predicate Nine: February 6, 2026 — Miller's contradictory statements to Judge Powell in certified hearing transcript (DIN 283/284). At the certified February 6, 2026, hearing, Miller made two irreconcilable statements about the estimate delivery mechanism within the same proceeding. At page 7 of the transcript, Miller stated: "That was sent to her via contractor scheduling system and invoicing system called Housecall Pro... and appears to be in the form of a text." At page 9, Miller stated: "she also clicked approved on the estimate, which sent that customer approved estimate number 2301 for 8863.00, which was automatically sent to First Charlotte AC & Refrigeration." These statements cannot both be true. An estimate delivered in the form of a text has no clickable approval mechanism. The only approval mechanism on the Housecall Pro platform requires accessing the platform through a customer account — an account Plaintiff never created, as established by her sworn discovery response filed November

15, 2025, and her Authentication Affidavit at paragraphs 9 through 13. Miller's statement that the approval was "automatically" generated at $8,863.00 is additionally false — the platform record shows $8,853.00, a $10.00 discrepancy that proves the entry was manual, not automatic, directly contradicting his sworn statement to the court. A materially false statement transmitted to a judicial officer in a court proceeding — that a customer clicked to approve an estimate that Miller simultaneously described as appearing to be in the form of a text — constitutes fraud on the court and a predicate act under 18 U.S.C. §1341 and §1343. Additionally, at page 11 of the same transcript, Miller argued to Powell that material factual disputes existed sufficient to defeat Plaintiff's motion for summary judgment. Seventeen days later, Miller argued to Judge Rouse that no material factual disputes existed to support his own Motion for Summary Judgment on the identical record. *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1066 (Fla. 2001). Miller's contradictory positions constitute judicial estoppel barring summary judgment in his favor and an additional predicate act of fraud on multiple tribunals in furtherance of the enterprise's scheme to obtain a foreclosure judgment on a void contract.

(b) Mail Fraud — 18 U.S.C. § 1341: the Claim of Lien (OR Book 5029, Pages 1487–1488, INSTR #3136320) signed by Darlene Cellamare as Manager and produced by Taylor Cellamare as Office Manager — as documented on the face of the recorded instrument — and the NOC bearing incorrect names and fabricated notarization, were recorded through the Charlotte County electronic recording system; the Contractor's Final Payment Affidavit (OR Book 5031, signed August 19, 2022, notarized by Gayle

Lube, Commission GG 316667) falsely swore under oath that all work had been "fully completed" seventeen days after installation and nine days after a reinspection that passed only upon submission of the fraudulent retroactive CoolCalc — constituting a false sworn statement filed in the official public record; (c) Extortion — 18 U.S.C. § 1951: the scheme employed two documented acts of wrongful use of legal process as financial coercion instruments. First, the Claim of Lien filed within 24 hours of Plaintiff's Chapter 558 defect notice, before any passing inspection, while maintaining the lien through breach of contract proceedings rather than statutory lien enforcement, constitutes wrongful use of legal process to obtain payment under threat of four years of continued title clouding. Second, on December 5, 2025, Miller arranged a private mediator billing Plaintiff $675.00 due in five days without disclosure of the available county mediator option at $60.00 to his client, without required cost notice, and after receiving DIN 220 establishing Plaintiff had no active claims — directed at a documented indigent litigant whose Application for Determination of Civil Indigent Status showing zero net income was filed December 4, 2025 — constituting wrongful use of court-ordered mediation process to impose financial burden under threat of non-compliance with a judicial order. Following Plaintiff's objection and filed indigency application, Miller switched to the county mediator at $60.00, confirming the $675.00 private mediator selection was a financial pressure tactic, not a billing preference; (d) Wire Fraud (Additional Predicate) — 18 U.S.C. § 1343: on June 26, 2025 at 3:46 PM, Miller transmitted by electronic mail the statement "I do not recall the judge instructing you to submit an order, nor do the Court minutes reflect that" — a materially false statement transmitted in interstate

138

commerce to deprive Plaintiff of her prevailing party right to draft the May 30, 2025 hearing order — directly contradicted by three independent sources: (i) the official May 30, 2025 court minutes, DIN 96, which expressly state "Miller to prepare" — the court's own written record of the direction Powell gave that Miller's June 26 email claimed was never given; (ii) Powell's certified November 24, 2025 transcript at Tr. 62:18-20, in which Powell invited both parties to submit proposed orders; and (iii) Miller's own false repetition of this denial to Powell's face at the November 24, 2025 hearing, Tr. 18:17-19 — constituting wire fraud in furtherance of the order-drafting control scheme; (e) Obstruction — 18 U.S.C. § 1503: the retroactive CoolCalc fabrication and its acceptance into the official record obstructed Plaintiff's ability to establish the installation was defective and unlicensed; Miller's upload of six Job-Card documents into the county permit system during active litigation on June 18, 2025 obstructed the integrity of the official record; Miller's drafting of DIN 221 to include disposition of his own unruled-upon Motion to Strike DIN 199 — without Powell ever separately granting it as confirmed by the certified transcript — obstructed Plaintiff's jury trial rights through the order-drafting mechanism rather than through adjudication; on June 26, 2025, Plaintiff appeared at case management hearing DIN 100 before Powell and directly raised the manipulated DIN 221 — presenting Powell with the documented sequence showing his own signed order disposed of Miller's unruled-upon motion through the order-drafting mechanism — and Powell affirmatively refused to address his own conduct; the official DIN 100 minutes record only scheduling and contain no reference to Plaintiff's objection; Powell's refusal to correct DIN 221 when directly confronted constitutes judicial

ratification of the obstructive scheme, extending the obstruction timeline to June 26, 2025; (f) Fraud on the Court — Additional Predicate — Suppression of DIN 243 and False Untimeliness Representation: On December 31, 2025, Miller filed First Charlotte's Motion for Summary Final Judgment (DIN 240). On January 3, 2026 — within four days of service — Plaintiff filed a timely Motion to Strike DIN 240 (DIN 243), challenging the procedural validity and legal sufficiency of the summary judgment motion on its face. DIN 243 was included in the notice of hearing for the February 23, 2026, pre-judgment hearing before Judge Rouse, giving both parties and the court formal advance notice that DIN 243 was scheduled for adjudication at that hearing. At the February 23 hearing, Plaintiff was denied the ability to record the proceedings; no court reporter was present; no complete transcript of the hearing exists; and the February 23 hearing minutes do not reflect the adjudication of DIN 243, the arguments made, or the independent judicial basis for any ruling. Miller thereafter submitted a proposed Summary Final Judgment — DIN 264 — to Judge Rouse, who signed it on March 5, 2026, the morning after receiving Plaintiff's written objection identifying false statements. That proposed order states at paragraph 18 that DIN 243 "was denied by the Court on February 23, 2026" — the sole memorialization of any ruling on DIN 243 in the entire record, inserted by Miller into his own proposed order, with no separate order on DIN 243, no transcript confirming independent adjudication, and no hearing minutes reflecting its disposition. Simultaneously, Miller argued to the court orally at the February 23 hearing and in writing in the proposed Final Judgment at paragraphs 17 through 22 that Plaintiff's

response to the summary judgment motion was untimely — having been filed more than 40 days after service — without ever disclosing to the court that DIN 243 was filed four days after service, was timely, was noticed for that very hearing, and was pending before the court at the time of that argument. Miller had actual knowledge of DIN 243's existence, timeliness, and pendency: he was served with it, it appeared on the same hearing notice he was aware of, and he was present in the courtroom when it was scheduled to be heard. The suppression of DIN 243's timeliness from the untimeliness argument — while simultaneously inserting a denial of that same motion into the proposed Final Judgment — constitutes a materially false and misleading representation to the tribunal in violation of Florida Rule of Professional Conduct 4-3.3(a)(1), and obstruction of Plaintiff's due process right to independent adjudication of a timely filed motion, in furtherance of obtaining a final judgment on a void contract supported by fabricated documentation. The ADA recording denial at the February 23 hearing — which ensured no transcript exists of what actually occurred regarding DIN 243 — is the mechanism that made this suppression unverifiable from the official record, establishing a coordinated sequence between the denial of Plaintiff's recording accommodation and the insertion of a false adjudication into the proposed Final Judgment; (g) Default-Based Orders and Void Post-Jurisdictional Acts — Systemic Denial of Independent Judicial Review: The foregoing pattern of obstruction and fraud on the court was completed and confirmed by the entry of a series of default-based orders, each of which bears the signature of a judicial officer who did not read the record before signing. The Summary

141

Final Judgment in Foreclosure, DIN 264, signed March 5, 2026, was adopted verbatim from Miller's proposed order the morning after receiving Plaintiff's written objection identifying specific false statements, with no citation to any legal authority, no engagement with Plaintiff's arguments, no acknowledgment of the unlicensed contracting bar under §489.128, no acknowledgment of the CoolCalc timestamp, and no acknowledgment of Hudson's paragraph 9 judicial admission — errors that a judge who read the file could not have committed simultaneously. On March 23, 2026, Judge Rouse signed the Order Denying Motion for Reconsideration, DIN 280, filed at 3:41 PM. That order identifies the Final Judgment as "DIN 26" rather than DIN 264 — twice, with the court's own clerk flagging the error with a (sic) notation — demonstrating that Rouse did not read the order he signed. The entirety of the court's legal analysis is a single sentence: "There is no basis in law or fact to reverse the Summary Final Judgment In Foreclosure in Favor of Plaintiff, First Charlotte A.C. & Refrigeration, Inc. [DIN 264]." No citation to any legal authority. No engagement with any argument Plaintiff raised in her motion for reconsideration — including the CoolCalc fabrication evidence, the Housecall Pro platform fabrication, the wrong legal name running through every contractor-generated instrument, the unlicensed contracting bar, or the pleading/remedy mismatch. The dispositive ruling is "DENIED WITH PREJUDICE" — claim-preclusion language applied to a motion for reconsideration, which is a procedural vehicle, not a claim — constituting a legally incoherent ruling that either reflects a judge who does not understand the procedural terminology he is applying or a deliberate attempt to

manufacture a res judicata defense against Plaintiff's withdrawn counterclaims and the facts supporting them before they could be refiled in federal court. The DIN 280 denial at 3:41 PM on March 23, 2026, is the moment jurisdiction transferred to the Sixth District Court of Appeal. Orders DIN 281 and DIN 282 — entered March 24 and 25, 2026, respectively — were entered after that jurisdictional transfer and are void under Florida Rule of Appellate Procedure 9.020(h). DIN 282 struck Plaintiff's jalousie window photographs — the physical impeachment evidence of the five CoolCalc falsification categories — after the court had lost jurisdiction to act. The complete sequence from DIN 264 through DIN 282 constitutes a coordinated series of default-based orders that individually and collectively denied Plaintiff independent judicial review of a four-year record of unlicensed contracting, fabricated documentation, and institutional concealment — in furtherance of the enterprise's goal of laundering a void contract into an enforceable foreclosure judgment through the state court system.

88(e). Fee Accumulation Strategy: On October 11, 2023, Miller filed the first Motion for Attorney's Fees at DIN 52 based on Bell's September 14, 2023, judgment. Bell vacated that judgment on November 2 and 3, 2023, at DIN 58 and 59. Miller did not withdraw DIN 52. On December 6, 2023, Miller appeared before Bell and argued that fees were extensive and caused by Plaintiff's filings — without disclosing to Bell that his pending fee motion at DIN 52 had lost its legal basis when Bell vacated the underlying judgment. That material omission to a judicial officer — planting the fee narrative with Bell the month after Bell ruled in Plaintiff's favor while concealing the evaporation of the

fee basis — is a predicate act in furtherance of the fee accumulation scheme. The fee strategy was operational from October 2023 — not February 2026 — and survived the vacation of the first judgment through deliberate narrative-building across two judges.

88(f).  Miller's Six Permit Accesses During Active Litigation: Miller or someone at Farr Law Firm accessed the Charlotte County permit file for Permit No. 20220729013 six times during active litigation. A public record accessed once yields all available information. Six separate accesses is evidence of monitoring, downloading, or investigating — consistent with awareness that the permit contained evidence dangerous to the litigation position and active management of that evidence base during proceedings.

88(g).  ChatGPT Misrepresentation: At the December 6, 2023, hearing before Judge Bell (certified transcript, Lucie Masi, CSR, December 17, 2023), Miller stated: "I'm not sure if there's ChatGPT involved or what." Plaintiff was not using AI in December 2023. Plaintiff discovered AI as an assistive tool in July 2025. Powell formally authorized AI as a reasonable ADA accommodation at DIN 159 on September 25, 2025. Miller's December 2023 suggestion was a factually false statement to a judicial officer, made four minutes before Plaintiff disclosed her dyslexia on the same certified record, designed to undermine the independent manual legal research of a pro se litigant with a language-based learning disability. This is fraud on the court documented in a certified transcript.

144

88(h). Housecall Pro Theory Concealment — Estoppel: First Charlotte concealed the Housecall Pro contract formation theory for three years and eighty-two days. During that period First Charlotte filed a complaint that did not mention the platform, argued contract formation before Judge Bell in December 2023 without mentioning the platform, conducted discovery without producing platform records, and allowed Plaintiff to conduct her entire defense without knowledge that a, platform approval would be claimed as the mechanism

of contract formation. The motion to compel the Housecall Pro audit log filed at DIN 274 was denied in void post-jurisdictional DIN 281. The void denial has no legal effect. The three-year concealment of the Housecall Pro theory is itself a RICO predicate act in furtherance of the scheme to defraud Plaintiff of her property.

89.     Continuity. The predicate acts span from July 5, 2022, through at least June 18, 2025 — more than three years — satisfying the closed-period continuity requirement.

90.     Causation. Plaintiff's business and property were injured by reason of Defendants' RICO violations. RICO damages are trebled pursuant to 18 U.S.C. § 1964(c), and Plaintiff is entitled to attorney fees.

## COUNT NINE

42 U.S.C. § 1983 — Fourteenth Amendment Equal Protection — Systematic Unequal Treatment of Pro Se Litigant with Documented Disability

Against Charlotte County, Florida, and Defendant Roger H. Miller III

91.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

92.    The Fourteenth Amendment's Equal Protection Clause prohibits state actors from treating similarly situated litigants differently without rational basis, and prohibits systemic procedural discrimination that denies meaningful access to court proceedings. A pattern of differential treatment — in which a

represented party's submissions are adopted without scrutiny while a pro se litigant's filings are consistently ignored — constitutes an equal protection violation when combined with documented disability-based access barriers. *Tennessee v. Lane*, 541 U.S. 509 (2004). Throughout the state court proceedings, Plaintiff's filings were consistently ignored or unread while opposing counsel's submissions were adopted without scrutiny: DIN 243 denied on its face; a 73-page memorandum directed by the court never acknowledged on the record; five filings submitted between February 26 and March 4, 2026 ignored before the Final Judgment was signed; Judge Powell characterized Plaintiff's Maine presence as abandonment without acknowledging her documented travel nurse status; Judge Rouse signed Miller's proposed Final Judgment the morning after receiving Plaintiff's written objection identifying false statements; Powell signed Miller's DIN 221 — which disposed of Miller's own unruled-upon motion — without the review he promised both parties at the November 24 hearing; and the court omitted Plaintiff's formal objections from official minutes at multiple proceedings while fully recording opposing counsel's positions.

93.    This pattern, combined with the systematic ADA accommodation violations documented in Count Three, establishes that Plaintiff — a pro se litigant with a court-recognized disability — was subjected to a two-track system in which represented parties received procedural protection and pro se filings received structural disadvantage, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Charlotte County's failure to correct this pattern despite documented notice constitutes deliberate indifference to equal protection rights. Miller's exploitation of the differential treatment — including his drafting of orders that disposed of his own unruled-upon motions and his submission of a proposed Final Judgment containing false statements the morning after Plaintiff's written objection — constitutes knowing participation under color of law in a scheme to deny equal access to the judicial process, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment.

## COUNT TEN

Florida Statutes § 713.31 — Fraudulent Lien and Abuse of Process

Against Defendants First Charlotte, Taylor Cellamare, Darlene Cellamare, and Joseph Cellamare

94.    Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

95.    The Claim of Lien, OR Book 5029, Page 1488, Instrument No. 3136320, was filed August 4, 2022 — within 24 hours of Plaintiff's Chapter 558 statutory defect notice (given on Atkinson's own advice) and within 48 hours of her written defect notice

— before any passing inspection, while First Charlotte held Plaintiff's written dispute of completion. The Lien was executed by Darlene Cellamare as 'Manager' without corporate authority, produced by Taylor Cellamare as documented on its face, and notarized by Gayle Lube with a blank date. It willfully includes a claim for work not properly performed. Critically, Plaintiff never paid First Charlotte any amount. No payment was made, no payment was demanded and refused, and no enforceable payment obligation existed under any valid contract at the time the Lien was filed. Florida's mechanic's lien statute exists to protect contractors who have performed work and have not been paid. At the time of filing, First Charlotte had performed defective work that had failed inspection, had received a formal written defect notice, and had not been owed any payment that was due and unpaid under any enforceable contract. A Lien filed before payment is owed, before inspection passes, and before any enforceable obligation exists is not a legitimate security instrument — it is a preemptive cloud on title. The DBPR declined to investigate Plaintiff's §489.129 complaint because no payment had been made, confirming that the lien's filing before payment defeated the regulatory mechanism designed to protect consumers from exactly this conduct. The use of a preemptive lien to prevent refinancing, lock Plaintiff to the property, defeat regulatory jurisdiction, and create the instrument for a §45.031 foreclosure credit-bid acquisition — filed within 24 hours of a statutory defect notice on a void contract by an unlicensed person — constitutes a fraudulent lien under § 713.31, entitling Plaintiff to damages including attorney fees and punitive damages, and abuse of process through improper use of the lien mechanism as a property acquisition instrument rather than a collection device. The

148

additional actual damages flowing from the fraudulent lien include four years of uninsured property exposure in a Florida hurricane zone — the property has never carried insurance from the date of purchase, and the fraudulent lien's prevention of sale, refinancing, and equity access has perpetuated that uninsured condition through the present date, with Hurricane Ian's direct strike on Charlotte County on September 28, 2022 occurring while the property sat uninsured and encumbered by a lien filed 54 days earlier before any payment was owed. The conscious disregard demonstrated by filing a preemptive lien on an uninsured property, pursuing four years of litigation to keep that property uninsured and unsaleable, and then engineering a credit-bid foreclosure acquisition of that same uninsured property with a defective HVAC system inside it — constitutes intentional misconduct satisfying Florida's punitive damages standard under § 713.31 and supports the maximum punitive award the evidence will sustain.

## COUNT ELEVEN

15 U.S.C. § 7001 et seq. (Federal E-SIGN Act) and Florida Statutes § 668.50 — Fabricated Electronic Signature

Against Defendants First Charlotte, Taylor Cellamare, and Roger H. Miller III

96.     Plaintiff realleges and incorporates paragraphs 1 through 58 as if fully set forth herein. Pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).

97.     The federal E-SIGN Act and Florida Statutes § 668.50 require that electronic signatures reflect the actual electronic act of the person whose signature is

149

purported. A manually-entered 'Customer Approved' designation on a contractor platform does not constitute a valid electronic signature of the customer.

98.    Plaintiff never created a Housecall Pro account, never completed the platform's customer verification process, and encountered the platform login wall preventing access. The profile was created in the name 'Terry Dunn-Fischer' — not Plaintiff's legal name — without her knowledge, participation, or consent. The platform's 'Customer Approved' designation was entered manually on the contractor side, as confirmed by the $10.00 discrepancy between the platform record ($8,853.00) and Miller's stated amount ($8,863.00).

99.    The fabricated Customer Approved designation was used in state court proceedings as evidence of Plaintiff's assent to a five-page integrated contract — a theory advanced after discovery closed, inconsistent with Hudson's paragraph 9 judicial admission, and premised on a record the county permit system shows was uploaded by user 'miller' during active litigation. The use of a fabricated electronic record to support a false contract theory constitutes a violation of the E-SIGN Act and § 668.50 causing direct harm.

## TOLLING OF STATUTES OF LIMITATIONS

100.    This complaint is filed on July 1, 2026 — four days before the four-year anniversary of July 5, 2022, the date Taylor Cellamare transmitted the estimate by interstate text message and entered the contractor-side "Customer Approved" notation, constituting the first predicate act of the scheme described herein. All claims in this

complaint are timely filed within the applicable four-year limitations period without resort to any tolling doctrine. Federal Civil Rights Claims under 42 U.S.C. § 1983 borrow Florida's four-year statute of limitations for personal injury actions. The following five independent tolling doctrines provide additional grounds for timeliness as to any individual act for which a defendant may assert a limitations defense:

101.    Continuing Violation Doctrine. Defendants' conduct constitutes a continuing pattern from July 2022 through at least March 18, 2026 — Bailey's final written refusal to act — and June 18, 2025 — Miller's upload of documents into the county permit system. Each new act in furtherance of the scheme resets the limitations period. On March 18, 2026, Plaintiff explicitly placed Charlotte County on formal notice of this issue 'within the applicable limitations period' in writing to Bailey, who issued his final refusal the same day.

102.    Discovery Rule. Plaintiff could not have discovered the full extent of coordinated institutional misconduct — including the five CoolCalc falsification categories — until documented through her own research during litigation. The five categories were formally presented in the Supplement to Motion for Reconsideration filed March 15, 2026, and in the formal §489.129 complaint of March 16, 2026.

103.    Fraudulent Concealment. The retroactive CoolCalc was created without a face date, deliberately concealing its retroactive creation. The contractors' failure to disclose the unlicensed nature of the operation constituted affirmative concealment.

104.   Equitable Tolling. Plaintiff is a pro se litigant with a court-recognized ADA accommodation for a language-based learning disability who has been actively and diligently pursuing her rights throughout the limitations period.

105.   Abeyance. Plaintiff requests this Court hold claims in abeyance, to the extent appropriate, pending resolution of Sixth DCA Case No. 6D2026-0615.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Terry Lynn Dunn-Fischer respectfully requests that this Court enter judgment against Defendants, jointly and severally as applicable, and award the following relief:

A.   Compensatory damages for all economic harm, including: four years of property carrying costs on a property rendered unsaleable, un-refinanceable, thus "FROZEN and CLOUDED" in the top of the housing market of 2022, by a fraudulent Lien filed before any payment was owed; the lost 2022 peak Southwest Florida market sale opportunity, the difference between the 2022 peak market value and current market value being a direct calculable loss caused by the August 4, 2022 fraudulent lien; the cost of EZE Air corrective work; forfeited Maine nursing income from Plaintiff's full-time State of Maine nursing position, broken Maine lease costs, lost security deposit, and travel and relocation costs for Plaintiff, her daughter, and her grandson caused by Powell's retaliatory in-person order and deliberate refusal to rule on Plaintiff's Zoom motions — all documented in Plaintiff's sworn Affidavit in Support of Application for Indigent Status filed in the Sixth District Court of Appeal, including credit card debt

approaching the $8,000 limit as a direct result of those losses; all litigation costs; and four years of uninsured property exposure — the property at 820 Conreid Drive NE, Port Charlotte, Florida 33952 has never carried property insurance from the date of purchase, the short-term cash investment having been converted by First Charlotte's fraudulent lien into a four-year legal dispute that prevented the sale, refinancing, or equity access that would have allowed insurance to be maintained, leaving an uninsured property in a Florida hurricane zone with a defective HVAC system installed by unlicensed workers running inside it since August 2, 2022; Hurricane Ian made direct landfall in Charlotte County on September 28, 2022 — seven weeks after installation and 54 days after the fraudulent lien was filed — exposing the uninsured property to catastrophic casualty loss during an active hurricane strike on the county; any casualty damage sustained by the property during the period of uninsured exposure caused by the fraudulent lien is recoverable as consequential damages flowing directly from the lien defendants' conduct;

B. RICO treble damages pursuant to 18 U.S.C. § 1964(c) on all economic damages attributable to RICO violations, including trebling of: four years of property carrying costs; the lost 2022 peak Southwest Florida market sale opportunity; the cost of EZE Air corrective work; forfeited Maine nursing income, broken lease costs, lost security deposit, and travel costs caused by the retaliatory in-person order; and the full market value of the property at 820 Conreid Drive NE, Port Charlotte, Florida 33952, in the event First Charlotte acquires the property through a credit-bid at §45.031 foreclosure sale — the economic endpoint the enterprise's four-year scheme of unlicensed

153

contracting, fraudulent lien, fabricated documentation, and judicial misconduct was designed to reach, in which a contractor who installed a defective HVAC system on a property for $8,863 acquires that property at foreclosure auction by crediting the inflated judgment amount against its bid, without paying cash, extinguishing Plaintiff's equity entirely;

C. Punitive damages under Florida Statutes § 713.31 for fraudulent lien — a lien filed within 24 hours of a statutory defect notice, before any payment was owed, before any passing inspection, by an unlicensed person, on a void contract, deliberately structured to defeat DBPR regulatory jurisdiction, lock Plaintiff to an uninsured property in a Florida hurricane zone, and create the instrument for a credit-bid property acquisition; punitive damages under Count Four for intentional fraud — Darlene Cellamare's false licensing representation, the fabricated retroactive CoolCalc, and the false Final Payment Affidavit each constitute intentional misrepresentation satisfying Florida's punitive damages standard of intentional misconduct or conscious disregard; the installation of a defective HVAC system in a property that has never carried insurance, by unlicensed workers, followed by four years of litigation designed to acquire that same uninsured property through credit-bid foreclosure, constitutes conscious disregard of the highest order;

D. Statutory damages under FDUTPA, § 501.201 et seq.;

154

E.  Non-economic damages for four years of emotional distress, dignitary harm arising from constitutional violations, and consequential damages for ADA accommodation violations;

F.  Attorney fees pursuant to 42 U.S.C. § 1988 on all § 1983 claims;

G.  Attorney fees pursuant to Florida Statutes § 713.31 on the fraudulent lien claim;

H.  Attorney fees pursuant to Florida Statutes § 489.128 for unlicensed contracting;

I.  Attorney and court cost fees pursuant to FDUTPA, § 501.213;

J.  Declaratory relief that the contract is void and unenforceable under Florida Statutes §§ 489.128 and 489.119;

K.  Declaratory relief that the Claim of Lien, OR Book 5029, Page 1488, Instrument No. 3136320, is fraudulent and void under Florida Statutes § 713.31;

L.  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Terry Lynn Dunn-Fischer hereby demands a trial by jury on all issues so triable.

## DECLARATION UNDER PENALTY OF PERJURY

I, Terry Lynn Dunn-Fischer, the Plaintiff declare under penalty of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief, and that I prepared this Complaint with the assistance of AI technology pursuant to court-recognized ADA Accommodation DIN 159."

The reference to 28 U.S.C. § 1746 is important — that's the federal statute that makes this declaration carry the same legal weight as a notarized oath without requiring a notary. It's the standard federal declaration language used by pro se filers and attorneys alike.

The ADA accommodation reference at the end is also worth keeping — it documents on the face of the complaint itself that AI assistance was authorized, which preempts any future challenge to the document's preparation method.

Respectfully submitted, this __1st__ day of July 2026.

_____

Terry Lynn Dunn-Fischer

Pro Se, Plaintiff

ADA Accommodation Ruling, DIN 159

820 Conreid Drive NE

Port Charlotte, FL 33952

(941) 977-9010

dunnfischer@aol.com